```
                    UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA


    ***********************************************************
    UNITED STATES OF AMERICA              CRIMINAL NO. 22-77
                                          SECTION "L"
    VERSUS                                NOVEMBER 12, 2024

    HENNESSY DEVON COOPER ZELAYA
    AND RUDY JACKSON HERNANDEZ
    ***********************************************************
           TRANSCRIPT OF JURY TRIAL DAY ONE OF FIVE
        HEARD BEFORE THE HONORABLE ELDON E. FALLON
               UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

FOR THE UNITED STATES:          CARTER K. D. GUICE, JR.
                                carter.guice@usdoj.gov
                                U.S. Attorney's Office
                                650 Poydras Street
                                Suite 1600
                                New Orleans, Louisiana 70130
                                (504)680-3037


                                RAMI SHAWKY BADAWY
                                rami.badawy2@usdoj.gov
                                USDOJ
                                1301 New York Avenue NW
                                Suite 1263
                                Washington, D.C. 20005
                                (202)365-6001


                                KATHARINE ANN WAGNER
                                katharine.wagner@usdoj.gov
                                Human Rights and Special
                                Prosecutions Section
                                Criminal Division,
                                U.S. Department of Justice
                                1301 New York Avenue NW
                                Washington, D.C. 20530
                                (202)514-4584


                    OFFICIAL TRANSCRIPT

FOR HENNESSY DEVON COOPER          JAMES R. WASHINGTON, III
ZELAYA:                            jwashington@
                                   attorneyjameswashington.com
                                   James R. Washington, III, LLC
                                   650 Poydras Street
                                   Suite 2430
                                   New Orleans, Louisiana 70130
                                   (225)953-4407


FOR RUDY JACKSON HERNANDEZ:        GWYNETH A. O'NEILL
                                   gwyneth@semmlaw.com
                                   Schonekas, Evans, McGoey &
                                   McEachin, LLC
                                   909 Poydras Street
                                   Suite 1600
                                   New Orleans, Louisiana 70112
                                   (504)680-6050


                                   ANDREA L. MILLER
                                   annie@semmlaw.com
                                   Schonekas, Evans, McGoey &
                                   McEachin, LLC
                                   909 Poydras Street
                                   Suite 1600
                                   New Orleans, Louisiana 70112
                                   (504)680-6050


Official Court Reporter:           Sammantha A. Morgan, RPR, CCR
                                   500 Poydras Street, HB-275
                                   New Orleans, LA  70130
                                   (504) 589-7781
                                   *Sammantha_Morgan@laed.uscourts.gov*


*PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT PRODUCED BY COMPUTER.*


OFFICIAL TRANSCRIPT

**INDEX**

PAGE

Opening Statement by Mr. Guice.............................121

Opening Statement by Ms. O'Neill..........................137

Opening Statement by Mr. Washington.......................143


WITNESSES                                              PAGE

AARON PATLAN

Direct Examination by Mr. Guice...........................148

Cross-Examination by Ms. O'Neill..........................157

Cross-Examination by Mr. Washington.......................160

Redirect Examination by Mr. Guice.........................161


COLLIS BROWN

Direct Examination by Mr. Guice...........................162


LUKE JOSEPH

Direct Examination by Mr. Badawy..........................167

Cross-Examination by Ms. O'Neill..........................195

Cross-Examination by Mr. Washington.......................216

Redirect Examination by Mr. Badawy........................225


MARY DONADIEU

Direct Examination by Mr. Guice...........................227

OFFICIAL TRANSCRIPT

Cross-Examination by Mr. Washington..........................250
Cross-Examination by Ms. O'Neill............................251

OFFICIAL TRANSCRIPT

**P-R-O-C-E-E-D-I-N-G-S**

**Tuesday, November 12, 2024**

**M O R N I N G   S E S S I O N**

**(COURT CALLED TO ORDER.)**

**THE DEPUTY CLERK:** All rise.

**THE COURT:** Be seated, please.  Good morning, ladies and gentlemen.  Let's call the case.

**THE DEPUTY CLERK:** Criminal Action 22-77, *United States of America versus Hennessy Devon Cooper Zelaya and Rudy Jackson Hernandez.*

**THE COURT:** Counsel, make their appearance for the record, please.

**MR. GUICE:** Good morning, Your Honor.  Carter Guice for the United States.

**MR. BADAWY:** Good morning, Your Honor.  Rami Badawy on behalf of the United States.

**MS. WAGNER:** Good morning, Your Honor.  Katharine Wagner on behalf of the United States.

**THE COURT:** Okay.

**MR. WASHINGTON:** Good morning, Your Honor. James Washington on behalf of defendant, Hennessy Cooper.

**MS. O'NEILL:** Good morning, Your Honor.  Gwyneth O'Neill on behalf of Rudy Jackson Hernandez.

**MS. MILLER:** And Annie Miller on behalf of Rudy Jackson Hernandez.

OFFICIAL TRANSCRIPT

**THE COURT:** Thank you.

Good morning, ladies and gentlemen of the jury. My name is Eldon Fallon and I'm the judge who'll preside over this case. I'd like to begin by welcoming each of you to the court, your federal court. I know that you probably would not like to be here. There are other things that you'd like to be doing; seeing friends and maybe business or something of that sort, but, folks, I remind you that in our system of government the citizens play a very important role and an important role is serving as jurors. You make our government work. Without your presence the criminal justice system or the justice system cannot work. So I know it's inconvenient, but it's very important and I appreciate you being here today.

Ladies and gentlemen, this is a criminal law case in which the United States government has brought certain charges against the defendants, Hennessy Devon Cooper Zelaya and Rudy Jackson Hernandez. The government charges these two defendants with conspiracy to bring undocumented aliens into the United States for commercial advantage and private financial gain and conspiracy to distribute and to possess with the intent to distribute cocaine.

The defendants have pleaded not guilty to these charges. This denial raises fact questions that must be resolved by the jury. The government has the burden, ladies and gentlemen, to prove the guilt of the defendants beyond a

reasonable doubt.  This means that the government must prove beyond a reasonable doubt every essential element of the offense charged before there can be a conviction.  The defendants are not required to prove their innocence or to offer any evidence at all.

The law requires the jury to presume that the defendant is innocent.  That presumption of innocence will continue throughout the trial unless and until, after deliberation, the jury is convinced, that the guilt of the defendant has been established beyond a reasonable doubt from the evidence adduced at trial.

Now this case is before you, ladies and gentlemen, by reason of a second superseding indictment found by a grand jury.  The second superseding indictment consists of multiple counts.  At this time, I will ask the attorney for the government to read the indictment to you.

**MR. GUICE:** Thank you, Your Honor.

Ladies and gentlemen, the grand jury charges that the two defendants, Hennessy Devon Cooper Zelaya and Rudy Jackson Hernandez, in a five-count indictment, count -- and it starts off kind of setting the stage, kind of telling you the story of who's who in the case, so I will briefly summarize that.

At all times material herein:

The Dynamic Capacity Group is a corporate entity, it's also known as DCG, based in Pittsburgh, Pennsylvania,

owned by an individual named Carl Allison. It's -- Allison and another individual named Lindomar De La Rosa, commonly called Omar De La Rosa, Allison was the president and Omar was the recruiting manager respectively.

There's another defendant who's not here today, Josue Alexandre Flores-Villeda was an employee of DCG and you'll be hearing his name throughout the proceedings.

The defendant -- another defendant, Darrel Martinez, is an Honduran who is a boat captain, who -- you'll hear his name many times and you will hear him testify and he was --

**MS. O'NEILL:** I'm sorry, Mr. Guice.

Your Honor, may we approach just briefly?

(Bench conference on the record.)

**THE COURT:** Yes. This is not an opening statement.

**MR. GUICE:** Right.

**THE COURT:** It's just a --

**MR. GUICE:** I wanted to give a summary. I'll just -- I'll just read it straight.

**THE COURT:** -- explain who they are. Just read the indictment.

**MR. GUICE:** Gotcha.

**MS. O'NEILL:** Thank you, Judge.

**THE COURT:** Yeah.

(End of bench conference.)

**MR. GUICE:** The defendant, Lenord Cooper, Hennessy

OFFICIAL TRANSCRIPT

Devon Cooper Zelaya, also known as Devon, and Rudy Jackson were crew members under Martinez aboard two vessels, the Masita III and the M/V POP.

On or about February 13th, 2022, the United States Coast Guard received information that the M/V POP, a 65-foot Sportfish vessel co-owned by Allison, was adrift without fuel in the Gulf of Mexico approximately 90 miles -- 91 miles off the coast of Grand Isle, Louisiana. Martinez reported to the U.S. Coast Guard that he and Honduran crewmen, Cooper, Cooper Zelaya, and Jackson Hernandez were aboard the vessel. While adrift a massive storm occurred nearly capsizing the vessel and endangering the lives of all onboard.

On or about February 14th, 2022, the U.S. Coast Guard Cutter Tiger Shark arrived on scene of the M/V POP and the U.S. Coast Guard officers learned that in addition to the captain and three crew members the inoperable vessel contained 24 Honduran nationals, collectively the aliens, and intended to complete their voyage at CoCo Marina, which is located in Cocodrie Louisiana.

Twenty-three of the aliens above the M/V POP -- aboard the M/V POP intended to remain in the United States. One of the aliens, Olvin Javier Velasquez Maldonado was responsible for bringing cocaine on board the M/V POP and ensuring its safe delivery. Velasquez Maldonado intended to return to Honduras after the cocaine was delivered. Upon

OFFICIAL TRANSCRIPT

apprehension by the U.S. Coast Guard, Velasquez Maldonado posed as an alien intending to remain in the United States so he could avoid prosecution and return to Honduras sooner.

On or about February 15th, 2022, the M/V POP was towed by the U.S. Coast Guard Cutter Tiger Shark to the U.S. Coast Guard base located in Grand Isle, Louisiana for further investigation.  Subsequently all individuals on board disembarked the vehicle -- the vessel into the custody of various federal agencies.  Upon a search of the M/V POP, approximately 24 kilograms of cocaine were found on board.

B.  The conspiracy:

Beginning in or about March 2021 and continuing until on or around February 14th, 2022, within the Eastern District of Louisiana and elsewhere, the defendants, Lindomar De La Rosa, a/k/a Omar, a/k/a Dr. Diablo, Hennessy Devon Cooper Zelaya, a/k/a Devon, Rudy Jackson Hernandez, Carl Allison, a/k/a Car, Darrel Martinez, Josue Alexander Flores-Villeda, and Lenord Cooper did knowingly and willfully combine, conspire, confederate and agree with each other and others known and unknown to the grand jury to commit an offense against the United States, that is:  To bring aliens to the United States at a place other than a designated port of entry as designated by the commissioner, knowing that such persons are aliens, for the purpose of commercial advantage and private financial gain, regardless of any official action which may be taken later and

with respect to such alien, in violation of Title 8, U.S. Code, Section 1324(a)(1)(A)(i) and (a)(1)(B)(i).

C.   Acts in furtherance of the smuggling:

In furtherance of and to conceal the conspiracy and accomplish its purposes, the defendants and others known and unknown to the grand jury, committed at least one of the following acts, among others, in the Eastern District of Louisiana and elsewhere:

In or around April 2021, Allison facilitated the -- the purchase and registration of the Motor Vessel Masita III. In or about July 2021, Allison facilitated the purchase and registration of the M/V POP.  On or about July 28, 2021, Martinez, Cooper Zelaya and Jackson Hernandez flew from Honduras to New York.  In or around August 2021, Martinez, Zelaya and Hernandez prepared the M/V POP to sail from New York to Honduras and, in fact, sail the M/V POP from the United States to Honduras.

3.   Martinez conducted several international voyages on the M/V Masita III and the M/V POP from Honduras to the United States on behalf of Allison and others.  Lenord Cooper, Cooper Zelaya and Jackson Hernandez served under Martinez as crew members on more than one international voyage on behalf of Allison and others.  Many of the aliens that were smuggled into the United States on these voyages were employed or recruited for work placement by corporate entities controlled by Allison

in the United States.

4. Payments in furtherance of the human smuggling conspiracy were made in a variety of methods and entities controlled by DCG, Allison and De La Rosa in Honduras and the United States. These payments included, but were not limited to, cash payments made by families of aliens to employees of DCG and domestic and international electronic money transfers.

During the February 2022 voyage, Martinez concealed the presence of both the 24 aliens and the cocaine on board the M/V POP when contacted by the U.S. Coast Guard.

7. During the February 2022 voyage when the M/V POP ran out of fuel off the coast of Grand Isle, Louisiana, Martinez attempted several times to make arrangements for a fuel drop to complete the voyage to Cocodrie, Louisiana through De La Rosa, Allison and Flores-Villeda and others.

8. Martinez contacted De La Rosa by satellite device and advised him of the vessel's problems. De La Rosa informed Martinez that someone, later identified as Flores-Villeda, would bring fuel.

9. Pursuant to instructions by De La Rosa, Flores-Villeda drove a 1999 Dodge passenger drive -- Dodge Passenger Van bearing a Pennsylvania license plate registered to Allison from Atlanta, Georgia to the CoCo Marina in Cocodrie, Louisiana. The van was intended to be used to pick up and transport the aliens.

10.  De La Rosa told Flores-Villeda to follow him to CoCo Marina in Allison's van, find a charter boat, and get the 600 gallons of fuel needed for the M/V POP.

On Monday, February 14th, 2022, a private charter boat was hired in Louisiana to deliver the fuel to the M/V POP by Flores-Villeda under orders from De La Rosa and Allison.

12.  The private charter boat arrived at the CoCo Marina, loaded the fuel, and picked up Flores-Villeda.  The charter and fuel were paid for with De La Rosa's DCG corporate American Express card.

De La Rosa instructed Flores-Villeda to navigate the private charter to the coordinates of the M/V POP and make sure the private charter did not steal the fuel on board.  As the private charter approached the M/V POP, it was interdicted by U.S. authorities.

While U.S. authorities were investigating the private charter's involvement, on board the M/V POP Martinez held a meeting with Cooper Zelaya, Jackson Hernandez, Velasquez Maldonado, Lenord Cooper and the other 23 aliens to instruct them on a fraudulent story to tell U.S. authorities.  The aliens were told that the coconspirators would hurt their families if they did not stick to the fraudulent stories.

And all of these are in violation of Title 8, U.S. Code, Section 1324(a)(1)(A)(v)(I) and (a)(1)(A)(i) and (a)(1)(B)(i).

OFFICIAL TRANSCRIPT

Counts 2 through 5:

Paragraphs A are incorporated in -- into this section.

In or about February 2022, within the Eastern District of Louisiana and elsewhere, the defendants Lindomar De La Rosa, Hennessy Devon Cooper Zelaya, Rudy Jackson Hernandez, Carl Allison, Darrel Martinez, Josue Alexander Flores-Villeda and Lenord Cooper and others known and unknown to the grand jury did knowingly attempt to bring and did aid and abet and attempt to bring an alien, as set forth in Counts 2 through 5 below, to the United States for the purpose of commercial advantage and private financial gain, knowing and in reckless disregard of the fact that such alien had not received prior official authorization to come to, enter and reside in the United States, regardless of any action which might later be taken with respect to the other.

Count 2 lists a specific alien, OFS, those are his initials.  Count 4 lists another alien, MMN, those are his initials.  And Count 5 lists another alien, ERP, those are his initials.  All in violation of --

**MS. O'NEILL:** Judge, can we just clarify that Mr. Guice said 2 through 5, but that there is no Count 3?

**THE COURT:** Right.

**MR. GUICE:** Yes.  We had originally --

**THE COURT:** Count 2, 4 and 5.

OFFICIAL TRANSCRIPT

**MR. GUICE:** Right.

**MS. O'NEILL:** Thank you.

**MR. GUICE:** All in title -- in violation of Title 8, U.S. Code, 1324(a)(2)(B)(ii) and Title 18, U.S. Code, Section 2.

Count 6, conspiracy to distribute and possess with intent to distribute cocaine.

Beginning in at least December 2021 and continuing until on or about February 15th, 2022, in the Eastern District of Louisiana and elsewhere, the defendants, Lindomar De La Rosa, Hennessy Devon Cooper Zelaya, Rudy Jackson Hernandez, Olvin Javier Velasquez Maldonado, Carl Allison, Darrel Martinez, and Josue Alexander Flores-Villeda, did knowingly and intentionally combine, conspire, confederate and agree with the other persons known -- with other persons known and unknown to the grand jury to distribute and to possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, U.S. Code, Section 841(a)(1), (b)(1)(A), and 846.

And, Your Honor, there's a notice of forfeiture to support. Do you wish me to read that?

**THE COURT:** That's fine.

**MR. GUICE:** Okay. Thank you.

**THE COURT:** All right. Ladies and gentlemen, under

OFFICIAL TRANSCRIPT

the law, an indictment is only a charge.  It is only a means or a vehicle by which the government accuses a defendant.  It is not evidence of guilt.  No inferences may be drawn by the jury from the mere fact that the government has charged the defendant.

Members of a jury are the judges of the facts in this case.  However, the jury must accept and apply the law applicable to the case that I give -- as I give it to you.  Thus, if you are selected as jurors, or as an alternate who may later deliberate on the decision to be reached in this case, it will be your sworn duty under the law to decide this case solely on the evidence adduced during the trial and the law applicable to the case as it is given to you by the Court.

Both the government and the defendant -- defendants have a right to have this case tried by qualified and fair and impartial jurors.  A jury is qualified and impartial if it acts responsibly and capably and if it will, without fear, favor, bias, prejudice or sympathy or passion, hear and decide the issues to be tried objectively.  A jury is also qualified and impartial if it renders its verdict based solely on the evidence presented at this trial and the law applicable to this case, as the law is given to you by the Court.

Now, ladies and gentlemen, the law requires that a juror's qualifications and impartiality may not be assumed without inquiry.  This inquiry, which is about to begin, is

known as the voir dire examination.  It is a time-honored process used to determine the qualifications and impartiality of prospective jurors.  Its purpose and its only purpose is to develop the whole truth concerning the competency of each prospective juror, their frame of mind and ability to do their sworn duty in accordance with the juror's oath.  I will ask some questions and the answers will not only enable me to determine whether any of you should be excused for cause, either by my own determination or as requested by either party, but will also allow counsel for the parties to make intelligent use of what we call peremptory challenges, that is, the opportunity that the law gives to each party to excuse a juror without requiring the party to prove the reason as long as it is a legal reason.

You should understand, therefore, that you're expected to answer the questions completely and truthfully.  When responding, each juror is required to disclose any matter that might tend to disqualify them, for any reason, from sitting on this case.  False or misleading or incomplete answers may well result in the seating of a juror who has been -- might have been discharged by the Court for cause or stricken through the exercise of peremptory challenges and could well result in a miscarriage of justice.

Now, ladies and gentlemen, I'm going to ask some questions of all of you first.  Although the questions will be

addressed to all of you collectively, you must consider them as if they were directed to each of you individually.

If you feel a response to any question that I'm going to ask is of a personal nature, please feel free to request permission to approach the bench and discuss it privately with me.

Now, please, swear in the jury.

(Venire dually sworn.)

**THE COURT:** My first question, ladies and gentlemen, do you have any difficulty -- if you do, please, raise your hand and I'll discuss it further with you. To all of you, do you have any difficulty reading, writing, speaking or understanding the English language? Anybody has any problem with English?

Do you have any difficulty hearing or seeing well?

All right. Have you ever served -- I'm sorry. Yes, ma'am. Would you give us your name and number, please?

**JUROR 33:** My name is Josephine Daspit and I'm Juror Number 33.

**THE COURT:** Yes, ma'am.

**JUROR 33:** I do wear hearing aids and if somebody is -- like the young lady that was talking, not in the microphone, I don't know what she was saying. If your back is towards -- facing me, I might not hear it. If you speak softly, I might not hear the proper words. That's all.

OFFICIAL TRANSCRIPT

**THE COURT:** Okay.  And if you don't -- if you're picked as a juror, please let us know and we'll have them speak loudly --

**JUROR 33:** Yeah.

**THE COURT:** -- and directly to you.  But did you hear what I just said, ma'am?

**JUROR 33:** You said something about, if I don't hear --

**THE COURT:** Yeah.

**JUROR 33:** -- they should look at me.

**THE COURT:** All right.  Okay.  All right.  And you're number is?

**JUROR 33:** I think that's what you said.

**THE COURT:** Okay.  All right.  Thank you very much.

Okay.  Have you ever served as a juror in a civil or criminal case or as a member of the grand jury?  Anybody have any prior jury service?  First in the -- okay.  Let's see.  In the first row.

**JUROR 21:** Gavin Lemaire, Juror 21.

**THE COURT:** Yes, sir.

**JUROR 21:** I was on a criminal case, but they --

**THE COURT:** I'm sorry.  You served when?

**JUROR 21:** Ten years ago.

**THE COURT:** Okay.

**JUROR 21:** It was parish -- well, state.

OFFICIAL TRANSCRIPT

**THE COURT:** Which parish?

**JUROR 21:** Washington.

**THE COURT:** Okay. And was it a civil case or a criminal case?

**JUROR 21:** Criminal.

**THE COURT:** Okay. Did you -- did the jury find the defendant guilty or not guilty?

**JUROR 21:** No. He -- they plea -- plea bargained and we were dismissed.

**THE COURT:** You didn't have to decide --

**JUROR 21:** No.

**THE COURT:** -- because it was resolved?

**JUROR 21:** Yeah.

**THE COURT:** All right. Thank you, sir.

**JUROR 21:** Thank you.

**THE COURT:** Yes, ma'am. On the second row. Oops. First row.

**JUROR 23:** Good morning, Your Honor.

**THE COURT:** Good morning.

**JUROR 23:** I did serve --

**THE COURT:** Give us your name and number, please, sir.

**JUROR 23:** I'm sorry. I'm sorry. John Burns.

**THE COURT:** Okay.

**JUROR 23:** Juror Number 23.

**THE COURT:** Okay.

OFFICIAL TRANSCRIPT

**JUROR 23:** I did serve on the -- Tulane Avenue for a civil.

**THE COURT:** All right. Tulane and Broad, as we call it?

**JUROR 23:** Correct.

**THE COURT:** Okay.

**JUROR 23:** Correct. It was an asbestos.

**THE COURT:** What was the nature of the case? It was a criminal case? Criminal law case?

**JUROR 23:** Correct.

**THE COURT:** Okay. And what was the charge?

**JUROR 23:** Basically, it was an -- it was an asbestos dispute.

**THE COURT:** I'm sorry. It was what?

**JUROR 23:** Asbestos dispute.

**THE COURT:** All right. This must have been a civil case since somebody was --

**JUROR 23:** I'm sorry.

**THE COURT:** -- saying they were injured?

**JUROR 23:** I'm sorry. So I went to two. So one time at Tulane Avenue and one time by City Hall.

**THE COURT:** All right.

**JUROR 23:** The one at City Hall was --

**THE COURT:** Was asbestos, right?

**JUROR 23:** Correct. I'm sorry.

OFFICIAL TRANSCRIPT

**THE COURT:** Okay.  All right.  And did you find for the plaintiff or the defendant?

**JUROR 23:** The plaintiff.

**THE COURT:** Defendant (sic).  All right.  And then you also said you served at Tulane and Broad --

**JUROR 23:** Correct.

**THE COURT:** -- the criminal court case?

**JUROR 23:** Correct.  That's been --

**THE COURT:** All right.  And what was the nature of the criminal case, sir?

**JUROR 23:** It was a cocaine charge.

**THE COURT:** Okay.  And did you find the defendant guilty or not guilty?

**JUROR 23:** Not guilty.

**THE COURT:** Not guilty.

**JUROR 23:** Correct.

**THE COURT:** Okay.  Thank you very much.

**JUROR 23:** You're welcome.

**THE COURT:** I think in the second row, the lady.

**JUROR 25:** Good morning, Your Honor.

**THE COURT:** Good morning.

**JUROR 25:** Cherrell Taplin, Juror 25.

**THE COURT:** Give us your name and number.

**JUROR 25:** Cherrell Taplin, 25.

**THE COURT:** Okay.

OFFICIAL TRANSCRIPT

**JUROR 25:** This was over 20 years ago.  I served as an alternate at Tulane and Broad on an attempted murder trial.  I was an alternate so I didn't get to deliberate, but the jury came back with a guilty verdict.

**THE COURT:** All right.  Do you know the -- the nature of the case?  What was involved with --

**JUROR 25:** It was an attempted murder.

**THE COURT:** Okay.  All right.  Thank you.

**JUROR 34:** Shelby McDonald, Juror Number 34.  It was a criminal case in Livingston.  They took a plea deal though.

**THE COURT:** All right.  Thank you very much.

**JUROR 38:** Good morning.  My name is Florestine Clark. I'm Juror Number 38.  I served in a criminal case.  It was a rape -- it was a rape case.

**THE COURT:** Okay.

**JUROR 38:** And we found him guilty of a lesser charge --

**THE COURT:** Okay.

**JUROR 38:** -- attempted instead of rape.

**THE COURT:** All right.  Thank you very much.

**JUROR 39:** Good morning.  Cameron Arnoult, Number 39. I've served on two murder trials in Jefferson Parish and both were found guilty.  One of second-degree murder, the other of manslaughter.

**THE COURT:** All right.  Thank you very much.

OFFICIAL TRANSCRIPT

Okay. I'm going to ask the defendant and the attorneys to stand and give their names. First, the government, please, again.

**MR. GUICE:** Good morning, ladies and gentlemen. I'm Carter Guice.

**MR. BADAWY:** Good morning, ladies and gentlemen. Rami Badawy.

**MS. WAGNER:** Good morning, ladies and gentlemen. Katharine Wagner.

**THE COURT:** And my question to you, ladies and gentlemen, is: Whether you know any of these individuals? Have they either represented you or contacted -- you have contacted them or know them as friends or -- or know them at all?

Yes, ma'am, in the back. You want to...

**JUROR 24:** Danielle Smith Graham, 24. I actually work in the U.S. Attorney's Office, Eastern District of Louisiana.

**THE COURT:** All right. You -- you work in -- you worked?

**JUROR 24:** I work currently.

**THE COURT:** You currently work for the --

**JUROR 24:** Yes.

**THE COURT:** What do you -- what's your position there, ma'am?

**JUROR 24:** I work in the criminal division. I'm a

OFFICIAL TRANSCRIPT

financial litigation specialist, legal assistant.  That's the title, I guess.

**THE COURT:** All right.  And what's your number?

**JUROR 24:** Twenty-four.

**THE COURT:** All right.  Thank you very much, ma'am.

And now from the defendants' standpoint, would you please give us your name and number -- name.

**MR. WASHINGTON:** James Washington.  I represent Hennessy Cooper.

**MS. O'NEILL:** And good morning again.  I'm Gwyneth O'Neill and this is Annie Miller and we represent Mr. Hernandez.

**THE COURT:** And my question to you again is:  Whether or not you know these individuals; whether they represented you, whether they represented any members of your family, whether you know them socially?

Okay.  Thank you very much.

Let me read the list of names of the individuals who may testify at trial.  If you know any of them, please, raise your hand as I call their name.  Marcela Aiken, Carl Allison, Jorge Mauro Amador Matos, Christopher Benoit, Collis Brown, James D. Coleman, Robert Conner, Senior, Lenord Cooper, Mary Donadieu, D-O-N-A-D-I-E-U, Jay Fitzmorris, Jose Garcia, Jarod Goff, G-O-F-F, Jeremy Hayes, Daryn Hope, Luke Joseph, Erin Lassus, L-A-S-S-U-S, Matthew Manning, Oscar Maltez, Darrel

Martinez, Janet McFadden, Gerardo Mejia Barahona, B-A-R-A-H-O-N-A, Marvin Martell Nunez, Michael Milstead, Isolina Nunez, Charles W. Parker, Junior, Aaron Patlan, Enmanuel Reyes Perez, Carol Sanders, Jason Young.

Does anyone know the defendants, themselves, Devon Cooper Zelaya and Rudy Jackson Hernandez?  You've seen them stand several times.

Would you like me to have them stand again for you?

All right.  Please, the defendants, please stand. Anyone know these individuals?  Thank you very much, gentlemen.

There are many people on the jury panel.  Anyone recognize any other member on the panel as a friend, acquaintance, relative, anything of that sort?

Yes.  Yes, ma'am.

**JUROR 34:** Shelby McDonald, Juror Number 34.  I know Juror Number 36.

**THE COURT:** All right.  Did you all do business together or any -- or owe any money to each other or anything of the sort?

**JUROR 34:** No, ma'am -- no, sir.

**THE COURT:** You just know each other as friends or acquaintances over the years?

**JUROR 34:** I just work at her son's orthodontist.

**THE COURT:** All right.  Okay.  Thank you very much, ladies.

Have either you or any member of your immediate family or close friend ever served in any law enforcement capacity?  Anyone work in law enforcement?  None?

Yes, sir.

**JUROR 4:** My wife -- oh, I'm sorry.

**THE COURT:** Give us your name.

**JUROR 4:** Mark Belton, Juror 4.

**THE COURT:** Okay.

**JUROR 4:** My wife was a police officer.  She's no longer.  She did in the early 2000s, railroad police.

**THE COURT:** Okay.  New Orleans police?

**JUROR 4:** It was railroad.

**THE COURT:** I'm sorry?

**JUROR 4:** Railroad police.

**THE COURT:** Railroad police?

**JUROR 4:** Yes, sir.

**THE COURT:** Okay.  And how long did she serve there, sir?

**JUROR 4:** Four or five years, something like that.

**THE COURT:** What was her job?  Do you know from the standpoint of railroad police?

**JUROR 4:** It was for Amtrak, just patrolling the yards, the property, and that's it.

**THE COURT:** I see.  While the trains were operating or before?  She just looked after the property to make sure

that --

**JUROR 4:** Yeah.  Property, any theft, anything like that.

**THE COURT:** All right.  Is she still working?

**JUROR 4:** Yeah, but she's a -- she's in teaching.  She's not -- no longer in law enforcement.

**THE COURT:** Okay.  Thank you very much.

All right.  Yes, ma'am.

**JUROR 19:** Gwendy Robinson, Number 19.  I work for St. John Parish Sheriff Department in the crime scene division.

**THE COURT:** What did you do for them?

**JUROR 19:** I work in crime scene.

**THE COURT:** And what did --

**JUROR 19:** I'm a tech.

**THE COURT:** What were your duties?

**JUROR 19:** I'm a crime scene tech.

**THE COURT:** I'm sorry?

**JUROR 19:** I'm a crime scene technician.

**THE COURT:** Okay.  And what does that cause you to do?

**JUROR 19:** I go out and I take pictures or I'll collect evidence that's at the scene.

**THE COURT:** All right.  And how long have you -- are you still working there?

**JUROR 19:** Yes, sir.

**THE COURT:** And how long have you worked?

OFFICIAL TRANSCRIPT

**JUROR 19:** I've been there for a year and a half.

**THE COURT:** And what kind of training did you have for that job?

**JUROR 19:** I -- I'm technically going to the academy now.

**THE COURT:** The police academy?

**JUROR 19:** Yes, sir.

**THE COURT:** All right. And are you officially a police person or are you in training?

**JUROR 19:** I'm a deputy. I'm in training.

**THE COURT:** All right. All right. Do you investigate people at this -- at your level at this point?

**JUROR 19:** No. No, sir.

**THE COURT:** Okay.

**JUROR 19:** I just go in and collect evidence and take pictures.

**THE COURT:** All right. Okay. And your number is?

**JUROR 19:** Nineteen.

**THE COURT:** Okay. Thank you very much, ma'am.

Yes, sir.

**JUROR 21:** Gavin Lemaire, Juror 21. I have a son who is a police officer and a son that's a state correctional officer.

**THE COURT:** And the one that's a police officer, what does he do? Which police?

**JUROR 21:** Harahan police.  He's a patrolman.

**THE COURT:** How long has he been there?

**JUROR 21:** About a year.

**THE COURT:** Okay.  All right.  Thank you very much.

**JUROR 21:** Thank you.

**JUROR 23:** Yes, Your Honor.  John Burns, 23.

**THE COURT:** Okay.

**JUROR 23:** My cousin is a state trooper in Charleston, South Carolina as well as I have another cousin, fireman in South Carolina, Charleston.

**THE COURT:** All right.  Okay.  Thank you very much.

**JUROR 25:** Cherrell Taplin, juror 25.  My father-in-law is a retired NOPD officer.  He was with the NOPD for 33 years.

**THE COURT:** Is he still there?

**JUROR 25:** No.  He retired recently.

**THE COURT:** Okay.  And he was a narcotics officer?

**JUROR 25:** He was with the K-9 Unit and then he was on the mounted patrol.

**THE COURT:** Okay.  All right.  Thank you very much.

**JUROR 29:** Deanna Proctor, juror 29.  My daughter used to work for the Sheriff Department for New Orleans.  She did intake and I have a cousin who works for NOPD.

**THE COURT:** All right.

**JUROR 29:** He currently works there now.

**THE COURT:** Okay.

**JUROR 46:** Archie Grefer, juror 46. My father is a retired state judge and my brother is a sitting state judge.

**THE COURT:** All right.

**JUROR 45:** Clayton Buzbee, III, Number 45. I have a very close friend of 30 years who has worked under various jurisdictions in Alabama.

**THE COURT:** All right. Thank you, sir.

**JUROR 48:** Juror 48, Your Honor, Ritchie Stanley. I'm a retired Louisiana State Trooper of 27 years of service with the Louisiana State Police.

**THE COURT:** And so how long have you been retired?

**JUROR 48:** Since 2018.

**THE COURT:** Okay. And you're -- while you were a state police officer you -- you -- what was your duties? Were you --

**JUROR 48:** I was a patrol officer for approximately 15 years. I worked in special units and special investigations for about 12, 13 years out of my career.

**THE COURT:** All right. And what's your number, sir?

**JUROR 48:** Juror 48.

**THE COURT:** Okay. All right. Thank you very much.

**JUROR 48:** Yes, sir.

**JUROR 50:** Kenneth Auzenne, Juror Number 50. After Katrina, Your Honor, I was a deputy program manager -- project

OFFICIAL TRANSCRIPT

manager for the current jail that was built.  So I oversaw the current Orleans Parish Prison that was built and currently -- in my current job, I'm business development for an architect firm and we build jails throughout Louisiana and Texas.

**THE COURT:** All right.  Thank you, sir.

Yes?

**JUROR 4:** Mark Belton, Juror Number 4.  I just wanted to add two more things to that.

**THE COURT:** Sure.

**JUROR 4:** When my wife finished with the -- when she left the position at Amtrak as a police, she was in probation and parole -- I forgot about that part -- a year or two after that, but she's out of the law enforcement field altogether.  Like I said, she's a teacher now.  And also, I have a relative who is a district attorney in north Louisiana, John Belton.  He's the DA in north Louisiana.

**THE COURT:** Okay.  Thank you very much.

There's another question?

**JUROR 2:** Robert Rusk, Number 2.  United States Coast Guard.

**THE COURT:** Okay.  Thank you very much.

**JUROR 17:** Rachel Caldwell, Juror Number 17.  My sister is an assistant district attorney here in New Orleans.

**THE COURT:** All right.  Thank you.

**JUROR 1:** Sarah Craig, Juror Number 1.  I have distant

cousins who are state police in North Carolina and I have close friends who are currently Jefferson Parish School Resource Officers.

THE COURT: Okay.  Thank you very much.

The reason I was asking, members of the jury, is that you should judge the credibility of each witness individually. The testimony of a law enforcement officer is to be considered in the same way as the testimony of any other witness.  So my question to you is:  Can you listen and weigh the testimony of a law enforcement officer just like you would any other witness?  Anyone have any problem with that time-honored rule?

THE COURT SECURITY OFFICER: Judge, I have one more --

THE COURT: You have one more?  I'm sorry.

THE COURT SECURITY OFFICER: -- for the last question, sir.

THE COURT: Okay.

JUROR 33: I'm sorry.  Josephine Daspit, Juror Number 33.  I used to work for the strike force, which was a branch of the U.S. Department of Justice with prosecuting attorneys.  We dealt -- we did indictments.  We had FBI, ATF, DEA agents constantly.  I just thought I would let you know.  So I know a lot of the -- back then, it was a long time ago, but I knew the U.S. Marshals, probation officers, et cetera.

THE COURT: Okay.  And how long ago was that?

JUROR 33: I left in -- over 30 years ago.

OFFICIAL TRANSCRIPT

**THE COURT:** Okay.

**JUROR 33:** But I still keep in touch with some of them.

**THE COURT:** All right.

**JUROR 33:** Okay.

**THE COURT:** Okay.  Thank you.

Anybody that's been a witness for state or federal government in a case?  Anybody has been a witness for the government?  Yes, ma'am.

**JUROR 1:** Sarah Craig, Juror Number 1.  I testified in a criminal armed robbery case in Jefferson Parish.

**THE COURT:** All right.  Okay.  Thank you.  Anyone else?

And my question to you, also, is would you give greater merit, credence or confidence as to what the government attorney or witnesses say merely and only because they represent the government or testify on their behalf?  Anybody simply because they are government witness, would you give them any greater credibility or would you judge them just as you would every other witness?  From your lack of response, I assume you would listen to the testimony, weigh their testimony in the same as you would any other witness.

Have you or any close relative ever studied law or had any legal training?  And of course this includes and is not limited to any paralegal, legal assistant, legal secretary or,

OFFICIAL TRANSCRIPT

of course, lawyer.

**JUROR 1:** Sarah Craig, Juror Number 1.  I'm a paralegal of six years, currently working in DBA and longshore.

**THE COURT:** And who do you work for, ma'am, as a paralegal?

**JUROR 1:** May I approach?

**THE COURT:** Sure.

(Bench conference on the record.)

**THE COURT:** Okay, Ms. Craig.

**JUROR 1:** I work as a paralegal at Mouledoux, Bland, Legrand and Bracket.  We do Defense Base Act and longshoreman work.

**THE COURT:** Yeah.  It's a civil case, right?

**JUROR 1:** Civil, yes, sir.

**THE COURT:** And you all do civil work both in federal and state?

**JUROR 1:** Yes, sir.

**THE COURT:** And mostly maritime and some longshore?

**JUROR 1:** Everything I do is Defense Base Act and longshore.

**THE COURT:** All right.  Anybody?

**MS. O'NEILL:** What was the abbreviation you said?

**JUROR 1:** DBA.

**MS. O'NEILL:** And what does that stand for?

**JUROR 1:** Defense Base Act.

OFFICIAL TRANSCRIPT

**MS. O'NEILL:** Okay.

**MR. BADAWY:** Nothing.

**THE COURT:** Thank you very much.

**JUROR 1:** Thank you, Judge.

(End of bench conference.)

**THE COURT:** And have you or -- I'm sorry.

**JUROR 20:** Kyle Pizzolato, Juror Number 20.  I study cyber law.  In grad school for cyber security right now.  That's it.

**THE COURT:** I'm sorry.  Say -- say that again.  You --

**JUROR 20:** I have just been studying cyber law.

**THE COURT:** Okay.

**JUROR 20:** It's an evolving field, but, yeah.

**THE COURT:** All right.  Thank you very much.

**JUROR 25:** Cherrell Taplin, juror 25.  I'm a trial lawyer in New Orleans.  I've been practicing for 22 years.  I'm currently a partner at Liskow and Lewis.

**THE COURT:** And do you do civil work or criminal work?

**JUROR 25:** I do civil work, Your Honor.

**THE COURT:** Okay.

**JUROR 25:** And I practice in this court frequently.

**THE COURT:** All right.  Do you know any of these individuals -- any lawyers?

**JUROR 25:** I do not, Your Honor.  I -- I rarely get to experience any type of criminal cases.

OFFICIAL TRANSCRIPT

**THE COURT:** All right.  Thank you very much.

**JUROR 24:** Danielle Smith Graham, 24.  I have an undergrad in criminal justice and I'm working on my masters in criminal justice.  In our type of work I deal with the DOJ, U.S. Attorney's office, you know, legal assistant-type work. That's it.

**THE COURT:** All right.  Thank you very much.

Yes, sir.

**JUROR 4:** Mark Belton, Juror Number 4.  One semester of law school.

**THE COURT:** All right.  Thank you.

**JUROR 28:** Kimberly Coon.

**THE COURT:** Yes.

**JUROR 28:** Number 28.  I have two cousins that are an attorney and a sister that's a paralegal.

**THE COURT:** All right.  Thank you.

I guess one semester is enough to make a decision.

**JUROR 29:** Deanna Proctor, jury -- Juror Number 29.  I have a master's degree in criminal justice.

**THE COURT:** Okay.  Thank you, ma'am.

Have you or any close friend or family member ever been a victim of a crime or been convicted of a crime?  And you can come up to the court, one way or the other, if you need to. Anybody has been a victim of a crime?

Yes.  I'm sorry in the jury box.  Would you like to

OFFICIAL TRANSCRIPT

come up, ma'am?

**JUROR 15:** Yeah.

(Bench conference on the record.)

**JUROR 15:** I am a domestic violence survivor.

**THE COURT:** Domestic violence.  Were you in court --

**JUROR 15:** No.

**THE COURT:** This is -- this is a criminal matter.  It won't have anything to do with domestic violence.  Would that experience that you've had, would that interfere in any way with you being a fair and impartial jury -- juror in this case?

**JUROR 15:** No.

**THE COURT:** You'd be able to listen to the evidence, judge credibility of the individuals and make a decision?

**JUROR 15:** Uh-huh (affirmative response).

**THE COURT:** Any questions?

**MS. O'NEILL:** I have a couple, Judge.

**THE COURT:** Okay.

**MS. O'NEILL:** How long ago was that?

**JUROR 15:** Five years ago.

**MS. O'NEILL:** Okay.  And it -- was it an issue that was dealt with in state court?  Did it go to court?

**JUROR 15:** No.  I ended up not having to do that because he ended up going to jail for drug charges.  So I just left it because he was in jail anyway.

**MS. O'NEILL:** Okay.  And I'm sorry that happened to

you.  Is -- some people feel that when they go through something like that they just have strong feelings about the criminal justice system in general.  Do you -- do you feel like that applies to you that you just -- even the slightest bit feel like if someone is sitting here charged with a crime that you might lean towards thinking they probably did something?

**JUROR 15:** Yeah.  I mean, maybe.

**THE COURT:** And you've never been in court though?  You didn't have anything to do with court?

**JUROR 15:** No, but...

**THE COURT:** As I mentioned to you, the person is simply charged, so you're not to draw any inference of fact that they're charged, that they're guilty or innocent.  You've got to listen to the evidence to make that decision.  Would you be able to do that fairly?

**JUROR 15:** I mean, yeah, I'm a fair person.

**MS. O'NEILL:** It seems like you're kind of hesitating, and -- and that's why we're up here at the bench.  It's okay to be honest.  If -- sometimes we're not the right person for the right case.

**JUROR 15:** Yeah.  I don't think I'm the right person.

**MR. GUICE:** Well, could you -- could you give both sides an equal hearing; both the government and the defense?

**JUROR 15:** I mean, yeah.

**MR. GUICE:** Would you consider the evidence, going

OFFICIAL TRANSCRIPT

back to the jury room, and not giving any favor to the government or the defendant?

**JUROR 15:** Oh, yeah.  I give no favors to the government.  I just don't think I'm the right person for this thing.

**THE COURT:** And what is your -- your number?

**JUROR 15:** Fifteen.

**THE COURT:** Yeah, I got it.  Okay.  All right. Thanks.

**JUROR 15:** Thank you.

**THE DEPUTY CLERK:** Y'all have a line.

**MS. O'NEILL:** Everyone wants to come up.

**THE COURT:** Let's get ready for somebody else.

**JUROR 26:** Good morning.

**THE COURT:** Good morning.  How are you?

**JUROR 26:** In 2001 I had a disturbing the peace charge and in 2009 I had a DUI so that's --

**MS. O'NEILL:** What's your number, ma'am?

**JUROR 26:** Oh, I'm sorry.  Twenty-six.

**THE COURT:** Twenty-six.

**JUROR 26:** I didn't know if that counted or not.

**THE COURT:** No, I appreciate it.  The question is: Would that have any effect on you being a fair and impartial juror in this particular case?

**JUROR 26:** Oh, no.

OFFICIAL TRANSCRIPT

THE COURT: You'll be able to listen to the evidence and make a decision based solely on the evidence?

JUROR 26: Oh, yes.

THE COURT: Okay.

JUROR 26: Okay.

MR. GUICE: Were you treated -- do you feel you were treated fairly by the police and the prosecutor during your --

JUROR 26: The arrest or during the --

MR. GUICE: Yeah, the -- yes.

JUROR 26: The first one not so much.

MR. GUICE: What happened?

JUROR 26: I don't know.  The cop kind of pushed me and put me on the car and then they transported me with a male to the jail.

MR. GUICE: Instead of a female?

JUROR 26: Instead of a -- yeah, they had a male prisoner in the backseat --

MR. GUICE: Oh, with you?

JUROR 26: Uh-huh (affirmative response).

MR. GUICE: Did you have any issues with him?

JUROR 26: No.

MR. GUICE: No.  And what about the prosecutors?

JUROR 26: Yeah.  They were okay.  It was --

THE COURT: And the question really is whether or not that would interfere in any way with you being a fair and

impartial juror in this particular case?

**JUROR 26:** Oh, no.  No, no.

**THE COURT:** Okay.  Thanks so much for sharing that with us.

**JUROR 26:** Okay.  Thank you.

**MR. GUICE:** Thank you.

**THE COURT:** Anybody else?

**THE DEPUTY CLERK:** Yes.

**THE COURT:** Oh, boy.  This is not unusual.

Yes, ma'am.  Give us your name and number again.

**JUROR 28:** Kimberly Coon.

**THE COURT:** Okay.

**JUROR 28:** Number 28.

**THE COURT:** Got it.

**JUROR 28:** I have two sons that are convicted of crimes that are in prison.  One is a second-degree murder and the other one is attempted rape.  I was raped by an illegal immigrant and I'm not --

**MS. O'NEILL:** I didn't -- I'm sorry.  I didn't hear what you said before.

**JUROR 28:** I said in the '90s I was raped by an illegal immigrant.

**MS. O'NEILL:** I'm so sorry about that.

**JUROR 28:** And I'm not sure how that may effect my judgment with all of this, so --

OFFICIAL TRANSCRIPT

THE COURT: Okay. Yeah.

JUROR 28: -- I wanted to bring that forward and let everybody know.

THE COURT: Okay. Fine. All right.

JUROR 28: So --

THE COURT: Any questions?

MS. O'NEILL: So -- and, again, I'm sorry that happened to you.

JUROR 28: It's okay. I've dealt with it. It's in the past.

MS. O'NEILL: But -- and we're going to talk about this in a minute that some people have strong feelings about immigration, too, but you have a very personal and very awful experience that happened to you.

JUROR 28: I do and I cannot say which way it's going to make me -- just because --

MS. O'NEILL: Does it -- can I ask you this: Does it -- I can tell you're getting upset even just thinking back to it.

JUROR 28: Yes.

MS. O'NEILL: Do you feel that -- that that's going to impact your -- even if it's just ever so slightly that you're -- you might be leaning to --

JUROR 28: To be honest with the Court --

THE COURT: Sure.

OFFICIAL TRANSCRIPT

**JUROR 28:** -- yes, I do.  I fully do.

**THE COURT:** Thank you very much.

**MS. O'NEILL:** Thank you, ma'am.

**THE COURT:** We appreciate it.

**MR. GUICE:** Thank you.

**THE COURT:** All right.  Dean, let's get somebody else.

**JUROR 32:** Good morning, everybody.

**THE COURT:** Come in closer.

**JUROR 32:** Sierra Bailey, Juror Number 32.

**THE COURT:** Yes, ma'am.

**JUROR 32:** So convicted meaning they were charged and then whatever consequences followed happened?

**THE COURT:** Okay.

**JUROR 32:** Okay.  So pretty crazy family.  So mom, dad, drugs, domestic violence, extended family, cousins, guns, drugs, all that kind of stuff.

**THE COURT:** And that's your family or you married into that?

**JUROR 32:** My family.

**THE COURT:** Your family, okay.  My question really, bottom line, is whether any of that would interfere in any way with your listening to the witnesses, basing your testimony -- basing your decision solely on the -- on the testimony?

**JUROR 32:** Absolutely not.  It will not interfere.

**THE COURT:** It will not interfere.  You feel that you

OFFICIAL TRANSCRIPT

can look these folks in the eye and say that you will be a fair and impartial juror?

**JUROR 32:** Yes to all of the eyes around me.

**MS. O'NEILL:** I just have one follow-up, Judge.  When you say you weren't involved in any of these --

**JUROR 32:** No.  Absolutely not.

**MS. O'NEILL:** -- you weren't a victim in any of those cases?

**JUROR 32:** I witnessed some of the cases but wasn't a victim.

**MS. O'NEILL:** Okay.

**JUROR 32:** Parent issue.

**MS. O'NEILL:** And do you feel that the -- the way in which those cases were handled by the police and the prosecutors was fair to all parties involved?

**JUROR 32:** Yes.

**MS. O'NEILL:** Okay.

**JUROR 32:** Yes.

**THE COURT:** Anything?  Okay.  Thanks very much for sharing that with us.

Yes, ma'am.

**JUROR 35:** My name is Anissa Hebert.

**THE COURT:** Yes, Ms. Hebert.

**JUROR 35:** Juror Number 35.  I'm not sure if it would pertain or not.

**THE COURT:** Sure.

**JUROR 35:** But my ex-husband was convicted of attempted first-degree murder, I think it was.

**THE COURT:** Okay.  And that's your ex?

**JUROR 35:** And it's been like 25 years, he's been in prison, so I didn't know if it would pertain.

**MS. O'NEILL:** And I'm sorry.  I didn't hear what he was convicted of?

**JUROR 35:** Attempted first-degree murder.

**MS. O'NEILL:** Okay.

**JUROR 35:** I believe it was.

**THE COURT:** And he's in jail now?

**JUROR 35:** Yes, he's still in there.

**THE COURT:** Still in there?

**JUROR 35:** Yes, sir.

**THE COURT:** And did you listen to the case at trial?

**JUROR 35:** No.  I wasn't in the room or anything when they did the trial.

**THE COURT:** Okay.  Were you married to him at that time or was he, basically --

**JUROR 35:** Yes, sir.

**THE COURT:** -- your ex at that time?

**JUROR 35:** Actually, ex.  I was the ex.

**THE COURT:** He was your ex at the time?

**JUROR 35:** Yes.

OFFICIAL TRANSCRIPT

**THE COURT:** And the bottom line question is whether or not that would give you any -- would that interfere with -- in any way with your being a fair and impartial juror in this particular case?  Would you be able to listen to the evidence and judge the witnesses the same as you would anybody else and make a decision that's fair and appropriate to this case?

**JUROR 35:** Yes.

**THE COURT:** Would that interfere with you in any way? Would you harbor that against the government or the defendant or --

**JUROR 35:** No.

**THE COURT:** And the fact that somebody is charged, would that mean automatically that they're guilty or would you require the government to prove that they are guilty?

**JUROR 35:** I would make y'all prove if they're guilty or not.

**THE COURT:** All right.  And you're not angry with the government for your ex-husband being in jail?

**JUROR 35:** No.

**MR. GUICE:** Did -- did the police and prosecution treat your ex-husband fairly during the trial?

**JUROR 35:** As far as I'm aware, yeah.

**MS. O'NEILL:** And I'm sorry.  I heard the Judge ask you this, but I didn't hear your answer.  You were married when he was charged or --

OFFICIAL TRANSCRIPT

**JUROR 35:** No.

**MS. O'NEILL:** -- this was after?

**JUROR 35:** It was, like, right after.

**MS. O'NEILL:** And did you have children together?

**JUROR 35:** Yeah.  I have four children.

**MS. O'NEILL:** With him?

**JUROR 35:** With him.

**MS. O'NEILL:** And was the -- was the -- what he was charged with, was that part of the reason that your marriage dissolved?

**JUROR 35:** We -- we ended up getting a divorce and then he ended up getting remarried and he had another child and it was shaken baby --

**MS. O'NEILL:** Okay.

**JUROR 35:** -- syndrome, I think it's called.

**THE COURT:** Did you have any doubts about whether or not he really was guilty?

**JUROR 35:** It was questionable, but -- because, I mean, he was kind of a little bit abusive to me and a little verbally to my children at times.

**MS. O'NEILL:** I'm sorry for that.

**JUROR 35:** I'm sorry still.

**MS. O'NEILL:** Do you feel that the process to him -- I mean, you weren't -- you weren't involved in the trial at all?

**JUROR 35:** I wasn't in the trial or nothing.

**MS. O'NEILL:** Okay.

**THE COURT:** Thanks very much.

**JUROR 35:** You're welcome.

**MS. O'NEILL:** Thank you.

**THE COURT:** Yes, sir.  How are you?

**JUROR 39:** Hi.  How are you?  My sister was convicted of an armed robbery charge along with a couple of her friends in about 2000 and then she was sentenced to probation for that and violated her probation and went to jail for, like, two years after that.

**THE COURT:** I see.  Was that in state court or federal court?

**JUROR 39:** State court in Jefferson Parish.

**THE COURT:** Jefferson Parish.  Okay.  Was she treated properly during that period of time --

**JUROR 39:** Yes.

**THE COURT:** -- by the government?

**JUROR 39:** Yes.

**THE COURT:** By the state?

**JUROR 39:** As far as I know.

**THE COURT:** Okay.  And the question is whether or not that experience would give you any problems or interfere with you being a fair and impartial juror in this case?

**JUROR 39:** I don't believe so, no.

**THE COURT:** Is she -- where is she now?

OFFICIAL TRANSCRIPT

**JUROR 39:** She's actually living in Arlington, Texas now with her husband and family.

**THE COURT:** Okay.  Do you keep in touch with her?

**JUROR 39:** Oh, yeah.  Yes.  Definitely.

**THE COURT:** Has she had any problems since?

**JUROR 39:** Thankfully, no.  She learned her lesson.

**THE COURT:** Do you have any bad feelings about the government simply because they prosecuted -- the state --

**JUROR 39:** No, not at all.

**THE COURT:** All right.

**MR. GUICE:** What did -- what did she do to violate her probation?

**JUROR 39:** I don't actually remember.  I think it was just not going to the meeting that she was supposed to go to and not paying the court cost.

**MR. GUICE:** Restitution.  Do you think the probation officer treated her fairly?

**JUROR 39:** Yeah.  In fact, more than fairly.

**MS. O'NEILL:** When she -- before she got the conviction, when she was first charged, did it surprise you?

**JUROR 39:** Honestly, no.

**MS. O'NEILL:** Okay.  So --

**JUROR 39:** I hate to say that, but --

**MS. O'NEILL:** So going into it -- and I know it's your sister so you have different information than, you know,

OFFICIAL TRANSCRIPT

about --

**JUROR 39:** Right.

**MS. O'NEILL:** -- any other defendant, but, you know, did you feel that she should be presumed innocent going into the process even though you, yourself, had your doubts about that --

**JUROR 39:** Right.

**MS. O'NEILL:** -- from the beginning?

**JUROR 39:** Yeah.  Everybody should get that -- get that privilege.

**MR. GUICE:** I didn't hear you.  I'm sorry.

**JUROR 39:** No.  I said, everybody should have that privilege.

**MS. O'NEILL:** Thank you.

**THE COURT:** Thanks very much.

Yes, sir.

**JUROR 45:** Clayton Buzbee, III, Number 45.

**THE COURT:** Yeah.

**JUROR 45:** I have an open investigation with the sheriff's office involving an individual leaving death threatening voicemails.

**THE COURT:** So you complained about -- you made a complaint to the sheriff's office?

**JUROR 45:** Several times and it's reopened right now.

**THE COURT:** And what is the charge?

**JUROR 45:** What is it, 14:285?  Leaving death threatening voicemails on my voicemail.

**THE COURT:** On your voicemail.

**JUROR 45:** Yes.  Credible threatens.

**THE COURT:** Okay.  And was that a prior friend of yours?

**JUROR 45:** Yeah.  Yes, sir.  Yes, sir.  A friend of 20 years and I had to cut ties with him and he just -- I guess he didn't like that.

**THE COURT:** I see.  All right.  And you're -- has he been charged at all?  Do you know?

**JUROR 45:** They -- they haven't charged him because they told me that they can't find him.  So I'm actually going to have to hire a private investigator to find this person's whereabouts so they can serve him with the warrant.

**THE COURT:** So you're concerned for your safety as a result of this?

**JUROR 45:** Yes.  I started carrying a firearm.  Not here.  Not in here, of course.

**THE COURT:** Yeah.

**JUROR 45:** Yes.  Yes, sir.

**THE COURT:** All right.

**MR. GUICE:** Are you satisfied with the St. Tammany Parish Sheriff's Office?

**JUROR 45:** No.

OFFICIAL TRANSCRIPT

**MR. GUICE:** No?

**JUROR 45:** No.

**MR. GUICE:** Why?  They're not doing a good job?

**JUROR 45:** Not at all.

**MR. GUICE:** How come?

**JUROR 45:** Because they didn't even -- they haven't even bothered to call this individual.  The number that I have -- I have, like, a list of voicemails that I originally blocked.  So he got a brand new phone number and started leaving voicemails from that phone number and they haven't even bothered to call this number.  So that's why I got to hire a private investigator.

**MS. O'NEILL:** Are you concerned about your safety having to come -- if you were selected for the jury, are you concerned about having to come here and serve on this criminal jury knowing that you have that complaint out there and St. Tammany Parish isn't handling it the way that you --

**JUROR 45:** I don't think that would concern me.

**MS. O'NEILL:** If -- if -- if this gentleman is arrested, when -- if he decided to go to trial he has a right to be presumed innocent.  Do you think that's fair to him that he has that right?

**JUROR 45:** Considering the nature of the voicemails, no.

**MS. O'NEILL:** And so as a result of your experience is

it fair to say that just because of what you've had to go through, and I'm sorry about that, that you -- do you think you may be just would be leaning not in favor of the defendants because they're sitting here they probably did something, too?

**JUROR 45:** They didn't do anything to me so I wouldn't hold anything against them.

**MR. GUICE:** I didn't hear you.  I'm so sorry.

**JUROR 45:** They didn't do anything to me so I wouldn't hold anything against them.

**MS. O'NEILL:** But if someone gets up here and, you know, says something about that they did do something to them, is it because of your experience being a victim?  Do you think you may be or are more likely to believe another victim?

**JUROR 45:** I'd like to think no.

**MS. O'NEILL:** So you're saying you'd like to think so, is that --

**JUROR 45:** I'd like to think no.

**MS. O'NEILL:** Yeah.

**JUROR 45:** No.  I would not be inclined to --

**THE COURT:** The question that they're really asking you is whether or not you could be a fair juror in this particular case?

**JUROR 45:** I -- I -- I think so.

**THE COURT:** That past experience or the experience that you have now, do you feel that you've been -- that would

not affect you being a fair and impartial juror in this case?

**JUROR 45:** Regarding the nature of the case, I'd like to think that I wouldn't -- I wouldn't be biased.

**MS. O'NEILL:** So you hesitated a little, sir, and there's no wrong answers here.  We just -- we just want you to answer truthfully.

**JUROR 45:** Yeah.

**MS. O'NEILL:** Is -- do you have any doubts about your ability to be fair because of your experience?  Knowing that there -- there is no right or wrong answer to that question.

**JUROR 45:** Well, if -- if it's okay for me to say this, I don't -- I don't agree with federal drug laws.

**MS. O'NEILL:** Okay.

**THE COURT:** What do you mean by that?

**JUROR 45:** Like, I think that certain -- certain -- I don't use recreational drugs myself, but I do believe that if an American citizen wanted to they should be allowed to.  I'm just being truthful.

**THE COURT:** All right.  All right.

**MR. GUICE:** And you know that we're -- we're -- part of this case is cocaine?

**JUROR 45:** Yes, I do.

**MR. GUICE:** So how would that -- how would your feeling about drugs make -- make you feel about giving the government a fair consideration on drug charges?

Case 2:22-cr-00077-EEF-KWR    Document 401    Filed 12/16/24    Page 56 of 258

**JUROR 45:** I'm not sure I'd be able to.

**MS. O'NEILL:** Is there a difference to you, in your mind, about, you know, someone who has a small amount of drugs for personal use?  Is that different than someone bringing in a large quantity of drugs into --

**JUROR 45:** Yes.

**MS. O'NEILL:** -- the country from somewhere else?

**JUROR 45:** Yes.

**MS. O'NEILL:** How do you feel -- in the situation, how do you -- what's your feelings about the latter?  Do -- do you feel that that -- those drug laws are fair; the large quantities?

**JUROR 45:** I -- to be honest, I -- I -- knowing that certain drugs have not always been illegal in this country, I'm -- at the current time, I kind of don't think that that's fair.

**MS. O'NEILL:** Okay.

**THE COURT:** All right.  Thanks very much.

**MS. O'NEILL:** Thank you.

**THE DEPUTY CLERK:** Judge, that's it for this question.

**THE COURT:** That's it.  Okay.  Thank you very much.

(End of bench conference.)

**THE COURT:** Okay.  Thank you.  Anyone on the panel has ever had any experience working in law enforcement, that is to say, either federal agent, police officer, military police?

OFFICIAL TRANSCRIPT

We're talking about police, but I want to extend it now to the military police and any -- any federal agent.

Anyone related by blood or marriage or does anyone have any close friend who is engaged in law enforcement? We asked about you. Anybody have any close friend or relative?

**JUROR 9:** Bereket Berhane, Juror Number 9. I was in the Louisiana Air National Guard Security Forces, which is military police.

**THE COURT:** All right. Thank you.

**JUROR 1:** Sarah Craig, juror one. I have close friends who are School Resource Officers in Jefferson Parish and a cousin who was a State Trooper in North Carolina.

**THE COURT:** Okay.

**JUROR 24:** Danielle Smith Graham, Number 24. My cousin, he's a Federal Corrections Officer in Texas.

**THE COURT:** Okay.

**JUROR 24:** And I also have a friend, a close friend, who is a sheriff at -- in Tarrant County in Texas.

**THE COURT:** And what's you're number, ma'am?

**JUROR 24:** Huh?

**THE COURT:** Your number?

**JUROR 24:** 20 (sic).

**THE COURT:** Okay. Anybody -- anybody work or have ever worked that -- is a customs agent or border patrol agent?

Anybody belong to an organization that seeks to

OFFICIAL TRANSCRIPT

influence the enforcement or lack of enforcement of any immigration laws in the United States?  Anybody a member of any organization that either objects to the enforcement or supports the enforcement of the -- anyone ever work for the Coast Guard?

Number 2.  Okay.  Tell us about that, sir.

**JUROR 2:** Well, a lot of military in my family.  I was born and raised in Michigan, lots of water.  That was perfect for me.

**THE COURT:** Okay.

**JUROR 2:** Dad was World War II and my brother was Marines in Vietnam and quite a few different family members were in the military.  I don't know if this counts.  I've got a stepsister had a husband that was involved in border -- a border agent.  I think in Arizona.

**THE COURT:** All right.

**JUROR 2:** Unfortunately he died of cancer a long time ago.

**THE COURT:** All right.

**JUROR 2:** My time in the Coast Guard was short.  It was one of my biggest mistakes in life that I didn't stay in and retire.

**THE COURT:** How long were you in it?

**JUROR 2:** Just two years.

**THE COURT:** And how long ago?

**JUROR 2:** I was out in 1981.

**THE COURT:** All right. Okay. Thank you very much.

**JUROR 2:** You're welcome.

**THE COURT:** Anything anyone has read in either the newspapers or magazines or viewed on television regarding immigration laws that would prevent you from being a fair and impartial juror in this case? Anything that you've read or heard or witnessed in a -- television that would make it hard for you to be a fair and impartial juror in this case?

Anybody have any friend or family member that's been impacted by unlawful immigration?

The law provides that the defendant -- I'm sorry.

Yes. Yes. Okay. Thank you. I -- I understand.

**JUROR 15:** My boyfriend's dad was an illegal immigrant. He recently became legal.

**THE COURT:** Great. Thank you very much.

The law provides that a defendant does not have to testify in a criminal case. The law further provides that if a defendant does not testify, you may not consider his failure to testify for any purpose in deciding his guilt or innocence. Is there any juror who, because of personal feelings or for any other reason, would not be able to follow this time-honored rule of law?

Prosecuting attorneys and defense attorneys --

**THE DEPUTY CLERK:** Hold on, Judge.

**JUROR 27:** Good morning, Your Honor. Rondell Battle,

OFFICIAL TRANSCRIPT

juror 27.  May I approach the bench?

**THE COURT:** Sure.

(Bench conference on the record.)

**JUROR 27:** Good morning, Your Honor.

**THE COURT:** Good morning.

**JUROR 27:** I'm sorry.

**THE COURT:** It's okay.

**JUROR 27:** I just want to be honest about it.  I don't want to compromise this case.

**THE COURT:** Not so loud.

**JUROR 27:** I really don't.

**THE COURT:** Okay.

**JUROR 27:** And I don't want to be a part of this because I don't want to make a decision to send two guys away from their family.  I don't want to make that decision because in my mind they're already not guilty and I feel like I'd be compromising this case if -- if I'm already coming in, no matter -- whatever evidence they have.

**THE COURT:** All right.  So you feel that you -- that without hearing any evidence at all you've concluded that they're --

**JUROR 27:** Yes.  I mean, because I raised six kids and to be able to make one mistake and just the thought of leaving my kids behind, I don't want to be a part of that -- making that decision with them.

OFFICIAL TRANSCRIPT

**THE COURT:** All right. Okay. Any questions?

**MS. O'NEILL:** Can I ask -- so -- so they are not guilty, right, the -- the Judge just said --

**JUROR 27:** I understand that, innocent until proven guilty.

**MS. O'NEILL:** But -- and so do you feel like if the government --

**JUROR 27:** Even with the evidence --

**MS. O'NEILL:** Okay.

**JUROR 27:** -- I would compromise the case. If -- if -- if I was the last one making a decision in saying guilty or not guilty, they're not guilty to me.

**MS. O'NEILL:** Thank you.

**THE COURT:** Okay. Thanks very much. I appreciate it.

**JUROR 27:** Y'all have a good one.

**MS. O'NEILL:** You, too.

**JUROR 27:** You're welcome.

(End of bench conference.)

**THE COURT:** Okay. As I was saying, prosecuting attorneys and defense attorneys both have a legal duty to object to evidence when they feel it should not be presented. You may not consider any objection in this trial as to -- as an indication of either the guilt or innocence of the party. Anyone have any -- believe that any objection to evidence made by an attorney during a trial indicates that his client or her

OFFICIAL TRANSCRIPT

client is guilty?

The indictment is not evidence of guilt, as I've said before. It is no more than a piece of paper used to advise the defendant of the charges brought against him. It's merely a means. It's merely a vehicle by which the government accuses the defendant. No inferences or suggestions of guilt are to be drawn from the mere fact that charges have been made. Is there anyone who cannot follow this rule of law?

Ladies and gentlemen, the burden of proof in this case is on the government. The government has the burden of proving the defendant's guilt beyond a reasonable doubt before the defendant can be convicted, and to do this the government must establish beyond a reasonable doubt every essential element of the charges contained in the indictment. The defendant is not called upon to prove that he is innocent. The defendant has the benefit of what is known as the presumption of innocence and he is presumed to be innocent until the government -- until -- until and unless the government proves his guilt beyond a reasonable doubt. If you are selected as a juror you must give the defendant the full benefit of the presumption of innocence and require the government to prove his guilt beyond a reasonable doubt before returning a verdict of guilty in the case. Is there anyone who cannot give the defendant the presumption of innocence?

Is there anyone here who does not understand that if

the government fails to establish the guilt of a defendant beyond a reasonable doubt it is your sworn duty to acquit the defendant?

If there are two reasonable theories or explanations that can be drawn from the evidence or from the lack of evidence, one consistent with guilt and one consistent with innocence, the jury is bound to accept the theory or explanation that is consistent with innocence and find the defendant not guilty.  Is there anyone unable or unwilling to follow this long-time rule?

If selected as jurors, it will be your sworn duty to decide this case solely on the evidence presented during the trial and the instructions that I will give you concerning the law.  Is there anyone who is unable to do that?

Is anyone taking any medication that will in any way interfere with your service as a juror?  Makes you tired, makes you sleepy.  Yes.

**JUROR 42:** Hello.  I'm Angela Washington, juror 42. I've just been diagnosed with diabetes and I -- you know, if anybody has diabetes they know how you feel, so I'm new to this.  And I have a lot of -- I'm scheduled for lab work and different things this week and some of next week, so I don't know if that -- I get sleepy.  My sugar drops.  My vision get blurry.  Those types of things happen and, like, if I'm at work I can leave, go get something to eat or eat -- you know, eat,

use the bathroom.  It's just different things like that that happen.  So if you're familiar with diabetes you would know.  And I'm new -- like I said, I'm new to it.  I'm just put on a medication, so...

THE COURT: Have you had any difficulties so far this morning, ma'am?

JUROR 42: Well, this morning it was low and I have some pain in my stomach as of right now actually.

THE COURT: All right.  Okay.  Thank you very much.

JUROR 42: You're welcome.

THE COURT: Anyone else?

JUROR 45: Clayton Buzbee, III, Juror Number 45.  I have an undiagnosed condition where I have random nauseous and I have to take pills for it and it can just come on like that.  I'm seeing a doctor about it.  We're trying to get a diagnosis on it.

THE COURT: All right.  Thank you very much, sir.

THE COURT SECURITY OFFICER: One more, Judge.

JUROR 30: Yes.  My name is Andrew Moliniare.  I'm Number 30.  I am diabetic.  I'm on insulin and the only bad thing is when I need to use the restroom, I have to use the restroom.

THE COURT: All right.  Sure.

JUROR 30: I can't -- I can't fix that.

THE COURT: Okay.  Well --

OFFICIAL TRANSCRIPT

**JUROR 30:** Thank you.

**THE COURT:** If you're on the jury, please let us know, and we'll --

**JUROR 30:** Yes, sir.

**THE COURT:** -- certainly take a break.

Yes?

**JUROR 2:** Number 2, Your Honor.  I've got Type 2, but it's no big deal.  Whatever time we're going to be rolling, I can eat and take my meds before, but I haven't taken them yet this morning, so --

**THE COURT:** All right.

**JUROR 2:** -- shortly I'll need to eat something and take them --

**THE COURT:** Okay.

**JUROR 2:** -- but I'm fine.  I don't fall asleep.  If it gets too hot I get irritable.

**THE COURT:** Okay.  Thank you very much.

**JUROR 2:** So I might start yelling at everybody or something.  I don't know.

**THE COURT:** Anybody read or hear anything about this particular case?  Just raise your hand if you have.

The case is expected to last approximately one week. The jury will not be sequestered, that is, you will not be required to stay here.  You can go home every day after trial. Our schedule will be about 8:30 in the morning, we'll start,

OFFICIAL TRANSCRIPT

and we'll try to stop around 5:00, 5:30.  We'll take a break in the morning, one in the afternoon.  We'll take a lunch break in the middle of the day.  And if any of you need any particular breaks or bathroom break in between, let me know and we'll stop immediately.  Does that schedule give anybody any serious problems?  Okay.

**JUROR 15:** I just missed a week of work because I was out of town so that would cause me to be --

**THE COURT:** Okay.

**JUROR 15:** -- like, almost three weeks out of work and I seriously cannot afford that.

**THE COURT:** All right.  Thank you, ma'am.

**JUROR 17:** Good morning.  Rachel Caldwell, 17.  I'm currently an oncologist at East Jefferson, so being here for a week would hinder my patients' care.  I do have people's therapy scheduled this week and next week so that would put my patients back from starting their treatment.

**THE COURT:** All right.

**JUROR 25:** May I approach, Your Honor?

**THE COURT:** Yes.

(Bench conference on the record.)

**JUROR 25:** Good morning, Judge.

**THE COURT:** Good morning.

**JUROR 25:** I have an oral argument on Monday scheduled in Louisiana First Circuit Court of Appeal.  I'm the trial

OFFICIAL TRANSCRIPT

lawyer in that case and it's up for appeal and so they -- they sent us the notice like right after I got secured for jury duty.  So...

**THE COURT:** Questions?

**MS. O'NEILL:** Are you doing the oral argument?

**JUROR 25:** I have an appellate counsel, but I'm the trial lawyer.

**MS. O'NEILL:** Okay.

**JUROR 25:** So...

**MR. GUICE:** I feel your pain.

**JUROR 25:** I'm sorry?

**MR. GUICE:** We feel your pain.

**JUROR 25:** Yeah.  I know.  I mean, the client does expect me to be there.  I have some information that she might need during the course of the argument, if necessary, because I'm more familiar with the facts of the case, of course, but, you know, we do have appellate counsel.  I'm just expected to be there by my client.

**THE COURT:** Okay.  All right.  Thanks for --

**JUROR 25:** Thank you.

**THE COURT:** Okay.

**JUROR 18:** Good morning.

**THE COURT:** Good morning.

**JUROR 18:** I'm president of a business and I am scheduled to do a transition in the department Thursday and I'm

OFFICIAL TRANSCRIPT

also scheduled to be out of town Thursday and Friday, so that would --

**MS. O'NEILL:** Of this week?

**JUROR 18:** Of this week.

**THE COURT:** Of this week.

**JUROR 18:** Eighteen.  I'm sorry.

**MR. WASHINGTON:** I'm sorry.  What did you say you were transitioning for?

**JUROR 18:** I'm terminating an employee Thursday.  I'm scheduled to do that and I'm scheduled to leave Thursday afternoon.  I'll be out of town Thursday and Friday.

**MR. GUICE:** And that's Pel Hughes Printing?

**JUROR 18:** Correct.

**MR. GUICE:** Okay.  And you're the owner?

**JUROR 18:** Correct.

**MS. O'NEILL:** And you're Mr. Hughes?

**JUROR 18:** Yes.

**MS. O'NEILL:** Thank you, Mr. Hughes.

**THE COURT:** Thank you.

**JUROR 29:** Good morning.  Hi.  I'm a teacher.  I just started working at the school that I'm currently at.  I have a second grade class.  We are short -- there's a shortage in teachers.

**THE COURT:** Yeah.

**JUROR 29:** My children are split up with other

OFFICIAL TRANSCRIPT

teachers right now.  A week would be detrimental to my children.

THE COURT: Where do you teach?

JUROR 29: I teach at Martin Behrman Elementary.  In addition to that, my husband had two strokes.  He had prostate cancer and just recently he was diagnosed with seizures.  So I watch him on the camera when I can when his home health aid is not there.  So if he needs me, I can -- my principal knows I need to go.  Like, so...

THE COURT: Okay.  Any questions?

MR. WASHINGTON: No questions.

MR. BADAWY: No.

THE COURT: Thank you.

MR. GUICE: Thank you.

MS. O'NEILL: I'm sorry about your husband.

THE COURT: Yes, sir.

JUROR 43: Lionel Griffin, juror 42.

THE COURT: Yes, sir.  Forty-three.

JUROR 43: Oh, I'm sorry, 43.  I'm a site construction supervisor and I run my own site.  And being out a week, I don't know how --

THE COURT: I'm sorry.  Tell me what you are.  You're a what?

JUROR 43: A site supervisor --

THE COURT: A site supervisor.

**JUROR 43:** -- for a construction company.  I'm the head guy on my site.  I actually have somebody sitting in for me today.

**THE COURT:** So what do you do?  Just watch them and make sure they're working?

**JUROR 43:** Well, they have me attend meetings with the clients, coordinate all work going on there, pretty much everything.

**THE COURT:** What are y'all doing now?

**JUROR 43:** Right now?

**THE COURT:** Yeah.  I mean, what -- what area?

**JUROR 43:** Doing electrical work, but I'm in Baton Rouge right now.

**THE COURT:** Baton Rouge?

**JUROR 43:** Yeah.

**THE COURT:** Okay.

**MR. GUICE:** No questions.

**MS. O'NEILL:** Do you work -- I'm sorry.  And you might have said this and I just didn't hear you.  Do you work for yourself or you work for a company?

**JUROR 43:** No, a company.

**MS. O'NEILL:** And what company is it?

**JUROR 43:** Triad Electric and Controls.

**MS. O'NEILL:** And so are there -- there's someone covering for you today?

OFFICIAL TRANSCRIPT

**JUROR 43:** Yes.

**MS. O'NEILL:** And they have -- you know, in the event that you got selected for the service, they would be able to get someone to cover for you?  It might not be the most convenient thing, but they could?

**JUROR 43:** I'm really not sure to be honest with you.

**MR. GUICE:** But you're the site supervisor?

**JUROR 43:** Correct.

**MR. GUICE:** And you make sure everything runs correctly?

**JUROR 43:** Correct.

**MS. O'NEILL:** How many other people have that title at your job?

**JUROR 43:** Me.

**MS. O'NEILL:** You're the only one at your job?

**JUROR 43:** On that site, correct.

**MS. O'NEILL:** Okay.

**MR. WASHINGTON:** What site are you working at in Baton Rouge?

**JUROR 43:** W.R. Grace --

**MR. WASHINGTON:** It's a power --

**JUROR 43:** -- Albemarle.  It's a construction company.

**MR. WASHINGTON:** No.  The job that you're working on, that you go work at, the project site --

**JUROR 43:** Okay.

**MR. WASHINGTON:** Is it a private job or a government job?

**JUROR 43:** I'm not sure how you classify it.

**MR. WASHINGTON:** Okay.

**THE COURT:** It's in Baton Rouge, huh?

**JUROR 43:** Yeah.  What do you mean by government?

**MR. WASHINGTON:** Who's the client that you're doing the work for?

**JUROR 43:** W.R. Grace Albemarle.

**MR. WASHINGTON:** Okay.

**THE COURT:** All right.  Okay.  Thank you.

Yes, ma'am.

**JUROR 13:** Tori Knight.

**MR. GUICE:** What's your number?  I'm sorry.

**JUROR 13:** Juror Number 13.

**THE COURT:** Thirteen.

**JUROR 13:** Hello.  So my boyfriend is currently out of work, so I wouldn't be able to miss a week of work as I'm paying all of the bills right now and I have no --

**THE COURT:** Who do you work for?

**JUROR 13:** I work for ABM Aviation.  ABM Industries. I work at the airport.

**THE COURT:** Why would they not pay you?

**JUROR 13:** Because if we don't show up for the shift, we don't get paid.

OFFICIAL TRANSCRIPT

**THE COURT:** Are you on a day-to-day basis?

**JUROR 13:** Yes, I am.

**MS. O'NEILL:** So you're paid hourly?

**JUROR 13:** Yes.  I'm paid hourly.

**MS. O'NEILL:** You're not a salary --

**JUROR 13:** No, not salary.

**MS. O'NEILL:** And do you get paid time off?

**JUROR 13:** No, we don't.  We don't get any PTO or any benefits.

**MS. O'NEILL:** And where do you work?

**JUROR 13:** At the airport.  Right at the MSY airport right here.

**MS. O'NEILL:** The Kenner airport.

**JUROR 13:** Yes.

**MS. O'NEILL:** I'm sorry.  I didn't hear you.

**JUROR 13:** And we don't have any --

**THE COURT:** Who's covering for you know?

**JUROR 13:** I have another supervisor covering, but she's already scheduled to work.

**MS. O'NEILL:** And who do you live with?

**JUROR 13:** I live with my boyfriend.

**MS. O'NEILL:** Just the two of you?

**JUROR 13:** Yes.

**MR. GUICE:** I'm sorry.  I didn't hear.  I'm so sorry.  What did you say?

**MS. O'NEILL:** She lives with her boyfriend.

**MR. GUICE:** Oh, okay.

**JUROR 13:** The two of us.

**MS. O'NEILL:** And do you have any children?

**JUROR 13:** No, we don't have any kids.

**MS. O'NEILL:** And you said he's out of work right now?

**JUROR 13:** Yes.

**MS. O'NEILL:** What did he do before he was --

**JUROR 13:** He was also working at the airport.  He was pushing wheelchairs.

**MS. O'NEILL:** Okay.

**MR. GUICE:** So you're the sole source of support for your family?

**JUROR 13:** Yes.

**MS. O'NEILL:** Is he collecting unemployment?

**JUROR 29:** No, he is not.

**THE COURT:** All right.  Thank you.

Good morning.

**JUROR 3:** Good morning, Your Honor.  Troy Roussel, Juror Number 3.  I'm slotted to be out of state starting tomorrow after work, combinations of how everything is already done.  It's a conference.  I'm supposed to be scheduled to go to Wednesday through Friday.

**THE COURT:** For whom?

**JUROR 3:** Cox Business.

OFFICIAL TRANSCRIPT

**THE COURT:** I'm sorry?

**JUROR 3:** Cox Business.

**THE COURT:** Cox?

**JUROR 3:** Yes, sir.  New Orleans, yes.

**THE COURT:** How long have you worked for them?

**JUROR 3:** It's going on 14 years.

**THE COURT:** What are you going to do?  You're going to leave town?

**JUROR 3:** Yes, sir.  Yeah.  It's a medical technology conference in Alabama and we're one of the major sponsors.

**THE COURT:** Who else is going to help you?

**JUROR 3:** I've got some of my account managers that are going to be attending and some of my engineers.

**THE COURT:** And why do you have to be there?

**JUROR 3:** I'm their leader, so I'm kind of running the show.

**THE COURT:** Okay.

**MS. O'NEILL:** Has this trip been planned for quite a while?

**JUROR 3:** It has, yeah.  Yeah.  We start budget season in January, so it's been planned since the beginning of the year.

**MS. O'NEILL:** Okay.

**JUROR 3:** Yeah.

**MS. O'NEILL:** I have no further questions.

OFFICIAL TRANSCRIPT

**MR. GUICE:** None.

**MS. O'NEILL:** Thank you.

**THE COURT:** Okay.  Thank you.

**MS. MILLER:** She just has to go to the bathroom.

**THE COURT:** Let's take a break.  Take a five-minute break.

(End of bench conference.)

**THE COURT:** We're going to take a five-minute break at this time.  Court will stand in recess for five minutes.

**THE DEPUTY CLERK:** All rise.

(Jury out and recess began at 10:30 a.m. until 10:43 a.m.)

(Jury in at 10:43 a.m.)

**THE COURT:** Be seated please.

Okay.  We have a couple more folks?

**THE DEPUTY CLERK:** Yes.

**THE COURT:** Y'all want to come back up?  Okay.

(Bench conference on the record.)

**THE COURT:** Yes, sir.

**JUROR 12:** Sir, how are you doing, sir?  Matthew Wilkerson.

**THE COURT:** Okay, Matt.

**JUROR 12:** Number 12.  I actually live in Natchitoches Parish.  I wasn't allowed to vote down here last week, so I don't know why they're making me come to the court.

**MS. O'NEILL:** You live in Natchitoches?

OFFICIAL TRANSCRIPT

**JUROR 12:** My driver's license still says Metairie. So I drove down four hours last night to be here today.

**MS. O'NEILL:** I'm sorry.

**THE COURT:** Where are you from?

**JUROR 12:** I'm from Natchitoches originally, but we're currently in the process of moving back. I just haven't changed my driver's license yet.

**THE COURT:** All right.

**JUROR 12:** So I'm kind of -- they wouldn't let me vote here last week. I had to do a paper vote -- a paper ballot.

**MS. O'NEILL:** I'm sorry to hear that.

**JUROR 12:** So I don't know why this one doesn't -- I don't know.

**THE COURT:** All right.

**MR. GUICE:** So you had to drive four hours --

**JUROR 12:** Yes.

**MR. GUICE:** -- from Nachitoches?

**JUROR 12:** To here, last night.

**MR. GUICE:** Four hours?

**JUROR 12:** Yeah. Oh, yeah.

**THE COURT:** Okay.

**MS. O'NEILL:** Did you -- do you think you registered to vote, though, in Natchitoches?

**JUROR 12:** Well, we're originally from there. We moved down here. We've been here about eight years now.

OFFICIAL TRANSCRIPT

**MS. O'NEILL:** Okay.

**JUROR 12:** Kids technically still go to school here --

**MS. O'NEILL:** Okay.

**JUROR 12:** -- but we're building a house now --

**MS. O'NEILL:** Okay.

**JUROR 12:** -- in Natchitoches and I've been living up there for the last four or five months.

**MS. O'NEILL:** So you consider yourself a resident of Natchitoches?

**JUROR 12:** I would say so, yes.

**MS. O'NEILL:** Okay.

**JUROR 12:** So...

**THE COURT:** Okay.  I got it.  Thanks.

**MS. O'NEILL:** Thank you.

**JUROR 12:** Good luck.  Thanks.  Sorry about --

**MS. O'NEILL:** Sorry about the drive.

**JUROR 12:** I just hate that I --

**MR. GUICE:** Enjoy the nice weather.

**MS. O'NEILL:** Did they put the lights -- 12.

**THE COURT:** How are you, sir?

**JUROR 21:** Good.  And you?  About three weeks ago my 14-year-old daughter attempted suicide.

**THE COURT:** Say again.

**MR. GUICE:** I'm sorry.

**MS. O'NEILL:** Oh, my gosh.  I'm so sorry.

OFFICIAL TRANSCRIPT

**JUROR 21:** About three weeks ago my 14-year-old daughter attempted suicide.

**THE COURT:** Goodness gracious.

**JUROR 21:** She got out of a mental facility about a week and a half ago so she's really kind of opening up to us now, then a kid last week at her school hung -- hanged himself and he passed away.  I just don't feel mentally, right now, with the therapy and everything.  I just -- I got a lot going on.

**THE COURT:** Yeah, sounds like it.  Well, I'm sorry to hear that.

**MS. O'NEILL:** I'm so sorry, sir.

**JUROR 21:** Thank you.  We think it's bullying, but she won't tell us.  So...

**THE COURT:** All right.  Thank you, sir.

**MS. O'NEILL:** Good luck to you, sir.

**JUROR 45:** Clayton Buzbee, III.

**THE COURT:** Hey, sir.

**JUROR 45:** Number 45, sir.

**THE COURT:** Yeah.  Gotcha.

**JUROR 45:** Your Honor, I'm out of PTO because of various health issues I've had throughout this year.  Back in July I was mandated by my employer to go on a Federal Medical Leave for general anxiety.  I work for a company, a well-known company, with a pretty good HR, you know, but like we've got --

this close to Federal Medical Leave would --

**THE COURT:** Yeah.  Okay.  All right.  Thanks.

**MS. O'NEILL:** Thank you.

**JUROR 45:** Yeah.

(End of bench conference.)

**THE COURT:** Okay.  Folks, before y'all get comfortable let me see you back here, please.

(Bench conference on the record.)

**THE COURT:** All right.  Folks, are there any other issues you want me to ask?  Sometimes things come up that's -- you want me to grab somebody up here, something is too hot to handle, you don't want to handle it, give it to me.  Anything of that sort?  Otherwise, I'll let you all go.

**MR. GUICE:** Okay.  Yeah.  Defense is going to go first?

**THE COURT:** Defense will go first.  You go last because you carry the burden.

**MS. O'NEILL:** I didn't -- I can't think of anything, Judge, that --

**MR. WASHINGTON:** I don't have anything.

**MS. O'NEILL:** -- we need for you to ask.

**THE COURT:** Okay.  All right.  Let's hear it.

**MS. O'NEILL:** Judge, are you okay -- because of James' voice, are you okay if we stand up together and -- I think it would be more efficient?

OFFICIAL TRANSCRIPT

**THE COURT:** That's fine.

**MS. O'NEILL:** Is that fine?

**THE COURT:** Sure.

**MR. WASHINGTON:** Thank you, Your Honor.

(End of bench conference.)

**THE COURT:** All right. Members of the jury, thank you for your -- your answers. I'll let the attorneys ask some questions. Hopefully, they won't be -- and I -- it won't be as long as I've been. So, hopefully, we'll get through this quickly.

**MS. O'NEILL:** Good morning everyone, again. My name is Gwyneth O'Neill. I represent Mr. Hernandez and this is Mr. Washington. He represents Mr. Cooper Zelaya. And to try to get everyone out as quickly as possible, we're going to do this together even though we normally do it separately. James also is having a little difficulty with his voice this morning, so if at any point you can't hear him or hear I, please just let us know.

**MR. WASHINGTON:** And I'll do my best to try to work through this voice issue this morning.

**MS. O'NEILL:** I wanted to do a quick follow-up with Ms. Daspit.

**MR. GUICE:** What number?

**MS. O'NEILL:** 33.

Thank you, Ms. Daspit.

**THE COURT:** What's the number?

**MS. O'NEILL:** I just -- I know you said before that you -- you have some difficulty hearing and I just wanted to see because the Judge has been talking for a while and you've heard other people talking and has it been difficult for you to hear? Do you have concerns -- and if you feel more comfortable coming up to the bench to talk, but do you have some concerns about your ability to be able to hear during the trial?

**JUROR 33:** My only problem is, like, some people were talking, if they spoke clearly and loudly, I could hear them, but some people that were talking in the microphone, I don't know what they were saying. The gentleman, when he told us we could go outside for a five-minute break, I didn't know what he said. I had to ask the lady next to me and, unfortunately, I do have -- I have scars on each eardrum and I'm constantly asking people to repeat if they don't talk to my face. And -- and I am sorry about that.

**MS. O'NEILL:** No. No apologies necessary. Thank you, Ms. Daspit. We appreciate it.

**MR. WASHINGTON:** So I expect my voice to get better as we go on, Ms. Daspit.

**JUROR 33:** See, I don't know what you're saying.

**MR. WASHINGTON:** And that's the point of my question. I expect my voice to get better during the week, but if it does not, would you be able to hear what I'm saying throughout this

OFFICIAL TRANSCRIPT

trial?

**JUROR 33:** Okay.  I heard, "Am I able to hear," and I don't know -- I know you said some other words, but they're not distinct.

**MR. WASHINGTON:** That answers my question actually. Thank you.

**JUROR 33:** I am so sorry.

**MS. O'NEILL:** So the judge asked a little bit about the issue of immigration and, you know, we all know there was an election last week and that was a big issue in the election and I'm wondering if anyone has -- first, any experience through their work or friendships dealing with people who may have come to the United States from another country legally or illegally?

Yes, ma'am.

**JUROR 6:** Jaqueline Becnel, Juror Number 6.  I work in the school system and probably 30 percent of our students are of immigrants and we have had several parents deported.

**MS. O'NEILL:** And -- and what do you -- where do you work?  Which school system?

**JUROR 6:** Terrebonne Parish.

**MS. O'NEILL:** And -- and what -- are you a teacher, an administrator?

**JUROR 6:** Secretary.  I've had a personal friend -- who I've become friends with and -- because we have children of

OFFICIAL TRANSCRIPT

the same age, whose father has been deported.

**MS. O'NEILL:** And do you feel as a result of those experiences that you would have a difficult time being impartial if you were selected to participate?

**JUROR 6:** I don't think I would.  I think I would -- you know, whatever the law would be, but it is -- they'd still have to follow the law.

**MS. O'NEILL:** Okay.  And so you'll hear the judge instruct you about the law and -- and you won't have any problem listening and applying the -- the law the way the judge tells you to?

**JUROR 6:** I don't think I would.

**MS. O'NEILL:** Okay.  Does anyone else?

Yes, sir.

**JUROR 22:** Hi.  I'm Terry Wright, Number 22.  I'm retired, but for approximately 20 years of my career I worked in an international shipping company.  I would say 75 percent of our work force were foreign born.  All legal immigrants, so...

**MS. O'NEILL:** So you're familiar with the C1/D visas and that kind of stuff?

**JUROR 22:** To some extent.

**MS. O'NEILL:** And do you have any concerns about, given your history, about being able to apply the law, you know, impartially?

**JUROR 22:** No, I don't.

**MR. WASHINGTON:** What was your position at -- what was your role at the shipping company?

**JUROR 22:** I was a strategic manager.

**MR. WASHINGTON:** And what did that -- what were your duties?

**JUROR 22:** I advised my company on acquisitions, divestments.  I would lead commercial deals, come up with business plans, strategies.

**MR. WASHINGTON:** No further questions.

**JUROR 22:** Thanks.

**MS. O'NEILL:** Thank you, Mr. Wright.

**JUROR 29:** Deanna Proctor, Juror Number 29.  Same. I'm a teacher and we -- I've taught several students who've been from, mostly, Honduras and, you know, some of them have had their parents deported back to where they're from.

**MS. O'NEILL:** Thank you, Ms. Proctor.  I appreciate it.

Yes, ma'am.  Is it Dr. Caldwell?

**JUROR 17:** Yes.  Seventeen.  We take care of all patients, so we have some who are undocumented and do not speak English that we use a translator to communicate with.

**MS. O'NEILL:** And can I ask you Miss -- Dr. Caldwell, do you work in a particular healthcare system?

**JUROR 17:** I work at East Jefferson.  That's LCMC

Healthcare.

MS. O'NEILL: And I know -- I'm sorry.  Did I cut you off?

JUROR 17: Huh-uh (negative response).

MS. O'NEILL: Okay.  And I know you said that -- that you have patients scheduled this week and -- and I know your job is very important, but jury service is really important, too, and so everyone even -- I worked in D.C. and one of the Supreme Court Justices came and was on -- on a jury panel once.  So I'm wondering if -- if you were selected for the jury, is it -- is it possible that LCMC would be able to -- to cover -- have someone cover the patients for you?

JUROR 17: Yes.

MS. O'NEILL: Okay.  I have no further questions.  Thank you, Dr. Caldwell.

THE COURT: Any further questions?

THE COURT SECURITY OFFICER: Two more, Judge.

JUROR 45: Clayton Buzbee, III, Number 45.  I work for a construction company who hires more and more people who can't speak English.  Was -- was that the question?

MS. O'NEILL: Not specifically.  The -- the question was -- was about working with people who are from another country, so -- so it might apply to some of the people who speak --

JUROR 45: Yes, yes.  Mostly Central America, South

America.

**MS. O'NEILL:** Okay.  Thank you, Mr. Buzbee.

**JUROR 48:** Juror Number 48, Retired Trooper Stanley. Any time we had charges against illegal immigrants or undocumented immigrants, depending on what was involved with the case, we would, you know, contact immigration, sometimes Homeland Security or other agencies that may be involved such as DEA, and a lot of the times we would turn them over to those agencies when we were done with them.

**MS. O'NEILL:** And if I'm not mistaken, Mr. Stanley, you said that you're retired?

**JUROR 48:** Yes.

**MS. O'NEILL:** But you worked as a State Trooper in law enforcement for quite a long time?

**JUROR 48:** Yes.

**MS. O'NEILL:** And thank you for your service.  Can you tell us -- you know, I know one of the things we hear a lot about now are -- are people saying that -- the blue lives matter movement and we need to support our law enforcement officers.  Is that something that -- that you feel applies to you, that you have those kinds of feelings about law enforcement?

**JUROR 48:** Yes.  Definitely.  I think our country is definitely in need of, you know, support from law enforcement.

**MS. O'NEILL:** And because you -- your experience is

someone who has been in law enforcement, you know, you're -- you're not in a courtroom, right? You're -- you're -- as a law enforcement officer you're not a juror. Your experience is you take the facts as you have them. You don't worry about the burden of proof or the presumption of innocence. That's for the court system to deal with later; is that fair to say?

**JUROR 48:** Yes. Correct.

**MS. O'NEILL:** And so because of that experience, you know, it's fair to say that you -- we all have biases, you know. Some of them are easy -- easily able to identify and some are not. For you, you know, even if it's just the smallest bit, you're -- you're going to be, as between two people, more differential to law enforcement as a result of your experience?

**JUROR 48:** Possibly, yes.

**THE COURT:** The question really is whether you'd be able to be a fair and impartial juror in this particular case, listen to the evidence, judge everybody in the same way? Would you be able to do that, sir?

**JUROR 48:** Yes, Your Honor. I believe so.

**THE COURT:** Okay.

**MS. O'NEILL:** Was there anyone else who had an experience with someone who was not from this country, either through work or...

**JUROR 20:** Juror Number 20, Kyle Pizzolato. I worked

in the engineering department for Vail Resorts and we had a lot of -- actually lived with the -- on the resort, on the mountain, you know, with people from Brazil, Chile, you know, Honduras, Mexico, all around.  Anyway, the resort actually sponsored, you know, work visas for, you know, foreign workers to come over there and work during -- the resorts during the holidays and stuff like that.  But yeah, so spent a lot of time with them.

MS. O'NEILL: And, I believe, Mr. Pizzolato, you said that you're in graduate school right now?

JUROR 20: Correct.  Yes, ma'am.

MS. O'NEILL: So are you working also?

JUROR 20: Yes.  I'm an electrician currently for a solar company and I'm in grad school for cyber security.

MS. O'NEILL: Is there anything about your experience with people, mainly these people at the resort, that makes you think you would have difficulty being a fair and impartial juror in this case?

JUROR 20: No, ma'am.  There's not.

MS. O'NEILL: Thank you.

JUROR 20: Thank you.

THE COURT: Anything further?

MS. O'NEILL: Just a minute, Judge.

And I know you filled out questionnaires before you came here and there's a couple of people we'd just like to

OFFICIAL TRANSCRIPT

follow-up with.  Ms. Hunter?

**MR. GUICE:** Number?

**MS. O'NEILL:** Ten.

Ms. Hunter, can you tell us what you do for a living?

**JUROR 10:** I work at the VA Hospital in the outpatient clinic.

**MS. O'NEILL:** Thank you.  And if you could just hand the microphone to Ms. Wooten.  Is that right, Ms. Wooten?

**JUROR 11:** Yes.

**MS. O'NEILL:** Ms. Wooten, can you tell us what you do?

**JUROR 11:** I'm retired from banking.

**MS. O'NEILL:** And if you could pass the microphone over to Juror Number 14.  Ms. Bedney, did I get that right?

**JUROR 14:** Bedney.  Bedney.

**MS. O'NEILL:** Ms. Bedney --

**JUROR 14:** Yes.

**MS. O'NEILL:** -- can you tell us what you do?

**JUROR 14:** I do security.

**MS. O'NEILL:** Okay.  For a private security?

**JUROR 14:** No.  No, ma'am.

**MS. O'NEILL:** What do you mean by, "I do security"?

**JUROR 14:** It's like -- I work for a security company, True Force, so it's like for events and stuff like that.  I do security for stuff like that.

**MS. O'NEILL:** Okay.  And, Mr. Bergeron, I think you

OFFICIAL TRANSCRIPT

said that, in you're questionnaire, you're a restaurant owner?

**JUROR 16:** Yes, ma'am.

**MS. O'NEILL:** Okay.  And -- and what's your restaurant called?

**JUROR 16:** Bonnie C's.

**MS. O'NEILL:** Okay.  And where is it?

**JUROR 16:** It's in Slidell.

**MS. O'NEILL:** Okay.  And have you, in the course of working in your restaurant, ever had employees who were from another country?

**JUROR 16:** So not -- not in my restaurant, but in previous management experiences I have.

**MS. O'NEILL:** Okay.  Was there anything about those experiences that you feel would make you not an impartial juror for this case?

**JUROR 16:** No.

**MS. O'NEILL:** Thank you.

**THE COURT:** Is that it?

**MS. O'NEILL:** Mr. Williams?

**JUROR 8:** Yes.

**MS. O'NEILL:** Can you tell us what you do, Mr. Williams?

**JUROR 8:** Well, I do a lot of things.  I'm a trainer at a restaurant, sometimes manager, and I do some stuff online for -- for myself.

OFFICIAL TRANSCRIPT

**MS. O'NEILL:** What kind of --

**JUROR 8:** Websites.

**MS. O'NEILL:** Like design?  Website design?

**JUROR 8:** Well, not website design.  I actually just do stuff for myself.  It's my own websites.

**MS. O'NEILL:** Okay.

**JUROR 8:** It's...

**MS. O'NEILL:** Thank you.

**JUROR 8:** You're welcome.

**MS. O'NEILL:** Ms. Hebert, Juror Number 35.  Hi, Ms. Hebert.  Can you tell us what you do for a living?

**JUROR 35:** I'm a front desk coordinator.

**MS. O'NEILL:** Okay.  And is that for a company?

**JUROR 35:** Yeah.  It's for Terrebonne General Health Systems.

**MS. O'NEILL:** Okay.

**JUROR 35:** Restorix.

**MS. O'NEILL:** Thank you, Ms. Hebert.

And Juror Number 40, Ms. Branigan.  Hi, Ms. Branigan. Could you tell us what you do for a living?

**JUROR 40:** I'm a realtor.

**MS. O'NEILL:** And do you work in the Greater New Orleans region?

**JUROR 40:** That's right.

**MS. O'NEILL:** And not just in Orleans Parish?

OFFICIAL TRANSCRIPT

**JUROR 40:** That's right.

**MS. O'NEILL:** Okay.  Mr. Bennett, Juror Number 41.

**JUROR 41:** Yes.

**THE COURT:** Did I say your name right, sir?

**JUROR 41:** Yeah.

**MS. O'NEILL:** I have very poor handwriting.

**JUROR 41:** Bennett, yeah.

**MS. O'NEILL:** And what do you do for a living, sir?

**JUROR 41:** I'm retired.

**MS. O'NEILL:** And what did you do before?

**JUROR 41:** I was all around entrepreneur.

**MS. O'NEILL:** Okay.

**JUROR 41:** Yeah.

**MS. O'NEILL:** So you were self-employed?

**JUROR 41:** Self-employed.

**MS. O'NEILL:** Thank you, sir.

**JUROR 41:** Okay.

**MS. O'NEILL:** Mr. Malbrough, Juror Number 47.  Good morning, Mr. Malbrough.

**JUROR 47:** Good morning.

**MS. O'NEILL:** Can you tell us what you do for a living?

**JUROR 47:** Operator at a chemical plant.

**MS. O'NEILL:** Thank you, sir.

**THE COURT:** Is that it?  Anything from the government?

**MR. GUICE:** Yes, Your Honor. Just a couple brief follow-ups.

I wanted to ask Juror Number 33 that if you made the jury you realize that you would be up here sitting in the box?

**JUROR 33:** Yes.

**MR. GUICE:** And that all of us would have microphones?

**JUROR 33:** Okay.

**MR. GUICE:** So do you think that would -- would help your hearing situation?

**JUROR 33:** Now, I would hate to say yes -- I'd like to say yes, but I would hate not to be able to understand and -- and ask for you to repeat. I don't -- I don't know what to tell you.

**MR. GUICE:** Okay. Judge, do you think she could walk up and maybe we could test if she could hear?

**JUROR 33:** See, I don't know what he's saying right now. I don't know what you're saying right now.

**MR. GUICE:** Okay. Yeah, because I was talking to the judge.

**JUROR 33:** But I'm just saying --

**THE COURT:** No. That's -- she believes she's going to have some problems. So that's --

**MR. GUICE:** Okay. We'll move on.

Juror Number 6, Ms. Becnel. You can sit down. You don't have to stand up. So you -- you're a teacher?

**JUROR 6:** Secretary.

**MR. GUICE:** Good.  And you teach some people from other countries, children?

**JUROR 6:** I work in the office.  I'm a secretary.

**MR. GUICE:** Okay.  All right.  And so -- and you had said that some of your friends had actually -- children's parents had been deported?

**JUROR 6:** Yes, sir.

**MR. GUICE:** Okay.  Does that make you mad at the government for deporting them or...

**JUROR 6:** Certain ones that upset me.

**MR. GUICE:** Okay.  Why did it upset you?

**JUROR 6:** I'm sorry.

**MR. GUICE:** No.  I'm sorry.

**JUROR 6:** It's okay.  Excuse me.  One particular one had been in the country for a good period of time and when he left, he left a family behind and no one was able to take care of them.

**MR. GUICE:** Okay.  I understand.  Now, let me tell you this and just -- so we're all clear because we're all kind of getting to know each other here.

**JUROR 6:** Yes, sir.

**MR. GUICE:** This case is about importing illegal immigrants into the United States for money.

**JUROR 6:** Yes, sir.

OFFICIAL TRANSCRIPT

**MR. GUICE:** And that's going to be the bulk of our case. So because of your feelings and maybe some people were deported unfairly or left family in the country, would you be able to really and truly, from the bottom of your heart, give the government a fair shake on an illegal immigration case?

**JUROR 6:** I feel like I could, but I couldn't tell you it wouldn't make me emotional.

**MR. GUICE:** Okay. All right. And Juror Number 48.

**JUROR 48:** Yes, sir.

**MR. GUICE:** Ms. O'Neill asked you about blue lives matter or something along those lines. You are a trained state trooper, right?

**JUROR 48:** Yes, sir. That's correct.

**MR. GUICE:** And so you went, I presume, to the state police academy?

**JUROR 48:** Yes, sir. I did.

**MR. GUICE:** And you learned about the presumption of innocence in the -- in the police academy?

**JUROR 48:** Yes, sir.

**MR. GUICE:** And you learned that the government has the burden to prove the case beyond a reasonable doubt?

**JUROR 48:** Yes, sir.

**MR. GUICE:** And could you give both sides a fair hearing with your law enforcement background?

**JUROR 48:** Yes, sir. I believe I could.

OFFICIAL TRANSCRIPT

**MR. GUICE:** Okay.

**THE COURT:** Okay.

**MR. GUICE:** That's all I have.

**THE COURT:** Let me see counsel, please.

(Bench conference on the record.)

**THE COURT:** I wanted to talk to y'all about cause. Number three, I'd like him on the jury, but he's committed and he's got a job.  He just has to be there.

Number 12, he doesn't live here, so that's a problem just logistically.  That's Number 12.

Number 13, she's the sole support for her family.  I don't think she'd be a good juror if we make her come.  She doesn't get paid if she doesn't work and so I'm going to excuse her for cause.

**MS. O'NEILL:** Judge, I just wonder -- you know, I know she works at the airport.  I wonder if we ask her -- I know it's not much, but they do get paid for jury service if they're selected to be on the jury.

**THE COURT:** Yeah, but not what she would get at the airport.

**MS. MILLER:** Judge, I'd hate to interrupt, but I just realized I know somebody.

**THE COURT:** I'm sorry?

**MS. MILLER:** I know Number 18.  I realized it sitting there.

OFFICIAL TRANSCRIPT

**THE COURT:** Yeah.  I'm going to excuse 18.

**MS. MILLER:** Okay.

**THE COURT:** Number 19, too.  She's -- I mean, she works for police -- presently works for police.  She's a crime scene tech.  It's going to be hard for her to say that she'd give the police the same hearing as she would anybody else.

Twenty-one seems -- I just had personal -- I can't -- I've forgotten that one.  What's the reason?

**MS. O'NEILL:** His daughter committed suicide.

**THE COURT:** Yeah.

**MS. O'NEILL:** I agree, Judge.

**THE COURT:** I'm going to excuse him.  The guy, you know, poor fellow's carrying a lot these days.

Twenty-four works for the U.S. Attorney's office.

**MR. GUICE:** I think she'd be a great juror, Judge.

**THE COURT:** Okay.  So I'm going to excuse her for cause.

Number 27, he's already made up his mind.  He doesn't want to be a juror, so I'm going to excuse him.

This poor lady, 28.  She's been raped by an immigrant.  I'm going to excuse her.

Twenty-nine, she's -- she's really a committed second grade teacher and, you know, you're not going to get her attention here.  I'm going to excuse her.

I'm concerned about 33.  The lady, she hears certain

things and she doesn't hear other things. She's concerned about hearing y'all. We don't want somebody on the jury who can't hear you guys. I mean, we're going to have -- yeah, that's a problem, so I'm going to excuse her.

Number 45, he thinks the drug laws are unfair. I'm not sure about --

**MR. GUICE:** Forty-five you're excusing, Judge?

**THE COURT:** Forty-five is excused. Forty-three, I don't know. I put a question mark by 43.

**MR. GUICE:** Forty-three?

**THE COURT:** Yeah.

**MR. GUICE:** He was the gentleman who was a site supervisor for the electrical company. He said he's the only guy that can do it.

**THE COURT:** Yeah, I'm concerned about him on the same point as before. If you get somebody that you have to send the Marshals to get him. I'll excuse him for cause.

**MS. O'NEILL:** And, Judge, I would -- I would just note that he does work for a company. He's not self-employed. Somebody's covering him here, today. I mean, again, no one wants to be here and everyone -- almost everyone has a job outside of here and --

**MR. GUICE:** I want to be here.

**MS. O'NEILL:** -- it would be better -- everyone, except for Carter, doesn't want to be here.

OFFICIAL TRANSCRIPT

THE COURT: I understand.

MS. O'NEILL: So just note our objection, Judge.

THE COURT: Yeah.

MR. WASHINGTON: And, Your Honor, that's the reason why I asked him the follow-up questions. He didn't seem to know much about his job. He doesn't come across as a site supervisor. So note my objection as well.

THE COURT: Let me get him up here again. Stay with me here.

THE DEPUTY CLERK: Juror 43, come forward, please.

THE COURT: Mr. Griffin, I'm just concerned a little bit about your job from that standpoint. Everybody thinks you're a great guy and a great -- you'd make a great juror. Tell me about your job. You -- can we get somebody to substitute for you at the job? And, I mean, you can be with us for this case. Once you serve you've got a free ride for a couple of months or a couple of years, I think -- yeah, years. So this is your opportunity to serve. Tell us a little bit about your job.

JUROR 43: Like I said, I'm a site superintendent. I'm working a small job, like, eight people. Basically, work the Plaquemine, Baton Rouge area. I mean, the company is big but the guy I work for, my project manager, has -- I don't know -- maybe six, seven superintendents under him and we have one big job going on in Delhi, which is a turnaround. That's

where most of them are at.  I actually went and covered this weekend for a guy, making relief.  Can't work no more than 13 days in a row.  So as far as being able to cover for that amount of time, I'm not sure.

**THE COURT:** You want to ask him some questions?

**MS. O'NEILL:** How many days a week do you normally work?

**JUROR 43:** Five.

**MS. O'NEILL:** Is it the standard Monday through Friday?

**JUROR 43:** Monday through Friday depending on turnaround work, depending on what's going on.

**MS. O'NEILL:** So today would be day one, you're already here today --

**JUROR 43:** Yeah.

**MS. O'NEILL:** -- and we think we -- we'd go, not on the weekends, so weekends would be open and Monday -- into Monday of next week maybe, maybe Tuesday, and then you'd be done.  Do you think for those five workdays you could get someone?

**JUROR 43:** They scrambled to get somebody today.  For numerous days it's going to be a challenge.

**MS. O'NEILL:** But not impossible?

**THE COURT:** Would you lose your job if you don't --

**JUROR 43:** Would I lose my job?

OFFICIAL TRANSCRIPT

**THE COURT:** Yeah.

**JUROR 34:** No, but I just got up to this level.  This is my first job by myself, standalone, so it's not really looking too good on me if I can't, you know --

**MR. GUICE:** What happens if you don't show up tomorrow, if you got sick, or Wednesday and Thursday and Friday?

**JUROR 43:** If I don't show up?

**MR. GUICE:** Yeah.

**JUROR 43:** I don't know.

**MR. GUICE:** So, I mean, your supervisor is going to have to find somebody to cover for you?

**JUROR 43:** Yeah.  My boss, but nobody is on site.  I am the -- I am the site guy.  Everybody else is in the office.

**MS. O'NEILL:** If the judge called your employer or gave you a letter and said you were -- you know, you had to be here, they would accept that?

**JUROR 43:** I'm sure they would have to accept that.

**MS. O'NEILL:** Yeah.

**THE COURT:** Anything else?

**MR. GUICE:** No, Your Honor.

**THE COURT:** Okay.  Thanks a lot.

**MS. O'NEILL:** Thank you, sir.

**THE COURT:** The question is getting his attention of the trial system.  This guy is -- I'm just concerned about him,

OFFICIAL TRANSCRIPT

frankly, because I can make him come, I can make the attorney -- the employer, at least, not fire him, but it's his first job as a -- both of y'all want him?

**MR. GUICE:** Your Honor, we haven't decided, Judge. But if the guy's going to -- I mean, I'm not sure if he's a site supervisor. I'm not going to be -- I mean, we're not just talking about three days. So today's Tuesday, so Wednesday, Thursday, Friday and maybe Monday and Tuesday, I mean, that's quite an absence.

**MR. WASHINGTON:** I mean, his answer -- answer to my question, you know, he didn't seem like he knew enough about the job. Now, he's saying this is his first time as a site superintendent. Those guys usually know the jobs in and out.

**MR. GUICE:** I don't know about that. I mean, what --

**MR. WASHINGTON:** I mean, the site superintendent is supposed to know the job in and out. That's their job to run the site.

**MR. GUICE:** Okay. Good. That would be implied by the title.

**THE COURT:** All right. I'll let him -- I won't exit him for cause. You all do what you have to do with him. All right. Let's go. You all go to your seats and Dean will come to you.

**MS. O'NEILL:** Judge, the court didn't say anything --

**THE COURT:** Yeah. I'm sorry you didn't have any --

104

**MS. O'NEILL:** -- Juror Number 15?

**THE COURT:** Fifteen?

**MS. O'NEILL:** She's the lady in the red sweatshirt, Judge.  She came up here and --

**THE COURT:** Yeah.  I thought I excused her.

**MS. O'NEILL:** I didn't have her in my list --

**MR. WASHINGTON:** No, Your Honor.  You didn't --

**MS. O'NEILL:** -- but I -- it seemed --

**THE COURT:** I didn't.

**MS. O'NEILL:** The way you were acting that you intended to, Judge, so...

**THE COURT:** And I had marked it, I just didn't know why.

**MS. O'NEILL:** Okay.

**THE COURT:** I usually -- okay.

**MR. GUICE:** That's 15?

**THE COURT:** Yeah.

**THE DEPUTY CLERK:** It's on that page, Judge.  You had 12, 13, 15, and 18.

**THE COURT:** Yeah.  Let me go through them again first. So this is Number 3, Number 12, Number 13, Number 15, Number 18, Number 19, 21, 24, 27, 28, 29, and 33 and 46.

**THE DEPUTY CLERK:** Forty-six or 45?

**MR. GUICE:** I have 45 on there.

**THE COURT:** I'm sorry.  Forty-five.  I'm sorry.  It's

OFFICIAL TRANSCRIPT

45.

**THE DEPUTY CLERK:** I believe that's 13, which gives -- we're below, Judge.

**THE COURT:** Say it again.

**THE DEPUTY CLERK:** We have room.  We have enough.

**THE COURT:** Do you have enough?

**THE DEPUTY CLERK:** Yeah.

**THE COURT:** Okay.  Okay.

**MR. GUICE:** How many peremptory do we get?

**THE DEPUTY CLERK:** Six.

**THE COURT:** Six.

We have enough jurors.  So --

**MR. GUICE:** Good.  All right.

**THE COURT:** This is what you'll do.  You all go through them and Dean will come back and forth.  When we get that we'll get you back up and then you can go to the alternates.

**MR. WASHINGTON:** Your Honor?

**THE COURT:** Yeah.

**MR. WASHINGTON:** Number 48, I know the government tried to rehabilitate him, but --

**THE COURT:** No.  He said he could be fair.  I'll let you take care of that if you need to on your own but, you know, the fellow said that he understands the burden.  He understands that he could be fair.

OFFICIAL TRANSCRIPT

106

**MR. WASHINGTON:** I would just note my objection, Your Honor.

**THE COURT:** I'm sorry?

**MR. WASHINGTON:** Would note our objection.

**THE COURT:** Yeah.  Sure.

**MS. O'NEILL:** And we'll join that, Judge.

**THE COURT:** Okay.  All right, folks.

**MR. GUICE:** Thank you, Judge.

**MS. O'NEILL:** Thank you.

(End of bench conference.)

**THE COURT:** Okay.  Members of the jury, this is what we're doing now.  I dealt with cause challenges.  The attorneys now are -- are -- have what they call -- what we call, peremptory challenges and they have a certain number of them. That's what they're doing now.

For those teachers among you, let me say that somehow or another western civilization really likes the idea of 12. There's 12 months in a year, 12 signs in the Zodiac, even the 12 apostles and on and on and on, the 12 tribes of Israel and there's something about 12, so that's what we do.  Since the fall of the Soviet Union we've been getting a lot of interest in jury trials because we've been doing them now for, in this country, 200 years and in England for 400 years.  So for about 600 years society has been being regulated by juries, by citizens, but they don't like the numbers, particularly, in the

OFFICIAL TRANSCRIPT

east.  They -- they like large numbers apparently, so Eastern civilization has difficulty with 12.  It's like western civilization has done it for a long time just with 12, but I think that's of interest.

In our civil matters in federal court, we now have dropped down to six.  We don't have 12 jurors.  We have, generally, six jurors, but in a criminal law case we still use 12.

Let's speed it up, folks.

**MS. O'NEILL:** Sorry, Judge.

**THE DEPUTY CLERK:** Counsel, would you approach?

(Bench conference on the record.)

**THE COURT:** Okay.  Check your records.  The first juror is Number 4.  The second juror is Number 10.  The third juror is Number 14.  The fourth juror is Number 17.

**MR. GUICE:** One second, Judge.  The third juror is 14. All right.

**THE COURT:** The fourth is 17.  The fifth is 22.  The sixth is 30.  The seventh is 34.  The eighth is 35.  The 10th is 38.

**THE DEPUTY CLERK:** Juror nine, Judge.

**THE COURT:** The ninth is 37.

**MR. GUICE:** Seven is 34.  What's eight?

**MS. O'NEILL:** Thirty-five.

**THE COURT:** Thirty-seven is nine.  The tenth juror is

OFFICIAL TRANSCRIPT

Number 38.  The 11th juror is Number 39 and the 40th juror is number 12 (sic).

**THE DEPUTY CLERK:** Twelfth juror is Number 40.

**THE COURT:** Twelfth juror is Number 40, right.

Does that comport with your...

**MR. GUICE:** Yes.

**THE COURT:** Okay.  Any *Batson* or anything of that sort for this case?  Hearing none.

Okay.  All right.  Each of you have a strike on the alternates.  Let's try to do it here.

**MR. WASHINGTON:** Judge, can we back strike?

**MS. O'NEILL:** Can we use our alternate as a back strike?

**THE COURT:** I'm sorry.

**MS. O'NEILL:** Can we use our alternate as a back strike?

**THE COURT:** Yeah.  Up and down.

**MR. GUICE:** I don't understand.

**THE COURT:** Let's see.  The 40th, 41, 42, 43.

**THE DEPUTY CLERK:** So 41 down.  The 12 that were picked -- the first 12 are the jury.

**THE COURT:** Yeah.

**THE DEPUTY CLERK:** You can't back strike.

**THE COURT:** Yeah.

**MR. GUICE:** So you can't go to the end of the list and

cut.  You have to make a decision on 41.

**MS. O'NEILL:** I'm sorry.  Judge --

**THE COURT:** Forty-one, 42 and 43.

**MS. O'NEILL:** -- we can't --

**THE COURT:** I misunderstood you.

**MS. O'NEILL:** We can't back strike --

**THE COURT:** No.

**MS. O'NEILL:** -- someone who is among the 12.

**THE COURT:** Right.  So 41, 42, 43 and 44.  You have two alternates.

**MR. WASHINGTON:** Number 44, Your Honor.

**THE COURT:** Forty-four.  You strike Number 44?

**MR. GUICE:** Wait.  What happened to 41 and 42?

**MS. O'NEILL:** We're not striking them.

**MR. GUICE:** Okay.

**THE COURT:** So you're striking Number 44.

Okay.  So one of those three will be a...

**MR. GUICE:** Strike 42, Judge.

**THE COURT:** Strike 42, so --

**MS. O'NEILL:** Which one?

**MR. GUICE:** 42.

**THE COURT:** -- the first alternate is 41?

**THE DEPUTY CLERK:** Yes.

**THE COURT:** And the second alternate is 43?

**THE DEPUTY CLERK:** Yes.

OFFICIAL TRANSCRIPT

**THE COURT:** Okay. I'm going to have a word with them. It'll take me about 10 minutes, 15 minutes, then we'll take a break for lunch, an hour and 15 minutes.

**MR. GUICE:** Thank you.

**MS. O'NEILL:** Thank you, Judge.

**THE COURT:** Thank you all. I appreciate your help.

(End of bench conference.)

**THE COURT:** Okay. Members of the jury, first, thank you for your answers to the questions. They've been very helpful and allowed us to pick a jury today.

If your name is called please remain. If your name is not called you can remove to 107. The first juror is Number 4, Mr. Mark Belton. The second juror is Number 10, Mr. Skye Hunter. The third juror is Number 14, Chelsea Bedney. The fourth juror is Number 17, Rachel Caldwell. The fifth juror is Number 22, Terry Wright. The sixth juror is Number 30, Andrew Moliniare. The seventh juror is Number 34, Shelby McDonald. The eighth juror is Number 35, Anissa Hebert. The ninth juror is Number 37, Jeffrey Burns. The tenth juror is Number 38, Florestine Clark. The 11th juror is Number 39, Cameron Arnoult. The 12 juror is Number 40, Michelle Branigan. The first alternate is 41, Kenrick Bennett. The second alternate is 43, Lionel Griffin.

If your name has been called please remain. If your name has not been called you can leave to 107. Before you do

so, I want to take the opportunity to thank you. Although you have not been selected on this jury, your questions have allowed us to pick a jury and I appreciate that. You need to know that your court appreciates it.

All rise out of respect for those individuals as they leave us today and go to 107.

You can sit down if you'd like to. They've left us now.

Swear in the jury, please.

**THE DEPUTY CLERK:** Before y'all have a seat, would y'all stand up. Raise your right hands, please.

(Jury dually sworn.)

**THE COURT:** Okay. Ladies and gentlemen, I just have a few words for you and then we'll take a break for lunch.

You have now been chosen as jurors in this case and I have no doubt that you, as juror, and when I make reference to jurors I'm also referring to the alternate jurors, all of you are mindful of your great responsibilities and certainly you are aware that your conduct during this trial will be observed by the Court, your fellow jurors, the defendants and the attorneys for all parties and other persons both inside and outside of this courtroom.

I expect, and your responsibility demands, that you be extremely careful in the manner in which you conduct yourselves in order that no one has any doubt that this case is

OFFICIAL TRANSCRIPT

being fairly and impartially tried and that in the end justice will be done.

For the same reason, the attorneys in the case, the defendants, the witnesses, and all others identified with or connected in any way with the trial should be equally careful of your conduct.

During the course of the trial jurors should not engage, nor even attempt to engage any conversation of any kind with the persons connected with the trial including, of course, the defendants, their relatives, supporters, if there be any, the attorneys for the government or the defendants, witnesses, or any other persons identified for the trial. And likewise, any person identified at the trial should not engage or even attempt to engage in any conversation whatsoever with any juror. If this happens, please bring it to my attention and I'll deal with it immediately. Further, you, as jurors, should avoid allowing yourselves to be placed in a position when outside the courtroom where the discussions of the case are being conducted by any of the parties in the trial. Furthermore, the attorneys and the defendants, the witnesses and other persons who may be observing the trial or are connected in any way with it must be particularly careful not to discuss and must not discuss the case where there is a possibility that a juror may hear the remarks. If such occurs, please bring it to my attention.

OFFICIAL TRANSCRIPT

Now, all of us, ladies and gentlemen, particularly in this community, are taught to extend a good morning, hello, how are you, how are you doing, things of that nature. Please don't do that in this occasion and I ask the attorneys not to do that with you. And I know they would like to greet you, just as you would to them. That's what we do in this community. And the reason for that, folks, is that we don't want anybody to get the feeling that this case is not being tried impartially and appropriately. So it's not only important that justice be done, it's important that justice appear to be done, and I don't want anybody to get any wrong impression.

I'd like to give you some specific instructions:

You're not to discuss the case. You're not to discuss the case with anyone, this includes your spouse, your child, your relatives, friends and strangers, and you're not to discuss the case even among yourselves until it is concluded and you are instructed to begin your deliberations. And the reason for that, ladies and gentlemen, is oftentimes when we begin discussing cases we say some things and we feel like we're stuck with it. And in this particular case, listen to all of the evidence. It's important that you listen to both sides of the evidence. It's like with my hand. Do you see my hand? You don't see my hand until you've seen both sides of my hand, then you see my hand. So the reason for not discussing

it, originally, is that we don't want you to reach a conclusion before you've heard both sides of the case.

If any publicity about this case has come to your attention, you must strike it from your minds and completely disregard anything that has come to your attention outside of this courtroom.

And from this moment on you are not to read any newspapers or other accounts of the trial, listen to any television reports, if there be any. And you should not check the internet, the websites, blogs or any information about the case, Facebook, X or other social media. Please don't engage in the discussions on those media. And the reason for that, ladies and gentlemen, is that in this case this is like a laboratory for us and it's where we explore justice. And laboratories have certain protocols that they have and we have one here called cross-examination and when you look at the media you get one side of the case and you're not subjected to cross-examination, they're not subjected to cross-examination, and when you bring that information into this laboratory you contaminate the whole laboratory and -- and justice can't be done in that atmosphere. So I know it's sometimes hard not to engage in social media, we're so used to it, but please don't do so in this particular case.

In the morning when you arrive and during the day when you're in the building and the court's in recess or the

OFFICIAL TRANSCRIPT

court's in session and you're not required to be in the courtroom, I ask that you go to and remain in the jury room, which I'll assign for you and I'll assign a United States Marshal to -- to assist you in any needs that you may have.

Let me say something about the trial and how it proceeds.  Counsel for the government and counsel for the defendant have an opportunity to make, what we call, opening statements.  The government will make its opening statement at the beginning of the case and the defendants may make their opening statement.  Now, opening statements, ladies and gentlemen, are not evidence.  It's a verbal program of what they expect the evidence to be.  So it's not evidence, but it is very helpful to you because it's like a verbal program which you'll be able to follow the evidence as it proceeds.  What is said in opening statements, as I said, is not evidence.

After the opening statements, the government will introduce evidence in support of their charges contained in the indictment.

After the government has presented its evidence the defendant may present evidence, but remember the defendants are not obliged to do so.  The burden is always on the government to prove every element of the offense charged beyond a reasonable doubt.  The law never imposes on any defendant in a criminal case the burden of calling any witness or introducing any evidence.

Now, rebuttal evidence may then be reduced -- produced.

At the conclusion of the evidence the parties will have an opportunity to present, what we call, oral arguments. Sometimes we call it summation in support of their respective cases. What is said in closing argument is not evidence, just as what is said in opening statement is not evidence. The arguments are intended to present to you the contentions of the representative parties as to what they believe the evidence has shown and what inferences they feel you may draw from the evidence. Counsel for the government has the right to open and close the arguments and the reason why they get two opportunities is because they have the burden and the law recognizes that and gives them two opportunities to speak.

After the closing argument I will instruct you on the law applicable to the case and you will then retire and consider your verdict, which must be unanimous.

The law applicable to the case will be contained in instructions that I will give you during the course of the trial and it's your duty to follow these instructions.

It is your duty to determine the facts and to determine them from the evidence and in doing so you may not indulge in any guesswork or speculation.

The evidence that you are to consider consists of the testimony of the witnesses and the exhibits admitted into

evidence.  The admission of evidence in court is governed by, what we call, Rules of Law or Rules of Evidence.  From time to time it may be the duty of the attorneys to make an objection to the admissibility of the evidence.  It is my duty to rule on the objections and my ruling may well affect whether you are to consider certain evidence or not.  You must not concern yourself with the objections or the Court's reasons for the ruling on them.  You must not consider testimony or exhibits to which an objection was sustained or which has been ordered stricken.

If I instruct you not to consider the testimony or evidence to which an objection is sustained or which has been ordered stricken, you must completely ignore that evidence and not take it into consideration when deciding the case.

You, of course, must be not -- not be influenced in any degree by any personal feeling or sympathy for or prejudice against any party or their counsel.

And remember, no statement or ruling or remark that I may make during the presentation of the testimony is intended in any way to indicate my opinion as to what the facts are.  In every jury trial there are, in effect, two judges.  I'm one of the judges but you, the jury, are the other judge.  You're the judges of facts and you and you alone are to determine the facts.  In determining this you must decide upon the believability of the evidence and the weight and value.

Now, if you'd like to take notes during the trial you may do so.  On the other hand, you are not required to take notes if you prefer not to do so.  Each of you should make up your own decision about this.  Notes may be helpful because you will not have access to the transcripts of the trial testimony once you retire into the jury room to deliberate.

However, if you do decide to take notes, please be careful not to get so involved in note taking that you become distracted from the ongoing proceedings.  Remember your notes should be used only as memory aids.  You should not give your notes precedence over your independent recollection of the evidence.  If you do take notes, you should rely upon your own independent recollection of the -- of the proceedings and you should not be unduly influenced by the notes of jurors.  And the same if you do not take notes.  You should rely on your own independent recollection and, again, you should not be unduly influenced by any notes of other jurors.

Remember, ladies and gentlemen, notes are not intended or entitled to any greater weight than the testimony and memory or impression of each juror as to what the testimony may have been.  Whether or not you take notes, each of you must form and express your own opinion as to the facts in this case.

Now, members of the jury, we will stop here and come back at 1:15.  Please have a good lunch and when you come back -- the Marshal will show you the jury room before you

leave so that you can come back into the jury room.

All rise as the jury leaves, please.

(Jury out at 12:06 p.m.)

**THE COURT:** Okay.  Folks, I'll see you at 1:15.  The court will stand in recess.

**MR. GUICE:** Thanks, Judge.

(Recess at 12:07 p.m. until 1:22 p.m.)

**MR. GUICE:** Judge, we need to put one thing on the record before the jury comes in.

**THE COURT:** Okay.  Sure.

Okay.  Wait.  Just hold it.

**THE COURT SECURITY OFFICER:** Yes, sir.

**THE COURT:** Okay.  Be seated.

**MR. GUICE:** Your Honor, we're going to -- Ms. Wagner is going to make a note of evidence on the plea offers that were made to the defendant before the trial starts --

**THE COURT:** All right.

**MR. GUICE:** -- if the Court will allow?

**MS. WAGNER:** Yes, Your Honor, just for appellate purposes we wanted to put on the record that on September 26th of 2024 we extended an offer of a plea to both defendants and the general terms were that the -- we -- the government would dismiss Count 6 if the defendants would plead guilty to Counts 1 through 5, which were the human smuggling charges.  And the -- there was an appellate waiver and,

OFFICIAL TRANSCRIPT

120

otherwise, it was a standard plea offer with no cooperation and both defendants declined that offer, but we just wanted to get on the record that the -- that the defendants, themselves, were aware of the offer --

THE COURT: Thank you.

MS. WAGNER: -- that was made and -- and declined them.

THE COURT: Okay.  Is it correct that you communicated the offer to the defendants?

MS. O'NEILL: Yes, Judge.  Gwyneth O'Neill on behalf of Rudy Hernandez.  That offer was communicated to Mr. Hernandez and he elected to exercise his right to trial.

MR. WASHINGTON: Same.  James Washington on behalf of Mr. Cooper.  The offer was related to him and he denied the offer as well.

THE COURT: Okay.  Both defendants are in the court, they heard what they heard; is that correct, both of you?

MR. HERNANDEZ: Yes, Your Honor.

MR. ZELAYA: Yes, sir.

THE COURT: Both have indicated that that is correct.

Okay.  Let's bring them in.

(Jury in at 1:23 p.m.)

THE COURT: Please stay standing until everybody gets in the box.

Okay.  Be seated, please.

121

All right.  Members of the jury, we'll now hear opening statements from both the -- from the parties.  You will hear from the government first.

**MR. GUICE:** Thank you, Your Honor.

Ladies and gentlemen, good afternoon.  I'm Carter Guice with the U.S. Attorney's office and all of my colleagues, Rami Badawy and Kate Wagner.  We're going to be presenting the government's case to you today.

As you heard this morning when I read the indictment, these defendants, Devon -- Hennessy Devon Cooper and Rudy Jackson Hernandez are charged with conspiracy to bring aliens illegally into the United States for financial gain and conspiracy to possess with intent to distribute more than five kilograms of cocaine.  This opening is really an overview of the evidence that we're going to present to you over the next couple of days.  You're going to hear witness testimony from that stand.  You're going to see evidence that's going to come in that you're going to be able to review.

It's really quite a simple story.  We tend to get -- these big courtrooms and courthouses and lawyers tend to overcomplicate things, but this is a simple story.  It's about a group of people, these defendants included, who made an agreement -- and that's a conspiracy.  A conspiracy, as the Judge will instruct you at the end of the trial, is simply an agreement by people to do something and they take some acts to

further the conspiracy.  They conspired to bring Hondurans -- and we use the term, "illegal aliens," that's kind of a mean term, so we're -- we're -- it's -- but that's a legal term, so that's what we're required to do, but they're Honduran immigrants.  They're people who are from another country, but they're not supposed to be here.  You were supposed to come in in a certain legal way and they chose not to.

These gentlemen and others that you'll hear about in the trial conspired to bring them illegally into the United States for money.  They weren't doing it for free.  They were doing it for profit.  Starting in 19 -- in 2021 and they came, and you'll get to know all of these places like the back of your hand before the end of trial.

Exhibit 21, please?

This is a map that I'm sure you've all seen before, especially if you've ever gone on a Carnival Cruise down the coast, but this is the -- New Orleans, this is the Gulf of Mexico, and you'll notice Honduras is down in Central America. And these boats that you'll hear about came from a small island.

Exhibit 23, please?

And that's Utila, which is the island where these gentlemen are from and where the journeys began.

Back to 21, if you would.

So Utila is off the coast of Honduras and the boat

OFFICIAL TRANSCRIPT

came north to a place called Cocodrie, Louisiana, which you may be familiar with.

Can we put up 25, please?

And this is Cocodrie and it's down in the bayou and it's very remote and it's very isolated.  And -- and you'll hear testimony from the government witness as to why they chose Cocodrie, Louisiana.

On the last voyage, and you'll -- and there was a series of voyages that you'll hear about and we'll detail each voyage for you where they brought Honduran immigrants illegally into the United States for money.  But on the last voyage in February of 2022 the captain of the boat, who you'll hear, Mr. Martinez, and the owner of the company, Carl Allison, and others, decided to smuggle 24 kilos of cocaine into the United States to sell in the United States and you'll hear all the details of that.

So the government's witnesses and the government -- and the evidence that we're going to present to you, you'll be able to review and you'll hear testimony that these gentlemen, Mr. Hernandez and Mr. Cooper, were an interval -- an integral part of the conspiracy of the agreement to -- from the beginning and you'll hear how they were trusted employees of this organization.

So who's who in this group and who are some of the names that you're going to hear over the course of this trial?

OFFICIAL TRANSCRIPT

124

The first person involved in this group is Carl Allison.  He's a businessmen -- businessman from Pittsburgh, Pennsylvania and he owned a company called Dynamic Capacity Group, DCG, as it's called.  And he previously had a career in the lumber industry working for 87 Lumber, which is a big lumber company.  You may have seen them on the interstate in -- primarily, in -- in North Carolina and that area of the country.  And he provided labor to a lot of these big lumber yards and -- and he along with his second in command started this company.  And his second in command is a guy named Omar De La Rosa.  And they had an idea to bring Hondurans into the United States illegally to work in the United States.

You'll hear from Carl that he had some contacts in Honduras and then in 2021 he and Omar and others traveled to Utila and met with a professional captain, Captain Darrel Martinez, who you'll hear his testimony from that stand during this trial.  They decided to bring them illegal -- the Honduran nationals from Utila -- from Honduras into the United States without going through -- and all of us, when we travel, we have passports and we have IDs and we go through airports and we go through TSA and we do all of the things that are a pain when we're traveling, they didn't do any of that.  They -- and the legal term is a port of entry.  They didn't enter the United States through a port of entry.  They entered through the CoCo Marina, which was a small marina in Cocodrie, where the boats

OFFICIAL TRANSCRIPT

docked.

Can we have 25, Page 2, please?

And this is a closeup and you'll see CoCo Marina and you'll hear a lot about CoCo Marina and it was a little place in Cocodrie where they had fuel, where they had a restaurant, where they had some -- some rooms where you could stay and it was very isolated. And it was out -- and they chose it for a reason. They chose it because there wasn't a lot of law enforcement around.

So Allison, Omar De La Rosa and the -- and the captain came to an agreement that he would -- the captain would transport for $4,500 a month, that was his salary, which is a lot of money in Utila, Honduras and that's where the scheme started.

A very important piece of evidence that you're going to see, you'll probably get tired of seeing it, I know I am, is we were lucky in that the -- that Carl Allison and Captain Martinez purchased a Garmin satellite phone. And I don't know if guys are familiar with satellite phones, but, you know, all of our cell phones now have GPS in them, but if you're in the ocean, middle of the ocean, middle of the Gulf of Mexico, guess what, they don't work. So a Garmin is -- they have an actual satellite in outer space and it can track where you are precisely, longitude and latitude, every time a text message is sent and we were able to capture that. And Carl Allison and

OFFICIAL TRANSCRIPT

Captain Martinez communicated extensively on this Garmin and we have -- you'll be able to see the text messages that they sent. And when they sent them, every time they sent them, it registered the location, so we know where they are.  And you'll hear from a government witness who has compiled all of this data and put it in the maps for you so you'll know exactly where they are and the specific date when they were there.

So first order of business, if you're going to run an illegal smuggling -- human smuggling operation on the water, you need a boat.  So they went to Fort Lauderdale and Carl Allison purchased a 45-foot vessel called the Masita III.

Could we have Government 51.1, please?

And it's going to pop up in a minute and that -- and you're actually going to hear about another boat called the M/V POP, P-O-P.  So the Masita was the first boat used on the first couple of journeys.  It was a 45-foot boat.  The POP, you see on the right, was a vehicle -- a vehicle -- a vessel they purchased later on because they wanted a bigger boat.  It was 65 feet, so they could fit more people, they could go more quickly and it was -- and you'll hear testimony from the stand that the operation was going great and the people -- they were getting a lot of Hondurans who wanted to come to the United States illegally so they needed a bigger boat, and you'll hear about the purchase of that as well.  So you'll hear that and you'll see records that Captain Martinez was contacted by Carl

Allison and he went to Fort Lauderdale, Florida and he -- and Allison purchased the Masita III and Captain Martinez captained it with -- with some crew, not Mr. Hernandez or Mr. Cooper but another crew back to Honduras.

So now they have a boat, now they have a Garmin sat phone. What's the -- the first journey -- the first voyage occurred in May of 2021 from Honduras to Cocodrie. Rudy Hernandez, sitting at that table, was the engineer on that journey so he was on it. You will hear the name Josue Flores-Villeda in this trial. And he is a part of the conspiracy and he was the chief recruiter and the money collector for this organization, for the Allison corporation. He collected money in the United States and -- and did a lot of things for the organization, but that -- that's the name that you're going to hear.

The fee was up to $20,000 per person to be transported from Honduras to the United States. Now that's a lot of money to me and it's especially a lot of money to Honduras which is -- is a fairly impoverished nation, so -- and you'll hear testimony from people who actually paid the money, how difficult it was to raise the money.

There's going to be some scenarios that you're going to hear because there's a lot of commonality because, in essence, they're doing the same thing over and over. They always leave at night, right, because they don't want to leave

in the middle of the day because they don't want people to see them. They -- the first voyage took -- and they always take the passengers' cell phones because they don't want them communicating with family. They don't -- they just don't want them to communicate because they're running an illegal operation.

You'll hear that they always go to the CoCo Marina and that at the CoCo Marina you'll hear another name, Lance Vroon, V-R-O-O-N. And Lance Vroon is not charged in this conspiracy, but he is Darrel Martinez's brother-in-law who lives in Louisiana and he was the logistics guy. He would help them with weather. He would help him with -- with fuel and other things and -- but we don't think that we can prove that he knew about the human smuggling, so he was dismissed from the indictment. But you'll hear that name and you'll see the name on the Garmin a lot and he -- he was Martinez's brother-in-law and Louisiana logistical guy. And you'll hear from Captain Martinez and you'll hear why they selected Cocodrie because of its remote location and it's -- there was -- there's relatively little law enforcement there. You'll also hear that on every journey Omar De La Rosa came and you'll hear that Omar sometimes flew down to Honduras before the journey and actually met the boat in Cocodrie with vans to load the Honduran nationals into -- to bring them in to the interior of the United States without any papers, without any official port of

entry.  It was just simply blatant illegal human trafficking.

Secondly -- and then you'll hear from Martinez that they would return -- sometimes they would stay for a day or two in Cocodrie.  They had a restaurant.  Like I said, they had a small -- some rooms and they would visit with his brother-in-law and then, generally, they would return to Utila, you know, without much incident.

Second voyage, July 2021.  The second voyage, as you'll hear from Captain Martinez, was supposed to go in June, but it was delayed by bad weather.  It went in July.  Devon Cooper, sitting at that table, but not Rudy Hernandez was on that crew.  It had 13 passengers.  So 13 passengers paid up to $20,000.  And I say "up to."  This is a criminal conspiracy. Nothing is real precise.  Some paid less, you know, depending on what they could pay and what their family could afford, but -- but that was generally the price and you'll see some conversations about that.  And, like I say, Josue Flores-Villeda was a chief recruiter and money collector on this conspiracy.  So the voyage went, again, from Utila to Cocodrie.  You'll hear a lot of testimony that these -- the boat -- the 45-foot Masita and the 65-foot POP really weren't designed to transport people.  They were fishing -- you know, fishing boats that people go out to catch marlin and -- and all of those kind of big fish.  And it was kind of rough and the people got seasick and frequently the passengers were sick

because they weren't used to it.  They weren't sailors.  They were just simple people wanting to be transported into the United States.  And so you'll hear a lot about the terrible conditions on the boat.  And the crew -- and more important for evidence reason for you guys to consider is that the crew interacted with them.  So Devon -- Devon Hennessy Cooper -- you'll hear from Martinez.  When the crew was sick, they went out and helped them.  So if there -- if there is any defense that "Oh, we didn't know about it," or whatever, they had tremendous interaction with the passengers and almost impossible -- impossible to believe they didn't know what was going on.

They were paid at $200 per day extra.  So Carl Allison was paying Mr. Hernandez and Mr. Cooper a certain amount weekly or monthly and you'll hear all the details of that to be available.  An additional -- additionally, when they went on the journey, on the human trafficking, they were paid an extra $200 per day.  So that's a part of what we charge in the indictment to say they did it for financial reasons.  They didn't do it for free.

Again, took their phones, left at night.  Omar De La Rosa was in Cocodrie to meet them and put them in vans to take them back.  You'll hear and see text messages on the Garmin between Martinez and Carl Allison that show the conspiracy was so successful, as we talked about earlier, that they needed a

OFFICIAL TRANSCRIPT

bigger boat.  I'm always reminded of jaws, you know, when the shark attacks the boat and they say, "We need a bigger boat." Well, these guys needed a bigger boat, too, not because of sharks, because they wanted to put more people on them.

You'll hear from Martinez, and you'll see records, that Carl Allison arranged for the purchase of the M/V POP in New York.  So Carl Allison -- and then the POP was a 65-foot vessel.

Could we have 51-2?

And you can see there's a comparison on your screen. So there's the Masita III, which is 45 feet, and there's the POP, which is 65 feet, which as you can see, is a little bit longer and bigger and it held more people.  More importantly, when Carl Allison purchased the POP in New York, Darrel Martinez, Rudy Hernandez and Devon Cooper all flew to New York to bring the boat back to Honduras and that was a pretty long journey coming from New York, all the way down the east coast, around Florida, and down to Honduras.  So -- and what does that tell you?  And you'll see summaries of the -- of the airplane trips from Honduras to New York.  But what does it tell you? It tells you that these two gentlemen sitting at this table were trusted members of this conspiracy.  They were going up to purchase a new boat, went with the captain, and crewed the boat back to Honduras.

So first POP trip, October 2021, and this is not this

132

long ago -- that long ago.  So you'll hear from Allison and Martinez that, after the purchase of the POP, the conspiracy was able to increase the number of passengers on the larger 65-foot vessel.  It was the same pattern.  Josue Villeda was the money man and recruiter.  The POP left in the dead of night so no one would detect it.  Rudy and Devon were members of the crew, these two gentlemen at the table, and they were being paid extra, aside from their salary, to be -- to be human traffickers.  The crew interacted with the passengers, as they had in prior journeys, when they were seasick.  Everyone knew it was a completely illegal transportation of Honduras -- Honduran nationals to the United States, no passports, no visa and Cocodrie was not a legal port of entry.

Omar and Josue were waiting with vans to transport the Hondurans into the interior of the U.S.  And you'll also hear from Martinez, who was there, that it was very quick transfers.  They weren't messing around in Cocodrie.  They wanted to get them off the boat and get them into the vans, a matter of minutes.  And you'll hear again from Martinez that the boat safely returned to Utila after this October journey.

December 2021, another voyage, so business is good.  Things are going great.  They're getting people to pay all of this money to transport people illegally into the United States.  Again, the December 2021 voyage was crewed by Rudy Hernandez and Devon Hennessy Cooper, the two gentlemen at the

133

table. Again, totally illegal, no passports or visas, no legal port of entry, the definition of human smuggling for money. Hondurans paid up to $20,000.

Again, left Honduras in the dead of night. You'll hear from Martinez that they intended to go to Cocodrie, Louisiana. However, this is when the story and the conspiracy begins to unravel and we always come in in the last act of a Greek tragedy when things go wrong and this was kind of the start of it going wrong. The engines -- the net -- the panel, where you drive the boat, and I'm not a sailor so I don't know -- I call it the wrong name, but wherever you pilot the boat, it started smoking, which is bad. So if you're ever on a boat and the engine -- and the instrument panel starts smoking, you know you're in trouble. Also, they lost an engine for whatever reason and you'll hear about it -- the details from Martinez. Martinez decided to turn back. He didn't think he could safely make it to the United States.

They decided in December -- so they returned to Honduras and they let the passengers go back home. Again, over 20 passengers, with the promise that we're going -- we're going to leave soon.

Now, here comes the drug part. You're going to hear from Carl Allison and Martinez -- well, mostly from Allison. And Allison, along with Omar De La Rosa, decided that things were going so well transporting humans that they were going to

OFFICIAL TRANSCRIPT

134

try to transport some cocaine into the United States because it's highly profitable. So -- and you'll hear the name Genesis and Genesis was Captain Martinez's girlfriend. She was a travel agent and ran a hotel down in Utila. You'll hear -- she's not here, but you'll hear her name and that's -- that's her kind of part in the deal. You'll hear that Carl agreed to it, that Martinez knew about it, that Carl paid over $100,000 for the cocaine. And where did Devon Cooper and Rudy Hernandez come into this story? They're on the crew. Furthermore, you'll hear from Carl Allison and Darrel Martinez that some time before the February '22 -- 2022 journey, that Cooper and Hernandez found out that the dope was on the ship and in Utila at Rudy's house, and you'll see pictures of his blue house in Honduras, that the crew, including Cooper and Hernandez, demanded more money from Allison because of the increased risk of the dope on the boat. And you'll -- we'll have two witnesses testify to this, Carl Allison and Darrel Martinez, and you'll be able to evaluate their testimony. They -- Allison agreed, and it's a little unclear. He agreed to pay them and you'll hear it's $20,000 and, of course, it was never paid because of what I'm about to tell you, but an agreement was made. And what does that show you? You can't look into somebody's mind, right, but if I take this pen and I put it on this desk, you can infer that my intent was to put the pen down, right? Pretty easy. So you can infer from the

meeting --

THE COURT: Well, that's argument, Counsel. Let's get to it.

MR. GUICE: Yes, sir.

So the boat left Honduras. It -- same scenario, left in the dead of night. Passengers' phones were taken away, pass -- and these passengers were this -- by and large the same passengers that were on the December journey. They were making progress getting to Cocodrie and -- but what happened? And this is why we're here today really. Ran out of gas. Ran out of fuel. So either the -- and I don't know why. You may hear some explanation from Captain Martinez. The engine wasn't processing the fuel correctly or there's some reason, but they -- they filled it up with enough gas to make it, but the engine was -- was operating inefficiently, so they ran out of gas 90 miles off the coast of Louisiana.

So they were -- and you'll see this Garmin, all of these texts. The captain let's Carl know, Carl Allison know, "Man, we're in trouble. We're running out of gas." And you'll see the exact quotes. He gets Omar and Josue to go to Cocodrie, hire a charter boat to try to get some gas -- some fuel to bring it out to the boat and you'll see all of these text messages trying to do this.

Well, a cold -- and you'll also hear a cold front passed through as we get in Louisiana in February. They come

136

down and go into the Gulf and it caused a lot -- the boat almost capsized. You'll hear testimony on that. You'll hear testimony from a witness this afternoon about how disgusting the conditions were on the boat because they lost their -- their sanitary facilities. Everybody was throwing up. It was terrible.

You'll hear from Allison and Martinez, again, that they tried to get fuel out to the boat. They actually hired a charter boat and that's when the U.S. Coast Guard gets involved. So you'll hear that there was -- the report of a vessel in distress off the coast, that the Coast Guard airplanes came and contacted them. You'll hear that Martinez failed to disclose that there were passengers on board and he just -- you'll hear that conversation between the Coast Guard airplane and Martinez. And you'll hear that the Coast Guard intercepted the boat -- the small boat with the fuel when it came out and then the gig was up. Then the Coast Guard Cutter, the Tiger Shark, that we talked about this morning in the indictment, came out, intercepted them, boarded the vessel, saw what was going on the vessel, and you'll hear about the conditions on the vessel. The vessel was then towed to Grand Isle where an inventory search was performed on the M/V POP and the 24 kilos of -- of drugs were hidden, not surprisingly, in a compartment in the boat. They were found, found to be -- later tested to be cocaine.

Conclusion, thankfully. Finally, after hearing the testimony and seeing the evidence, you will be able to find beyond a reasonable doubt, that Rudy Hernandez and Hennessy Devon Cooper were integral and trusted members of this conspiracy. They crewed multiple voyages. They knew what was going on. They saw the Hondurans both put on the boat, in the dark of night, saw their phones confiscated, saw them go to Cocodrie, Louisiana, and be placed in the vans to be transported into the interior of the United States. You'll hear testimony from two witnesses that Mr. Cooper and Mr. Hernandez, when they found out that there was dope on the boat, demanded more money, showing their intent to possess with intent to distribute more than five kilograms of cocaine.

And that's our case. And we're going to begin presenting witnesses this afternoon. We look forward to it. Thank you.

**THE COURT:** Anything from the defendants?

**MS. O'NEILL:** Good afternoon, ladies and gentlemen. Thank you for being here.

Rudy Hernandez is not guilty. I'm not going to hide the ball here, ladies and gentlemen. Mr. Guice is right that Mr. Hernandez was on this vessel, the M/V POP, where these undocumented people and this cocaine were found, but when you've heard all of the evidence in this case you'll know that Rudy Hernandez is not guilty.

OFFICIAL TRANSCRIPT

This case is about a person's worst nightmare.  About Rudy Hernandez's worst nightmare come true.  So how did he get here?  Well, the evidence will show that Rudy took a job to crew a yacht and you'll hear all about the maritime industry.  You'll hear that that's not uncommon.  People with means buy boats, they buy them all over and they hire people to deliver those boats elsewhere for them.  They hire people to maintain and work on those boats when they have maintenance issues.  You'll hear that Rudy has done maintenance work and crewed boats all over the Caribbean and that he did that with the captain, Darrel Martinez, long before Darrel Martinez met Carl Allison.  And you'll hear that the standard pay for that kind of work for someone like Mr. Hernandez is $75 to $200 a day depending upon whether the boat is docked or whether it's at sea.

So you'll hear that crewing a boat, maintaining a boat, that's what Rudy did for a living.  But you'll hear that in February of 2022, Captain Martinez, Darrel Martinez, he called Rudy and said that he had a job, just as he had done dozens of times before.  He said, "I have a job.  I need a crew."

And Rudy said, "Okay."

So Rudy shows up.  It's nighttime.  He gets on the boat, and he goes down into the bowels of the boat where the engine room is and that's where he does his job.  And next to

that is a room with bunk beds.  That's where Rudy sleeps at night.  So the next day he gets up.  He goes up to check in with the captain, and Rudy sees there's a lot of other people on the boat.  Rudy knows that this is a problem, but he didn't know that those people were going to be there.  He didn't see them when he got onto the boat, but he knows that this is a problem, but he didn't agree to be a part of anything like that.  But at this point the voyage is already underway.  They're already in the middle of the Caribbean, pretty soon the Gulf of Mexico.  So then the nightmare gets worse because the yacht starts having engine trouble and they think that the fuel that they got was contaminated.  And Rudy knows that it's a problem that these people are on the boat, but he has a job to do, to try to fix this engine problem, and keep everyone safe so that's what he tries to do, but the first engine goes down and then the other and the boat's adrift.

So the captain who's in charge of the boat, he puts out some kind of distress signal.  And the Coast Guard arrives and they first arrive by plane and they call down over the radio and Captain Martinez talks to them.  And he's already collected the crew's passports because that's the standard procedure.  And so he's able to say here's who's on the boat, but, of course, Captain Martinez who you heard a lot about already, he doesn't say anything about these extra people on the boat.  He doesn't tell them where they're coming from.  He

lies and says we're coming from Florida.  Now, that's the first lie you're going to hear from Darrel Martinez, but I promise you it won't be the last.

So the Coast Guard leaves, they accept the answers, but the truth is they've already been tipped off that something's going on.  There's extra people on this boat.  So they get everyone together.  They mobilize and they send out a larger ship to meet up with the vessel.  And as Mr. Guice already told you, we know what happens.  They board.  They see the people.  They see the crew.  They tow the boat in.  They tear it apart and in a secret compartment in the captain's quarters they locate 24 kilos of cocaine.

Now, the government has already tried to make you think this is a simple -- it's an easy case.  Rudy is on that boat with those undocumented people and that cocaine is found, but Rudy Hernandez didn't know about those people in advance. And until federal agents told him they found 24 kilos in that secret compartment, he didn't know a single thing about that cocaine.  So how will you know?  Well, you just heard the government tell you about the witnesses it intends to call, but you're not going to hear from one single witness who doesn't work for a federal agency or who isn't getting a significant benefit from testifying for these prosecutors.

Now, I won't lie to you, the government's evidence, it's definitely going to show you that Darrel Martinez and Carl

OFFICIAL TRANSCRIPT

Allison are guilty of this conspiracy.  That they're the architects of this conspiracy, who have pled guilty to this conspiracy, who will be rewarded by the government for their testimony against Mr. Hernandez.

You'll hear a lot about Carl Allison and the companies that he created to try to legitimatize his crimes. One of those companies is called Dynamic Capacity Group, DCG for short, and Carl hired a team of people in the United States to work for him so he could bring people in from Honduras and make money off of that and then give them jobs through a staffing company and also make money on the back end.  You'll hear that Carl Allison hired Darrel Martinez to work for DCG and Darrel Martinez took his job with DCG and his relationship with Carl Allison so seriously that he tattooed the name of the company on his wrist.  You'll hear about the kind of money that Carl and Darrel were making.  Enough to buy a Maserati for Carl's wife and a hotel and a restaurant for Darrel.  The government's not going to bring you a single thing like that when it comes to Rudy Hernandez.  And soon enough you'll hear how Carl Allison and Darrel Martinez's greed pushed them to evolve from just smuggling in people to smuggling in drugs.

I'm going to ask you to listen closely when Carl Allison and Darrel Martinez take the stand and tell you about this meeting that happened at Rudy's house.  Sure, you'll see a picture of Rudy's house, probably won't know who took it, but I

want you to listen closely about what they say about that because the story they're going to tell you, not only does it not make sense, it changes every single time they tell it. Because, the truth is, the government won't bring you one single piece of physical evidence showing that Rudy Hernandez had anything to do with those drugs. You're not going to hear about any DNA evidence on the backpacks that they were found in. You're not going to see a video of Rudy Hernandez, the crew member, hanging out in the captain's quarters where the drugs are found. And, in fact, you'll hear that the government had a fingerprint analyst check each and every one of those 24 separate packages of cocaine and that Rudy Hernandez's fingers -- his fingerprints were not on one single part of any of those 24 kilos of cocaine. They weren't there because Rudy didn't know anything about those drugs.

Ladies and gentlemen, Rudy Hernandez sits before you today almost three years in the making. He's been waiting for you, waiting for this day anxiously, but Rudy doesn't have the burden of proving anything here today. As you heard the Judge already tell you, he has the presumption of innocence. His innocence is where we begin this case and at the end of this case we'll have the opportunity to stand up before you again and ask you to hold the government to their burden and to return the only just verdict in this case and that's a verdict of not guilty. Thank you.

**THE COURT:** Okay.

**MR. WASHINGTON:** Good afternoon.  One of the hardest things to do is to ask yourself the question, "What if I'm wrong?"  Ladies and gentlemen, my name is James R. Washington and I represent the defendant, Mr. Hennessy Cooper.

Mr. Guice said in his opening that this case is simple.  I respectfully agree.  The reason why we're here today is because the individuals sitting at that table refuse to ask themselves the simple question, "What if we're wrong?"  For now, the reason why they refuse to ask themselves the question is irrelevant.  Let's focus on what's relevant.  Mr. Hennessy Cooper is not guilty of the charges brought against him.  Mr. Cooper has been working in the maritime industry almost since he was born.

In February of 2022 he boarded a vessel to serve as a crew member, something he had done hundreds of times before.  After boarding the vessel he learned about a plan to bring individuals into the United States illegally.  He was unaware of that plan before he stepped foot on that vessel.  How do we know that?  When that vessel began to have problems, Mr. Cooper shot flares.  He sent distress signals.  It was important for him to get help because he had nothing to hide.  He had no clue what he had gotten himself into.  After Mr. Cooper and others were towed to safety, he found out.  He found out that there were 24 kilos of cocaine hidden in Captain Darrel Martinez's

OFFICIAL TRANSCRIPT

sleeping quarters. The situation was much worse than Mr. Cooper could ever have imagined. That very night the government came to a conclusion. They've obviously concluded that every single member of the crew played a part in this illicit scheme to bring illegal individuals and drugs into the country. They then set out on a reckless, tunnel vision, laser-like focus investigation to prove their erroneous conclusion correct. Their recklessness began immediately. They were so focused on the crew members, they didn't even realize that one of the individuals was posing as a passenger, was the individual who actually was tasked with bringing the cocaine aboard the vessel.

You will hear testimony from Captain Martinez. He will tell you himself, Olvin Maldanado had one single goal on that vessel, was to act as a passenger just to hide cocaine in Darrel Martinez's sleeping quarters. The government paid no notice to Maldanado. They departed him almost immediately. He's gone. The government then mismanaged the handling of another individual. They spoke about Omar De La Rosa. Where is he at? They were so focused on the crew members, Mr. De La Rosa has fled the country. They have mountains of evidence against this individual but they can't bring him before you today because they have been unable to get him and find him from where he's at and bring him back here.

Embarrassed by these missteps the government has

OFFICIAL TRANSCRIPT

decided to focus on the only two individuals who have maintained their innocence throughout this entire investigation, Mr. Hernandez and Mr. Cooper. By placing their focus there the government continues to rely on just about any individual who will tell them what they want to hear. No matter how many times the stories change or no matter how many ulterior motives were evident.

During this trial you will hear the evidence of Carl Allison. He and his father benefited to the tune of hundreds of thousands of dollars from elicit organizations that Mr. Allison put together. You will hear how he started working for the government to implicate Mr. Cooper, but when you hear him, I want you to pay attention to who he implicates and who he tries to protect. Pay attention to whom, based off of his testimony, he actually is able to prove, knew about this entire organization. It will not be Mr. Cooper.

You will hear from the captain, Darrel Martinez, who's received boat loads of money to assist Mr. Allison. You will hear how he implicated his drug dealing girlfriend. There's no charges against her. You will see hundreds of text messages and bank transactions that will explain to you why he had no choice but to implicate her. When you listen to him testify, listen to him carefully. Listen to who he is trying to protect, how he's trying to help himself out, but more importantly pay attention to him again and realize that he has

no concrete evidence that can implicate Mr. Cooper.

You will then hear -- either hear from or hear about multiple individuals and a picture will become clear. The government went through great lengths to establish their case against Mr. Cooper without once asking themselves the question, "What if we're wrong?" They offered unbelievable benefits to individuals, individuals like Josue Alex Villeda. You heard the government talk about him, but what you did not hear the government talk about is the fact that in exchange for his testimony and in their scheme to implicate Mr. Cooper, they decided to bring his family to the United States, all noncitizens. They decided, in exchange for his cooperation, that his family could come here and be with him. You won't even hear from him. The government has decided not to call him as a witness. And there's others here illegally who receive special work authorizations, deferred prosecution resolutions and promises all in exchange for telling the government what they want to hear. The list goes on and on and on.

And while the government has spent the last two-and-half years trying to build a case against Mr. Cooper, he has been sitting here, waiting for them to ask themselves the important question, "What if we're wrong?" They have not mustered up the strength to ask themselves that question. So, unfortunately, for all of us here today, we're here because their time is up. Mr. Cooper is no longer going to wait for

them to ask themselves the question.  Mr. Cooper is going to place the evidence in you guys' hands.  What Mr. Cooper needs is for you guys to examine all of the evidence and realize that the government cannot meet their burden of proof.  They cannot establish, beyond a reasonable doubt, that Mr. Cooper knew about the scheme to transport individuals to the United States, that Mr. Cooper knew about some scheme to smuggle drugs into the United States, that Mr. Cooper benefited or profited from this scheme that Mr. Allison and Captain Martinez and Omar De La Rosa and Josue Villeda, that they put together.  You won't see any evidence of profit for Mr. Cooper.

So as we sit here today, we're respectfully asking you that, once the evidence is in, you tell the government you're wrong, you cannot prove this case against Mr. Cooper and Mr. Cooper is not guilty.  Thank you.

**THE COURT:** All right.  Thank you, counsel.

Before we go on, oral argument, as I mentioned to you, oral argument is not evidence.  We'll now hear the evidence.  Oral argument is just a verbal program that will help you follow the case a little bit better.

Let's put on your evidence, please.

**MR. GUICE:** Yes, Your Honor.  The government calls Aaron Patlan.

**THE DEPUTY CLERK:** You can step on up and would you raise your right hand.

AARON PATLAN,

having been first duly sworn, was examined and testified as follows:

**THE DEPUTY CLERK:** Please have a seat.  State and spell your name for the record.

A.    Aaron Patlan, A-A-R-O-N, P-A-T-L-A-N.

**DIRECT EXAMINATION**

BY MR. GUICE:

Q.    Good afternoon, Mr. Patlan.  My name is Carter Guice and I'm an assistant U.S. Attorney here in New Orleans and I'm going to be asking you a couple of questions about your involvement in this case.

A.    Roger that, sir.

Q.    What do you do for a living, sir?

A.    For the purpose of this case, I was the mission systems operator.

Q.    Okay.  What is a missions systems operator?

A.    We operate the sensor -- sensor system on the C-144 via radio communications, center operation like radar, fleet or stuff like that.

Q.    Okay.  So let's back it up a little bit.  So you -- obviously, that's a nice suit you have on.

A.    Thank you, sir.

Q.    What branch of government do you work for?

A.    United States Coast Guard.

Q.   Okay.  And then you -- what type of Coast Guard machine are you in?

A.   I'm in a C-144 Bravo, which would be -- it's like a medium size aircraft, two engine.

Q.   Okay.  So you're -- and you said you were a mission system operator?

A.   Yes, sir.

Q.   And what -- tell -- tell us what that means in lay terms.

A.   Basically, a radioman and I control the radar --

Q.   Okay.

A.   -- in the simplest of terms.

Q.   All right.  Very good.  That's what I like.

A.   Roger that, sir.

Q.   I want to direct your attention to February 14th, 2022 -- well, first off, where are you stationed?

A.   I'm currently stationed in Elizabeth City, North Carolina at the air station there.

Q.   Okay.  In February -- on February -- on or around February 14th, 2022, where were you stationed?

A.   Air station Corpus Christi, Texas.

Q.   Okay.  And on that date, did you receive any calls about vessels in distress in the Gulf of Mexico?

A.   Yes, sir.  We were launched on a vessel in distress south of Louisiana, offshore of Louisiana, for a search and rescue mission.

OFFICIAL TRANSCRIPT

Q.   Okay.  And what did you do?

A.   We launched on mission.

Q.   Okay.  So you got in your airplane and you flew over here?

A.   Yes, sir.

Q.   All right.  Did you -- as a radioman, did you have -- and I know you're a mission specialist --

A.   Yes, sir, but we can keep it simple.

Q.   All right.  Did you have an opportunity to communicate with a vessel you later learned to be the M/V POP?

A.   Yes, sir.

          **MR. GUICE:** Okay.  Your Honor, may I approach the witness?

          **THE COURT:** Yes.

BY MR. GUICE:

Q.   I'm going to show you what's been marked as Government Exhibit 6.3 and I'm going to ask you a couple of questions about it.  Now, this is not the first time that you and I have met, correct?

A.   That's correct, sir.

Q.   And, in fact, you and I have talked about -- have met before and talked about this case?

A.   Yes, sir.

Q.   Okay.  And in our preparation, did you have an opportunity -- well, let me ask you this:  Was there a recording -- did you communicate with the M/V POP from your

OFFICIAL TRANSCRIPT

radio in the airplane?

A.    Yes, sir.

Q.    And was there a recording made of this conversation?

A.    Yes, sir.

Q.    Okay.  And did you and I and others review this conversation on a computer in the U.S. Attorney's office?

A.    Yes, sir.

Q.    And was -- were those conversations reduced to this disc?

A.    Yes, sir.

Q.    And did you review those conversations?

A.    Yes, sir.

Q.    And were those conversations an accurate portrayal of the actual conversation that you had with the M/V POP on February 14th, 2022?

A.    Yes, sir.

Q.    And -- and you examined the disc that -- that the recordings were put on?

A.    Yes, sir.

Q.    And the government exhibit that I just showed you, Government Exhibit 6.3, how do you know that's the same disc?

A.    It has my signature on it, sir.

Q.    So we asked you to sign that disc and did you date it?

A.    No, sir.

Q.    Okay.  So that's your signature on the disc?

A.    Yes, sir.

OFFICIAL TRANSCRIPT

**MR. GUICE:** Okay.  Your Honor, at this time we'll offer Government 6.3 into evidence.

**THE COURT:** Any objection?

**MS. O'NEILL:** No, Judge.

**MR. WASHINGTON:** No objection, Your Honor.

**THE COURT:** Let it be admitted.

BY MR. GUICE:

Q.   Now, what we're going to do is, we're going to play the tape for you and you -- when we went over it, I noticed that you're the only voice on the tape, but you -- who were you talking to?

A.   I was talking to the Motor Vessel POP, sir.

Q.   Okay.  So presumably the captain of the vehicle --

A.   Yes, sir.

Q.   -- of the vessel?

A.   Yes, sir.

Q.   Why is his voice not on the -- on this recording?

A.   Probably because their radio wasn't powerful enough and they were far enough offshore where it's -- we're much higher in altitude and our radios are very powerful, so the unit listening could record or hear us, but they couldn't hear the vessel.

Q.   So was it recorded in your airplane?

A.   Negative, sir.

Q.   Where is it recorded?

A.   It sounds like it would have been sector New Orleans, sir.

Q.   Okay.  So -- so the Coast Guard was monitoring the conversations, obviously?

A.   Yes, sir.

Q.   And your radio is a strong radio?

A.   Yes, sir.

Q.   And what about the radio on the M/V POP?

A.   Not -- not strong enough to -- from that far offshore to reach a land base station, sir.

Q.   So the New Orleans station couldn't pick up the radio transmissions of the M/V POP?

A.   That's correct, sir.

Q.   And that's why Martinez isn't on the tape?

A.   Yes, sir.

Q.   Okay.  Could we play this?

     I want you to listen to this.

                    (Video plays.)

BY MR. GUICE:

Q.   Now, what does, for us civilians, Lima Charlie mean?

A.   Lima Charlie means loud and clear, sir.

Q.   So you're hearing him loud and clear.  And what -- when a vessel is in distress -- because you all do this frequently, right?

A.   Yes, sir.

Q.   When a vessel is in distress what's the Coast Guard

OFFICIAL TRANSCRIPT

protocol when approaching that vessel?

A.    Typically, we'll hail them on Channel 16, which is the international hailing and distress frequency, and once we've spoken to them and established like -- or well, evaluated how much of an emergency it is and if it's not, we'll shift that traffic typically to the -- to channel 22 Alpha, which is what we're talking on right now, sir.

Q.    Okay.  So -- and what's the international emergency channel?

A.    That'll be Channel 16, sir.

Q.    Sixteen.  So that's -- every -- every seaman knows that if you're in trouble you -- you broadcast an SOS on 16?

A.    Yes, sir.

Q.    Okay.  But then you don't want to clog up the channel so you switch to another channel?

A.    Yes, sir.

Q.    Okay.  So you're hearing them loud and clear and so what's the first thing you're trying to ascertain when you're asking the captain questions?

A.    Typically, we're just trying to ascertain, like, how many people are on board, who we're talking to, stuff like that. We're just following a checklist essentially.

Q.    Okay.  Can we play?

       I want you to listen to your conversation.

A.    Roger.

OFFICIAL TRANSCRIPT

(Video plays.)

BY MR. GUICE:

Q.   So when you say, "affirmative," that means that you're hearing Captain Martinez's voice and -- and you know what he's saying?

A.   Yes, sir.  I'm -- I'm letting him know that I can hear him and understand.

(Video plays.)

BY MR. GUICE:

Q.   Okay.  So that answer that we just heard you say, so are you telling the ladies and gentlemen of the jury that the captain told you they came from Florida?

A.   Yes, sir.

Q.   That's what you heard?

A.   Yes, sir.

Q.   Okay.  You can continue.

(Video plays.)

BY MR. GUICE:

Q.   Okay.  And just -- so, to review, this is what you all do on a -- on a search and rescue mission is you try to obtain the names of the crew and their dates of birth?

A.   Yes, sir.

Q.   Okay.  Did Captain Martinez, at any time in this recording, tell you that there were 24 Honduran nationals on the boat?

A.   No, sir.

Q.   You never heard that?

A.   No, sir.

Q.   Okay.  We can continue and this is pretty much technical stuff at the end, I think, but let's listen to it.

                    (Video plays.)

BY MR. GUICE:

Q.   Okay.  And that's the end.  After you finish this colloquy with the captain what -- what did you do?

A.   Shortly thereafter, I think, we stay on station and then we return to base.

Q.   Okay.  You never boarded the M/V POP?

A.   No, sir.

Q.   And you were actually in an airplane flying above it?

A.   That's correct, sir.

Q.   So you have no personal knowledge of the 24 Hondurans on board?

A.   No, sir.

Q.   And you have no personal knowledge of the cocaine on board?

A.   No, sir.

Q.   Okay.  And you had no personal knowledge where the ship home port was?

A.   No, sir.

Q.   Okay.  Although, the captain told you Fort Lauderdale,

Florida?

A.   Yes, sir.

MR. GUICE: Your Honor, I'd offer into evidence Government Exhibit 6.3.

THE COURT: Okay.  That's the tape?  That's the tape?

MR. GUICE: Yes, sir.

THE COURT: Yes.  Okay.

MR. GUICE: As well as the transcript.

THE COURT: Right.  Let it be admitted.

MR. GUICE: And we tender, Your Honor.

THE COURT: Okay.  Any cross?

**CROSS-EXAMINATION**

BY MS. O'NEILL:

Q.   Good afternoon.

A.   Good afternoon, ma'am.

Q.   And I'm sorry, I didn't catch your title, Mr. Patlan.

A.   ATD1, Aaron Patlan.

Q.   Oh, ATD.  Is it okay if I call you mister?

A.   Absolutely, ma'am.

Q.   The Coast Guard became aware of the POP on February 13th, of 2022?

A.   To my knowledge, yes, ma'am.

Q.   And they found out, not because of the distress signal, but rather because someone had called in a tip to the Coast Guard; isn't that right?

A.   I couldn't speak to that, ma'am.

Q.   So you're not aware of a tip from someone named Raul?

A.   No, ma'am.

Q.   Okay.  What was your understanding of how you ended up at the vessel?

A.   Essentially, the sector in New Orleans notified our air station that we're going to be responding for a SAR for the Motor Vessel POP and then we were launched on SAR, ma'am.

Q.   And SAR is what?

A.   Oh, I apologize.  Search and rescue, ma'am.

Q.   Okay.  Thank you.  And the whole time you were talking, it was just you -- we just hear your voice on that recording, correct?

A.   Yes, ma'am.

Q.   And you heard just one voice when you were talking to the vessel as well?

A.   Yes, ma'am.

Q.   And because you were in a plane you were significantly above the POP when you were speaking with the captain?

A.   That's correct, ma'am.

Q.   And you didn't see that there were three crew members standing next to the captain while he was on the radio?

A.   At some point in time we could see -- I saw at least two people just through IR imaging, going up and down from the superstructure which is like, basically, everything above the

OFFICIAL TRANSCRIPT

haul on the boat, to clarify.

Q.   But you couldn't see who those people were?

A.   No, ma'am.

Q.   You just saw the outline of people; is that fair to say?

A.   Yes, ma'am.

Q.   And working in the Coast Guard, you've worked on boats yourself?

A.   Limited, yes, ma'am.

Q.   But you're aware there's, you know, different levels to the boat as you just alluded to?

A.   Yes, ma'am.

Q.   And a lot -- and, you know, often in a boat there's a big part of it that's kind of under the water?

A.   Yes, ma'am.

Q.   And often that's where the engine is?

A.   Yes, ma'am.

Q.   And the engine room.  And usually on a yacht you also put the crew in the bottom of the boat, right?

A.   Yes, ma'am.

Q.   And your only involvement in this investigation was just what we heard there on the radio?

A.   Yes, ma'am.

        **MS. O'NEILL:** Thank you, Mr. Patlan.

A.   Thank you.

        **MR. GUICE:** Your Honor, one question.  One question.

OFFICIAL TRANSCRIPT

**THE COURT:** Wait, wait.

**MR. GUICE:** Oh, I'm sorry.

**CROSS-EXAMINATION**

BY MR. WASHINGTON:

Q. Excuse me.  My name is James Washington.  I have a couple of questions for you as well.

Were you the only person on your plane?

A. No, sir.

Q. Okay.  Who else was on the plane with you?

A. We had Lieutenant Commander Tim Mullen, at the time, Lieutenant Collis Brown, myself, AT3 Nick Uric and I don't recall who the drive -- the master and the basic air crew were, but we had two others as well.

Q. Was someone on that plane taking photographs?

A. We typically will -- are videoing all the evidence -- all the evidence of what's going on.  On the -- through our fleet or through a sensor package, we have a forward-looking infrared that we're watching, but I don't think anybody was taking photographs to my knowledge, sir.

Q. Okay.  And Ms. O'Neill asked you, but I want to be certain.  She asked you were you only speaking to one person during this.  Did you ever speak to anyone else aboard the M/V P -- M/V POP?

A. Not that I can recall, sir.

Q. And she asked you if there were individuals standing next

161

to the captain.  Was that while you were speaking to the captain?

A.    Occasionally, yes, sir.

Q.    Okay.  So I'm trying to visualize.  Can you explain -- explain that to me how you see them standing next to the captain?

A.    So the sport fishers, if you're not familiar, it's typically like an aft cabin vessel.  So it has like a long haul and most of the superstructure and everything is near the rear, it's built up, so there's like steps up to where, kind of, like a platform is or a helm for the captain to talk right -- from up there.  And so, basically, what -- from what I could see, that's where he was accessing the radio and there was a crew man up there with him.

Q.    But there was one crew man up there with him?

A.    To the best of my recollection, yes, sir.

        **MR. WASHINGTON:** Okay.  No further questions.

A.    Roger.

        **THE COURT:** Any redirect?

                    **REDIRECT EXAMINATION**

BY MR. GUICE:

Q.    In Government Exhibit 3.1, the captain clearly identified that Rudy Hernandez and Hennessy Devon Cooper were on that vessel, correct?

A.    Yes, sir.

OFFICIAL TRANSCRIPT

**MR. GUICE:** Okay.  No more, Your Honor.  Thank you.

**THE COURT:** Okay.  You're excused.  Thank you, sir.

**THE WITNESS:** Thank you, Your Honor.

**THE COURT:** Call your next witness, please.

**MR. GUICE:** Collis Brown.

**THE DEPUTY CLERK:** Would you raise your right-hand?

COLLIS BROWN,

having been first duly sworn, was examined and testified as follows:

**THE DEPUTY CLERK:** Please have a seat.  State and spell your name for the record.

A.   Yes, sir.  My name is Collis Brown, spelled C-O-L-L-I-S, last name Brown, B-R-O-W-N.

**DIRECT EXAMINATION**

BY MR. GUICE:

Q.   Good afternoon, Mr. Brown.  My name is Carter Guice and I'm the assistant U.S. Attorney.  I'm going to be asking you a couple of questions.

A.   Sounds goods, sir.

Q.   Okay.  Where do you work?

A.   I work for the Coast Guard out of Corpus Christi, Texas.

Q.   Okay.  And what is your rank?

A.   I'm a lieutenant commander.

Q.   Okay.  Wow.  And what do you do for the U.S. Coast Guard?

A.   I'm a pilot.

Q.   Okay.  And I'm going to refer your attention to February 14th, 2022.  Do you remember that date?

A.   Yes, sir.  I do.

Q.   Okay.  And before we go any farther, this isn't the first time you and I have -- have spoken, is it?

A.   No, sir.

Q.   And we actually talked about the facts of the case over in my office a couple of times?

A.   Yes, sir.

Q.   Okay.  And where were you stationed?

A.   Out of Corpus Christi, Texas.

Q.   Okay.  And did you receive a call or was a call received about a vessel in distress 90 miles off of Grand Isle?

A.   Yes.

Q.   Okay.  And what type of aircraft do you fly?

A.   I fly a HC-144 which is also called a CASA.  It's a fixed wing, multi-engine aircraft.

Q.   Okay.  And do -- and -- and generally, from your duty station, do y'all do a lot of search and rescues?

A.   Yes, sir.

Q.   Okay.  And so this -- this was just a routine call?

A.   Correct.

Q.   Okay.  What did you do next?

A.   We talked with the crew, looked at our weather conditions, and determined that it was worth it to go follow-up on a call

that we received for a disabled vessel.

Q.   Okay.  So you all -- obviously, your safety is paramount so you check the weather conditions and -- and all that?  Okay.  And you --

A.   Yes.

Q.   And how long did it take you to fly from Texas to south of Grand Isle?

A.   Approximately two hours.

Q.   Wow.  Okay.  What did you do when you got over the zone?

A.   So whenever we got into the area, the last known position of the vessel, we initiate a search pattern that was given to us by our command center, basically our search and rescue coordinators, and then we started to look for the vessel that fit the description.

Q.   Okay.  And how -- what kind of pattern do you go in?

A.   It's called a parallel search, essentially a snaking pattern, that helps us find anything that might be in that search area.

Q.   Okay.  And did you eventually find what later you determined to be the M/V POP?

A.   Yes, sir.  We found the vessel that appeared to meet the description, so we started to reach out to confirm that they were, in fact, the vessel that was reported to be in distress.

Q.   Okay.  And was -- Aaron Patlan, was he a member of your crew?

A.   Yes, he was.

Q.   And was he the -- I say radioman, what's the official Coast Guard term?

A.   Mission systems operator.

Q.   Okay.  And did you witness him operate the radio?

A.   I did.

Q.   And did, in fact, he make contact with the captain of the Motor Vessel POP?

A.   Yes.  Yes, sir.  He did.

Q.   Okay.  Did you land and go on the POP?

A.   No, no.  In a fixed wing aircraft no landing for us, just flying overhead.

Q.   Okay.  And -- and now, you heard the conversation and it's in evidence as Government 3.1, correct?

A.   Yes.

Q.   Okay.  And did the captain represent that the boat's home port was Fort Lauderdale?

A.   I believe so, sir.

Q.   Okay.  And did he disclose that there were four crew members on the boat?

A.   Yes, he did.

Q.   And did he disclose that there were 24 Haitian -- I mean, Honduran passengers on the boat?

A.   No.  I did not hear him disclose that.

Q.   Okay.  After this radio communication, how was your fuel

166

level?

A.    We started to get lower on fuel and also longer into our crew day.  We got launched pretty late at night, so for me, as a pilot, I'm considering our fuel state, our crew fatigue, and basically how long we can stay on scene to continue the mission, make sure that they're safe and that we can also get home safely.  So a little bit lower on fuel at the end of this case.

Q.    Okay.  So what did you do?

A.    We had a crew discussion and determined that there was nothing else that we could do for the vessel on scene.  They indicated that they were safe, so we elected to return to Corpus Christi and shut down for the evening.

        **MR. GUICE:** Okay.  I tender, Your Honor.

        **THE COURT:** Any questions?  Any?

        **MS. O'NEILL:** We have no questions.

        **THE COURT:** Okay.  You're excused.  Thank you, sir. Call your next witness, please.

        **THE WITNESS:** Thank you.

        **MR. BADAWY:** Thank you, Your Honor.  The government calls Luke Joseph to the stand.

        **THE DEPUTY CLERK:** Raise your right hand, please.

OFFICIAL TRANSCRIPT

LUKE JOSEPH,

having been first duly sworn, was examined and testified as follows:

**THE DEPUTY CLERK:** Please have a seat.  State and spell your name for the record.

A.    My name is Luke Joseph, L-U-K-E, J-O-S-E-P-H.

**THE COURT:** Proceed, Counsel.

**DIRECT EXAMINATION**

BY MR. BADAWY:

Q.    Good afternoon, Mr. Joseph.

A.    Good afternoon, sir.

Q.    Mr. Joseph, do you work?

A.    Yes, sir.

Q.    What is your job, sir?

A.    I'm a marine interdiction agent for the Department of Homeland Security, U.S. Customs and Border Protection's Office of Air and Marine Operations.

Q.    And how long have you been a marine interdiction agent for the United States Customs and Border Protection Agency or a CBP, I believe it's commonly referred to?

A.    Yes, sir.  Just over 15 years.

Q.    As a CBP marine interdiction agent, can you tell the members of the jury, generally, what your duties and your responsibilities are?

A.    Yes, sir.  As a marine interdiction agent my job is to

detect, identify, prevent and interdict threats to the national security and the border, suspected criminal activities and persons or contraband from entering the United States illegally.

Q.   And when you use that term interdict, what does that mean, Agent?

A.   For me, specifically, it's the equivalent to a police officer doing a traffic stop, but in the maritime environment.

Q.   Before joining CBP were you employed?

A.   Yes, sir.

Q.   Who did you work for before joining CBP?

A.   I worked for four years at the Baton Rouge City Police Department.

Q.   In what capacity, sir?

A.   I was a uniform patrol officer in the First District Precinct from Katrina until I was hired with the U.S. Customs.

Q.   Agent Joseph, where are you currently assigned?

A.   I'm with the Houma Marine Unit in Houma, Louisiana.

Q.   And how long have you been assigned to the Houma Marine Unit in Houma, Louisiana?

A.   All 15 years.

Q.   Agent Joseph, I'm going to direct your attention to February 14th of 2022, do you recall that day?

A.   I do, sir.

Q.   On that day, were you working as a CBP maritime

OFFICIAL TRANSCRIPT

interdiction agent?

A.    Yes, sir.  I was.

Q.    And on that day did you have occasion to respond to a vessel in the Gulf of Mexico?

A.    Yes, sir.

Q.    Did you learn the name of that vessel?

A.    Yes, sir.  The POP vessel.

Q.    And what was the nature of your response to the POP vessel?

A.    We were informed that there was a vessel at sea, the Coast Guard had interacted with, that another vessel was approaching rapidly, that they did not believe that they had the capability to stop if they tried to stop it, so they contacted us to assist.

Q.    And did you respond to the POP vessel?

A.    Yes, sir.  We did.

Q.    When you say, "we," who do you mean by we?

A.    Typically in a crew for -- for our vessels, we run a three-man crew minimum to go offshore.  There was a vessel commander, myself and another marine interdiction agent and one HSI special agent.

Q.    Okay.  What time of day did you respond?

A.    We initially responded around midday, shortly after lunch time.

Q.    And was there a certain kind of vessel that you used to

respond to the -- to that -- to the M/V POP vessel?

A.    Yes, sir.  We have a large 41-foot offshore interceptor vessel called a CIV, Coastal Interceptor Vessel.  It's a marked CBP multi-engine outboard vessel.

**MR. BADAWY:** May I approach the witness, Your Honor?

**THE COURT:** Yes.

BY MR. BADAWY:

Q.    Agent Joseph, I'm showing you what's been marked as Government's Exhibit No. 27.  Do you recognize what is contained in Government's Exhibit No. 27?

A.    Yes, sir.  This is the CBP marked 41-foot interceptor vessel that we responded in.

**MR. BADAWY:** All right.  Your Honor, the governor -- the government would move Exhibit No. 27 into evidence.

**THE COURT:** Okay.  Any objection?  Hearing none.  It's admitted.

**MR. BADAWY:** The government would ask --

**MR. WASHINGTON:** No objection.

**MS. O'NEILL:** No objection.  Sorry, Judge, I was just turning to my page.  Thank you.

**MR. BADAWY:** The government would ask the Court to publish 27 to the jury, please?

**THE COURT:** Granted.

BY MR. BADAWY:

Q.    What are we looking at here, sir?

A.    That is our 41-foot coastal interceptor vessel.

Q.    Okay.  When you left on this vessel, what direction were you heading?

A.    We were headed south into the Gulf of Mexico, approximately 75 miles out.

Q.    And did you arrive, eventually, at the POP vessel?

A.    Yes, sir.  Several hours later.

Q.    When you arrived on scene of the POP vessel, can you tell the members of the jury what you saw -- what you first saw?

A.    When we got out to the position that we were given we observed the U.S. Coast Guard Cutter Tiger Shark, the POP vessel and a third center console fishing vessel.

Q.    Where was the U.S. Coast Guard ship, Tiger Shark --

A.    It was --

Q.    Excuse me.

A.    Oh, I'm sorry.

Q.    In relation to the POP vessel?

A.    It was near and interacting with the POP vessel.

Q.    And you said that you saw a second vessel on scene?

A.    Yes, sir.

Q.    Where was that second vessel in relation to the POP vessel?

A.    The second vessel was in close proximity, within a mile or so, of both the Cutter and the POP vessel.

Q.    When you saw that second vessel, what did you do, sir?

OFFICIAL TRANSCRIPT

A.    We made contact with the U.S. Coast Guard Cutter, who advised us that they had not made contact with the small vessel and asked us to go and ascertain their intentions.

Q.    And did you go to that second vessel?

A.    Yes, sir.  We approached it with our blue lights activated to indicate that we were law enforcement, advised them that we intended to board their vessel, asked all of the crew on board to move forward of the vessel and then boarded the vessel.

Q.    Did you board the vessel?

A.    Yes, sir.

Q.    When you boarded the vessel what did you observe?

A.    At first we observed very strange, two very large tanks on the back of the vessel, abnormal for a fishing vessel, filled with what appeared to be fuel.

Q.    And was there anything else you observed on the vessel?

A.    Just the three individuals.

        **MR. BADAWY:** Your Honor, may I approach the witness?

        **THE COURT:** Yes.  You're referring to it as a vessel, this is not the POP, this is another vessel?

        **MR. BADAWY:** Yes, Your Honor.

BY MR. BADAWY:

Q.    Agent Joseph, I'm showing you there what's been marked as Government's Exhibit 29.  Do you recognize what is depicted in those three pages in Government's Exhibit 29?

A.    Yes, sir.

Q.   And what is depicted in Government's Exhibit 29?

A.   This is the picture of the extra -- the other fishing vessel, the center console, it's called a Catamaran.  It's a twin haul kind of fishing vessel with outboard motors typically used for fishing in offshore blue water conditions.

The second picture is the three individuals that were encountered on the boat and the third picture being the abnormal tanks that were positioned on their back deck of the boat.

Q.   And do those pictures fairly and accurately show that second boat, the tanks we discussed, and the crew as you saw them on February 15th -- excuse me -- February 14th of 2022?

A.   Yes, sir.  They do.

    MR. BADAWY: The government would offer Exhibit 29 as evidence.

    MS. O'NEILL: No objection.

    THE COURT: Let it be admitted.

    MR. BADAWY: The government would ask permission to publish 29 to the jury?

    THE COURT: Granted.

BY MR. BADAWY:

Q.   Can you tell the members of the jury what we're looking at here, Agent Joseph?

A.   Yes, sir.  This is the fishing vessel that was -- the second vessel on scene, Down the Bayou.  This is the vessel we

approached and saw the tanks on the back with the three individuals. Typically, just an offshore-type fishing vessel.

Q.    Next picture, please.

A.    This is the three individuals that were encountered on the boat. The ones that we had advised to move forward when we made contact with them.

And this is the two abnormal tanks that -- containing what appear to be fuel, which is abnormal for a boat like this. It normally would be inside of their normal tanks under the boat.

Q.    Why -- why is it abnormal for a boat like this to have these two tanks?

A.    For a few reasons. One, if you were offshore fishing that would interfere with movement around the boat and the ability to fish, but, two, just the sheer weight of it is -- is not conducive to the boats underway abilities. It's -- it's -- it's all the way aft. It's not in the tanks where it's more stabilized and low in the waterline and it's dangerous.

Q.    When you say, "aft" --

A.    I'm sorry.

Q.    -- the layman's terms --

A.    The rear deck. The back of the boat.

Q.    Thank you, Agent. Did you -- were you able to determine, at some point, what was in these tanks?

A.    We did -- we did not open it. Assuming that it was fuel, in its nature and its color, we -- we didn't open them.

OFFICIAL TRANSCRIPT

Q.   Okay.  After you boarded this vessel, what did you and your fellow agents do?

A.   Once we made contact we did a preliminary search to ensure there were no individuals on the boat, check for weapons, and then we maintain -- secure the individuals who were on the boat while the HSI special agent conducted interviews.

Q.   Okay.  At the conclusion of those interviews what happened with this boat?

A.   We subsequently got off the boat momentarily.  We put the HSI agent on the U.S. Coast Guard Cutter to continue his investigations and then we were later advised to escort this boat to the U.S. Coast Guard station Grand Isle.

Q.   Did you escort the U.S. -- this boat to the Coast Guard station Grand Isle?

A.   Yes, sir.  We did.

Q.   Approximately, how long did it take you to escort this boat to Grand Isle?

A.   It took us a while.  We had just come out of a low pressure system.  The seas were originally about four to six feet, but subsiding.  So underway, as you see in these pictures here, it's a little bit misleading, it looks kind of calm, but it was -- it was -- it was a little rough.  We were not able to make good speed, but as the seas calmed we were able to pick up a little bit and make better time, but it took us several hours to get back.

Q.   And when you say "Grand Isle," is that Grand Isle, Louisiana?

A.   Yes, sir.

Q.   When you arrived back at Grand Isle, what time was it when you and the boat arrived at Grand Isle, Louisiana?

A.   By the time we got there it was well after midnight.

Q.   What happened when you arrived?

A.   When we got within the vicinity of the Coast Guard station we took the boat on, what's called, an alongside tow.  We tied it up to the side of our boat so we could safely maneuver it without the need of them to be at the driving station or the helm.  We maneuvered it to the dock and secured it and then assisted them with getting off the boat.

Q.   After you secured -- excuse me.  What happened after that, sir?

A.   We were met at the dock by additional HSI agents, which escorted the individuals that were on the boat inside for interviews.

Q.   What did you and your colleagues do at that point?

A.   Oh, we stayed at the dock and remained doing security on the boat, watching over the boat, making sure nothing happened to it.

Q.   What happened after that, sir?

A.   Once the HSI agents concluded their interviews, the individuals came back downstairs, we helped them get back on

OFFICIAL TRANSCRIPT

their boat, assisted them in untying and helping them get back on their way.

Q. And at that point what did you and your fellow agents do?

A. Due to the late hour and the work time that we had endured, we secured our vessel there at the facility, at the U.S. Coast Guard station, our supervisor came and picked us up, brought us back to our maritime unit in Houma -- Houma, Louisiana, where we got back to our vehicles and were able to go home and get a little bit of rest.

Q. Did there come a time when you returned back to the Coast Guard Station Grand Isle?

A. Yes, sir. The next day.

Q. Approximately what time the next day did you return back to the Coast Guard Station Grand Isle?

A. Because we had -- were up so late, it was again around midday or just before lunch.

Q. When you arrived back at Coast Guard Station Grand Isle, what did you do?

A. When we -- when I arrived back at Grand Isle at the U.S. Coast Guard station, the boat had already been tied up. There were a multitude of other partner agencies there. We have locally, what's called, a ReCoM, a Regional Coordinating Mechanism. It's a -- it's a group where DHS components, HSI, Border Patrol, OFO, Coast Guard can coordinate together to better use the assets efficiently and get help when we need

assistance because sometimes we're in limited numbers and need help. They were already on scene and were actively removing individuals from the boat.

Q. When you say, "the boat," which boat are you referring to?

A. I'm sorry. The POP vessel. The POP vessel was tied up to the dock and the last few individuals were being escorted off of the vessel.

Q. When the individuals were escorted off of the vessel what happened?

A. We got to the back of the boat, waited for the U.S. Coast Guard and Border Patrol to finish their preliminary search for other individuals and then once given the all clear the vessel was then turned over to us.

Q. And by, "us," who do you mean us?

A. The Office of Air and Marine Operations, the Houma Marine Unit.

Q. When the boat was turned over to you, what did you do?

A. We then went to the top of the boat to begin an inventory and search of the vessel from the top down outside inward.

Q. Can you describe the POP vessel for us, please?

A. Yes, sir. It's a -- what's commonly known as a sport fishing boat. A 65-foot Donzi. Donzi being like a car brand, a Honda, Toyota, whatever, but this is for a boat. Sport fishing boat meaning that it has the ability to go way offshore, long distance, sleeping quarters, living area type of

stuff, meant to go after large pelagic or large deepwater fish.

**MR. BADAWY:** Your Honor, may I approach the witness?

**THE COURT:** Yes.

BY MR. BADAWY:

Q.   Agent Joseph, I'm showing you what is Government's Exhibit No. 41.  Can you take a look at that, please?

A.   Yes, sir.

Q.   And do you recognize what is contained in Exhibit No. 41?

A.   Yes, sir.

Q.   What is contained in Exhibit No. 41?

A.   The pictures here are pictures of the helm station, the upper helm station and the exterior of the Motor Vessel POP vessel.

Q.   And do those photographs fairly and accurately show the POP vessel's exterior on February 15th of 2022?

A.   Yes, sir.

**MR. BADAWY:** Your Honor, the government would offer Exhibit 41 into evidence.

**MS. O'NEILL:** No objection.

**THE COURT:** Let it be admitted.

**MR. BADAWY:** And the government would ask permission to publish 41 to the jury?

**THE COURT:** Granted.

BY MR. BADAWY:

Q.   Agent Joseph, what are we looking at here in the first

OFFICIAL TRANSCRIPT

picture of Government's Exhibit 41?

A.   So in this picture this is what's commonly known as a flybridge or an upper helm station.  It's a position on the boat where an operator can drive the boat from an elevated location allowing them to see all the way around the boat, making it easier to maneuver in tight quarters and spaces and also be out of the weather.

Q.   Go to the next picture, please.

A.   In this picture, this is a short, little hallway next to the helm station that leads to a forward seating area for any visitors or guests could sit with whoever was in command of the vessel.

This is another picture, just at the end -- edge of that hallway, just in front of the helm station, showing the -- the seating area.

This is an additional photo.  Same position, looking more forward, also of the seating area.

This is a few more steps forward into the seating area, looking towards the back of the boat at the front of the helm station where the operator would be sitting.

This is the -- what's called, the aft deck or the rear deck.  It's the very back end of the vessel where usually a fighting chair, as you see here, would be for somebody who was fighting a fish or operating lines.

This is the same deck, but facing slightly more forward,

OFFICIAL TRANSCRIPT

also showing the opening or the passageway into the interior of the vessel.

Q. Thank you, Agent Joseph. I believe you testified that you and your fellow officers searched the exterior?

A. Yes, sir. We did.

Q. Did you find any contraband in the exterior of the M/V POP vessel?

A. No, sir.

Q. After you finished searching this exterior area, what did you and your fellow agents do?

A. Once we were sure that we had done a full inventory and search of all of the compartments and exterior of the vessel, we then moved our search to the interior.

Q. And did you, yourself, enter the interior of the POP vessel?

A. Yes, sir.

Q. How did you get to the interior of the POP vessel?

A. Through the displayed door there on the left, the open door.

Q. When you first entered the interior of the POP vessel, can you describe what you found?

A. I can only best describe it in my -- my personal reaction, which I can only simulate to a very hot, overfilled, overflowed, Port-o-John at a large music festival. The conditions were abhorrent. Every porous surface that was able

to absorb was filled with urine, feces, excrement and other human bodily fluids.  It -- the carpet squished, the mattresses were soaked, the -- the sofas were gross.  There were rotten and spoiled food, items and clothing scattered throughout the entire vessel.  It was absolutely abhorrent.

Q.   Okay.  Did you and your colleagues search the interior of the POP vessel?

A.   Yes, sir, we did.

          **MR. BADAWY:** May I approach the witness, Your Honor?

          **THE COURT:** Yes.

BY MR. BADAWY:

Q.   Agent Joseph, I'm showing you what's been marked as Government's Exhibit 42.  Can you look at that, please?

A.   Yes, sir.

Q.   Do you recognize what's contained in Exhibit 42?

A.   Yes, sir.

Q.   What is contained in Exhibit 42?

A.   These are images of the interior of the Motor Vessel POP.

Q.   And do those images fair -- fairly and accurately show the interior of the POP as you saw it on February 15th of 2022?

A.   Yes, sir.

          **MR. BADAWY:** Your Honor, the government would move Exhibit No. 42 into evidence.

          **THE COURT:** Admitted.

          **MS. O'NEILL:** No objection.

**MR. WASHINGTON:** No objection.

**MR. BADAWY:** The government would ask permission to publish 42 to the jury?

**THE COURT:** Yes.  Granted.

**MR. BADAWY:** Thank you.

Can you bring up the first page, please?

BY MR. BADAWY:

Q.   Agent, can you tell us what we're looking at here?

A.   Yes, sir.  That first door that we saw leading from the back deck, this is the entryway into the main part of the vessel.  This is what's called a galley or -- or a living room area on one of these kinds of boats.  It contains seating, dining, kitchen-type area and this would be a main meeting point for people who are -- who are guests on the boat.

Q.   Next picture, please.

What are we looking at here?

A.   This is a little further into the galley or into the living room area, more of the center, looking forward, towards the front of the boat, looking at a stairwell, ladder well or hallway that goes down into the berthing area or the sleeping quarters.

This is the same room, but a few steps forward looking to the left into the galley or -- or kitchen, if you will, of the -- of the boat.

This is the same position, but facing forward, down that

ladder well or stairwell that leads down into the berthing area or the bedrooms of the vessel.

This is at the bottom of the stairs.  This is looking back towards the back of the vessel.  There's a little continuation that goes down and a hidden nook where two -- what they call, hideaway bunks or extra bunk beds would be for crew or maintenance.

This is a picture of those two hideaway bunks.

This is that same position, but facing towards the back of the boat.  This is a passageway that would typically use -- be used for -- by, like, a mechanic to access the engine room from underneath the boat out of -- out of the weather.

This is the same position, but facing forward.  This is the passageway or the hallway facing towards the front of the boat showing the various rooms and bathrooms towards the front of the boat.

This is the first bedroom off the hallway, showing a single bed and a closet and the objects therein.

This is that same room, but a picture to the left showing the room in its entirety.

This is another room off of the hallway, I believe on the other side of the vessel.  It's two bunk beds.  It's a smaller room.

This is back out in the hallway, looking forward into what would be the master suite or the master bedroom of the boat.

OFFICIAL TRANSCRIPT

This is one of the bathrooms off of that suite, off the master suite.

And this is a second bathroom off of the hallway as well.

Q.    Agent Joseph, I believe you testified earlier that you and your fellow agents searched the interior of the POP vessel; is that correct?

A.    Yes, sir.

Q.    Approximately how long did it take you to search the interior of the POP vessel?

A.    It took us quite a while to do the interior.  One being that there was -- the boat was disabled, so there was no power, no lighting so we were having to use alternative sources of light.  Due to the conditions of the boat, the sinks were overflowing, the -- the toilets were overflowing, the drains were overflowing and had been used.  The bilges which is the collection points in the boat where access water or sea water or other things collect were all filled.  Due to the conditions we had to move slowly and carefully for our own health as well to do the search.  So it took several hours.

Q.    During the course of that search, did you find any contraband in the Motor Vessel POP interior?

A.    Yes, sir.

Q.    What or -- excuse me.  Where did you find that contraband?

A.    We found it in the master bedroom, underneath the master bed, beneath a compartment there.

OFFICIAL TRANSCRIPT

Q.   Can you tell the members of the jury what you found?

A.   We -- we found two bags or backpack-type bags containing 24 individually wrapped bricks of white, powdery substance that we suspected to be cocaine.

         MR. BADAWY: May I approach the witness, Your Honor?

         THE COURT: Yes.

BY MR. BADAWY:

Q.   Agent Joseph, I'm showing you what's been marked as Government's Exhibit No. 43.  Can you take a look at that?

A.   Yes, sir.

Q.   Are you familiar -- familiar with what's contained in Exhibit 43?

A.   Yes, sir, I am.

Q.   What's contained in Exhibit 43?

A.   These are pictures of the front bedroom, the master bedroom, the bed and the contents that we located therein.

Q.   Do those photographs fairly and accurately show the recovery of the contraband that you found in the interior of the Motor Vessel POP?

A.   They do, yes, sir.

         MR. BADAWY: Your Honor, I'd offer Government's Exhibit 43 into evidence.

         MS. O'NEILL: No objection.

         MR. WASHINGTON: No objection.

         THE COURT: Let it be admitted.

OFFICIAL TRANSCRIPT

**MR. BADAWY:** I'd ask permission to publish it, Your Honor.

**THE COURT:** Go ahead.

BY MR. BADAWY:

Q.   Put up, please, 43.

Agent Joseph, what are we looking at here?

A.   So this is the master bedroom in the forward part of the vessel.  As you can see, the way that the bow kind of comes together in the forward section, they built the bed up to allow for storage of clothing, suitcases, excess gear, things like that, but it allows for compartments under the bed.  This is a picture of the mattress removed and one of those compartments exposed and the contents of one of those compartments onto the -- the bed there.

Q.   What is that yellow item that we're looking at right there?

A.   That is one of the bags that was located underneath the compartment under that bed with its contents therein.

Q.   And just to be clear, that opening area right there, it looks like to the right of the yellow bag, what is that?

A.   That is the compartment.  It's a little storage compartment where someone would typically put, like, luggage or extra gear.  Beneath that was a hatch that allowed access to essential components like tanks, wiring, hoses, things vital to the vessel that you may need access or service.  These bags

OFFICIAL TRANSCRIPT

were located beneath that second hatch on top of that -- that -- those fittings.

Q.   Can we go to the next image, please?

What are we looking at here, Agent Joseph?

A.   So this is a view directly over that hatch looking straight down into that compartment with the second lid also removed.  And if -- you can kind of see the two fittings that are there, underneath that lid that's flipped over there's still one of -- one of the bags in there, a black backpack.

Q.   Okay.

A.   We had not -- we had not removed it yet.

Q.   Please go to the next image.

A.   This is the -- the same -- same view, but further back out showing that smaller compartment and then the -- the hatch open beneath it.

This is the two bags that were located beneath that second hatch.

This is the first backpack.  It was a yellow, what's called, a dry sack.  It has the ability to roll up and be watertight, keeping the contents dry.

This is the first opening of the yellow backpack and observing the contents therein.  Again, individually wrapped bricks of a white, powdery substance that, at the time, we suspected to be cocaine.

This is the second bag that was removed from that hold, a

black backpack.

This is the first opening of that. Also, containing similar items, individually wrapped bricks of what was suspected to be cocaine.

So this is the contents of that bag. Again, because of the conditions and the lighting we -- we came out of that room into a room where we had more space and could have more light available to us. We removed the items to inspect them and -- and inventory its contents. These are the individual bricks of white powdery substance that we found.

This is the second bag's contents. Same thing.

Q. Thank you, Agent Joseph. And when you say -- you use the term, "suspected cocaine," why did you suspect this to be cocaine?

A. In the many years that I've been working for Customs I've had the opportunity to seize many, many other items like this, similar in nature, wrapped in this way, which is very typical of or indicative of further distribution or intended further distribution, usually done in one kilogram increments. And this is -- this is -- the weight, feel, packaging is nearly identical.

Q. Thank you, Agent Joseph. Agent Joseph, when you and your colleagues recovered these bricks, what did you do with them?

A. They were secured, inventoried, later transported to the U.S. Customs vault and turned over to the seized property

OFFICIAL TRANSCRIPT

specialist there for -- for -- to store as evidence.

Q.   Do you know if they were weighed?

A.   They were eventually, yes, sir.

Q.   Were you present when they were weighed?

A.   I was present, yes, sir.

Q.   What were the weight of -- the total weight of these bricks?

A.   One kilogram each for a total of 24 kilograms.

Q.   And did you prepare any paperwork associated with the seizure of this cocaine?

A.   Yes, sir.  I did.

Q.   Excuse me.  The seizure of these bricks?

A.   Yes, sir.

Q.   Okay.  And what was that?

A.   We are required to maintain a chain of custody for any items or property that -- that are seized to show the -- to show the chain of custody.  It's a -- it's a required CBP form, 6051.

        **MR. BADAWY:** May I approach the witness, Your Honor?

        **THE COURT:** Yes.

BY MR. BADAWY:

Q.   Let me show you what's been marked as Government's Exhibit 18.  Can you take a look at what is Government's Exhibit 18, please?

A.   Yes, sir.

Q.    What is contained in Government's Exhibit 18?

A.    These are the custody receipts for the seized property in evidence.

Q.    Okay.  And does your name appear on those forms?

A.    Yes, sir.  Each of them.

Q.    Did you prepare those forms?

A.    Yes, sir.

Q.    And are those forms prepared in the regular course of business by a CBP officer when he or she recovers items?

A.    It is.  It's required.

Q.    Okay.  And are those forms maintained in the regular course of business by United States Customs and Border Protection?

A.    Yes, sir.  To show the chain of custody.

Q.    And does your signature appear on that form?

A.    It does, yes, sir.

Q.    And did you -- were you the one that completed that form?

A.    Yes, sir.

          **MR. BADAWY:** Your Honor, the government would offer Exhibit No. 18 into evidence?

          **MS. O'NEILL:** No objection.

          **MR. WASHINGTON:** No objection, Your Honor.

          **THE COURT:** Let it be admitted.

BY MR. BADAWY:

Q.    Just a few more questions, agent.  Agent Joseph, are you

OFFICIAL TRANSCRIPT

familiar with Cocodrie, Louisiana?

A.   Yes, sir.  I am.

Q.   How are you familiar with Cocodrie, Louisiana?

A.   We've gotten fuel there many times.  We've visited there many times.  We've interacted with the public there many times.

          **MR. BADAWY:** Okay.  Your Honor, may I approach the witness, please?

          **THE COURT:** Yes.

BY MR. BADAWY:

Q.   Agent Joseph, I'm showing you what's been marked as Government's Exhibit No. 25.  Do you recognize what's contained in Government's Exhibit No. 25?

A.   Yes, sir.  This is a Google Map image of south Louisiana, showing a marker -- a pin dropped where Cocodrie, Louisiana is.

Q.   Okay.  And does that map there fairly and accurately show where Cocodrie, Louisiana is?

A.   Yes, sir.  Very remote.

          **MR. BADAWY:** Your Honor, the government would offer Exhibit No. 25 into evidence, which I believe has already been stipulated to.

          **THE COURT:** Admitted.

          **MR. WASHINGTON:** No objection, Your Honor.

          **MS. O'NEILL:** No objection.

          **MR. BADAWY:** May we publish Exhibit 25, Your Honor?

          **THE COURT:** Admitted.

BY MR. BADAWY:

Q.   Please publish it.

Again, could you tell the members of the jury what we're looking at here, Agent Joseph?

A.   Yes, sir.  A Google Map image of the southern coast of Louisiana.  You can see Pontchartrain there and Mississippi River which goes out to the bottom right and to the left the marker which indicates, right there, in the very edges of the marshes, pretty much the end of the road, Cocodrie, Louisiana.  It's the last marina before there's nothing but marsh and bay.

Q.   Okay.  Are you familiar with the CoCo Marina?

A.   Yes, sir.

Q.   Where is the CoCo Marina located?

A.   In Cocodrie, Louisiana.

Q.   Okay.  Have you ever been to the CoCo Marina?

A.   Yes, sir.

Q.   Okay.  What is the CoCo Marina?

A.   It is a privately owned marina that the public can use and pay to launch vessels there.  They have a very nice restaurant, too.

Q.   Okay.  Are you familiar with the term -- are you familiar with what a designated port of entry to the United States is?

A.   Yes, sir.

Q.   What is a designated port of entry to the United States?

A.   A designated port of entry is any designated location

OFFICIAL TRANSCRIPT

where CBP or U.S. Customs has a presence, is able to process individuals and -- and cargo and enforce regulations.

Q.   Is the CoCo Marina a designated port of entry to the United States?

A.   No.  It is -- it is a private -- private marina.

**MR. BADAWY:** One moment, Your Honor, if I may?

**THE COURT:** We'll take a 10-minute break after this witness before you get him.

**MS. O'NEILL:** Before I --

**THE COURT:** Before.

**MR. BADAWY:** Your Honor, I have no questions -- no further questions at this time.

**THE COURT:** Okay.  Let's take a 10-minute break at this time.  Court will stand in recess.

**THE DEPUTY CLERK:** All rise.

(Jury out and recess began at 3:16 p.m.)

**THE COURT:** While they're lining up the jurors, the jurors are not in the courtroom, both counsel wish that the witnesses be sequestered.  They -- I'll assume they moved it timely and I'll ask counsel to make sure that the witnesses are not in the courtroom one at a time.  So far they have not been, I noticed.

Let's bring them in, Marshal.

(Jury in at 3:29 p.m.)

**THE COURT:** Okay.  Be seated please.

OFFICIAL TRANSCRIPT

You may proceed with cross-examination, Counsel.

**MS. O'NEILL:** Thank you, Judge.

**CROSS-EXAMINATION**

BY MS. O'NEILL:

Q.   Good afternoon, sir.

A.   Good afternoon, ma'am.

Q.   So, Mr. Joseph, if I understood you correctly, you -- you first became involved on which date; February 13th?

A.   The -- it was Valentine's Day.

Q.   Okay.  And so that's February 14th?

A.   Correct.

Q.   I think.  I'm not great at holidays.

A.   I'm sorry.

Q.   And so on February 14th, you came out via boat to -- somewhere off the coast of Louisiana?

A.   About 75 miles offshore, yes, ma'am.

Q.   And when you made contact, you saw the -- the Motor Vessel POP, which we've -- we've looked at photographs of, correct?

A.   Yes, ma'am.

Q.   And you also -- at that point, though the Coast Guard had already intercepted the POP?

A.   The Coast Guard was on scene with them.  We did not interact with them directly, no, ma'am.

Q.   Okay.  You didn't interact directly with the Coast Guard or you didn't interact directly --

OFFICIAL TRANSCRIPT

A.   The Motor Vessel POP.

Q.   Okay.  And so your only involvement with the POP was after it was towed in?

A.   Once it was at the dock, yes, ma'am.

Q.   Okay.  And that was the following day on February 15th?

A.   Yes, ma'am.

Q.   Okay.  So going back to -- to February 14th, your involvement was to meet up with the Down the Bayou fishing boat?

A.   Yes, ma'am.

Q.   And on that boat there were three individuals, correct?

A.   Yes, ma'am.

Q.   And who were those individuals?

A.   I do not know.  I did not interview them.

Q.   Okay.  You didn't get their names?

A.   No, ma'am.

Q.   Do you have any idea whether they were U.S. citizens or not?

A.   I -- I want to say yes, but I can't recall that specifically.

Q.   Okay.  Did anyone, who you arrived with, interview those individuals?

A.   Yes, ma'am.

Q.   Okay.  And you testified about the size of the boat that you left out on, correct?

A.   Yes, ma'am.

Q.   It was about 45 feet?

A.   Yes, ma'am.

Q.   And the POP was a larger boat than that, correct?

A.   The POP vessel was, yes, ma'am.

Q.   And it's about a 65-foot boat?

A.   Yes, ma'am.

Q.   So I'm not very good at sizes but --

          MS. O'NEILL:  Your Honor, may I approach the witness?

          THE COURT:  Yes.

BY MS. O'NEILL:

Q.   So I have here a tape measurer, Agent.  May I ask you to hold that for me?  I'm just going to -- actually, I'll give you this end and I'll take this.  If you could stop me when that says 65 feet.  Pause that there for a second.

     Can you hold that, sir?  Thank you for your participation. Thank you, sir.

     Where are we at now, sir?

A.   52 feet.

Q.   Fifty-two feet.  So the -- the POP vessel is larger than this courtroom?

A.   About 10 feet more, yes, ma'am.

Q.   Okay.  I'll just leave this here for efficiency for now.

A.   You don't want me to wind -- you don't want to wind it up.

Q.   You don't have to do that.

OFFICIAL TRANSCRIPT

**MS. O'NEILL:** May I approach, Judge?

BY MS. O'NEILL:

Q.   I'll just leave it down here for now.

So that's a -- we call it a fishing ship, but, I mean, it's a big -- 65 feet, bigger than this courtroom, right?

A.   It -- it would be considered probably smaller to middle size sport fishing boat, yes, ma'am.

Q.   Okay.

A.   For that class of vessel, yes, ma'am.

Q.   And it's a -- and some people refer to it as a yacht?

A.   Maybe in some context, yes, ma'am.

Q.   And so I just want to make sure I understand the size of this yacht.  The -- I believe, you -- you walked us through, in the photos, but ultimately there's, like, a main living space, right, with a living room?

A.   Yes, ma'am.

Q.   And a kitchen?

A.   Yes, ma'am.

Q.   And then there were stairs that went down inside, correct?

A.   Yes, ma'am.

Q.   And that's where the living quarters, as you call them, were, right?

A.   Yes, ma'am.  Berthing areas or sleeping -- sleeping rooms.

Q.   And there's three bedrooms?

A.   Yes, ma'am.

OFFICIAL TRANSCRIPT

Q.   And two bathrooms?

A.   And hidden bunks underneath the stairs.

Q.   And that's where a crew member probably would sleep?

A.   Or a mechanic, yes, ma'am.

Q.   Or a mechanic or an engineer.  And so those are -- those crew -- when you say under the stairs, that's even lower in the vessel, correct?

A.   Yes, ma'am.

Q.   And that's next to where the engine room is?

A.   Yes, ma'am.  Near it.

Q.   And you're familiar, having been on boats, that engines on boats, not unlike engines on lawnmowers or whatever, can be kind of loud, correct?

A.   Yes, ma'am.

Q.   And you testified that first you searched the outside of the boat?

A.   Yes, ma'am.

Q.   And there was no contraband located, did I hear you correctly?

A.   No, ma'am.  No -- no -- no contraband.

Q.   And so there was nothing out in the open at all that you would consider contraband?

A.   No, ma'am.

Q.   And the only contraband -- that's a law enforcement term for something that's illegal, right?

OFFICIAL TRANSCRIPT

A.   Yes, ma'am.

Q.   And the only contraband that was found were these 24, I think you called them, bricks of what you believed to be cocaine, correct?

A.   Yes, ma'am.

Q.   And just to be clear, those were -- 14 of them were in one bag, correct?

A.   Yes, ma'am.

Q.   And 10 were in another bag?

A.   Yes, ma'am.

Q.   And those bags were found in a double secret compartment on the boat?

A.   They were -- yes, ma'am.  They were found underneath the bed, underneath the second compartment.

Q.   So to get to those drugs, you had to lift off the mattress from the bed, correct?

A.   Yes, ma'am.

Q.   And then you had to -- there was an initial compartment that you had to go into, right?

A.   Yes, ma'am.

Q.   And then you had to -- within there, there was another compartment that you had to go into in order to be able to get to those drugs?

A.   A hatch, yes, ma'am.  The floor of that first compartment.

Q.   Okay.  And you didn't find any guns or knives on the boat,

OFFICIAL TRANSCRIPT

correct?

A.    No, ma'am.

Q.    But you did find a box containing 9mm bullets, correct?

A.    I don't recall.

Q.    And we looked at some pictures, Agent, I'd like to show you just a couple more.

          **MS. O'NEILL:** Your Honor, may I approach?

          **THE COURT:** Yes.

BY MS. O'NEILL:

Q.    Mr. Joseph, I'm showing you what I've marked as Defense Exhibit 1.  Those are three photographs.  Do you recognize what's depicted in those photographs?

A.    Yes.  Yes, ma'am.

Q.    And what do you recognize them to be?

A.    So the first picture is a picture of the helm station in that forward seating area, looking towards the rear, at a pile of life preservers.  And the second one is a pile of life preservers in a pile on the floor, it looks like on the interior of the vessel.  And the third one is a required safety kit, flare kit box.

Q.    And as with the other photographs, are those fair and accurate depictions of what those items were on that date?

A.    Yes, ma'am.

Q.    Okay.  May I retrieve those?

A.    Yes.

**MS. O'NEILL:** Judge, I offer, file, and introduce Defense Exhibit 1.

**THE COURT:** Any objections?

**MR. BADAWY:** No objection, Your Honor.

**THE COURT:** Let it be admitted.

**MS. O'NEILL:** Permission to publish?

**THE COURT:** Yes.

**MS. O'NEILL:** Dean, can I use this?

**THE DEPUTY CLERK:** Yes.  It takes a second.

**MS. O'NEILL:** I'm a little low tech, but...

BY MS. O'NEILL:

Q.   And so that's -- just since the jury couldn't see it before, that was a bunch of life preservers that were found on the -- on the Motor Vessel POP?

A.   Yes, ma'am.  They were originally in a stored compartment. We pulled them out to show that they were, in fact, on the vessel.

Q.   Okay.  And then elsewhere there were additional life pre -- preservers that were also on the boat, correct?

A.   Yes, ma'am.  There were additional ones on the boat.

Q.   And then you mentioned the flare gun.  That's the flare gun that you also observed, correct?

A.   Yes, ma'am.  The -- the original ones -- the original life vests being the ones I think that we pulled out of a compartment.  The second one with the tags still on them, I

don't -- I can't attest that those were given to them by the Coast Guard or on the vessel.  They were just in a large pile.

Q.   Okay.

A.   And then that one there was, I believe, also inside the vessel.

Q.   And based on this photo it looks there's some spaces were some flares were -- it's not full, let me say that, correct?

A.   It does -- it does not appear to be, no.

Q.   It looks like it could fit at least maybe two flares and maybe did at some point?

A.   Possibly, yes, ma'am.

Q.   Okay.  And you testified -- and just so I'm clear, Mr. Joseph, you work for U.S. Customs and -- and Border, correct?

A.   Protection.

Q.   Protection.  What other agencies -- I believe you testified that there were a number of partner agencies that showed up.  What other agencies were there?

A.   To the best --

Q.   Let's start on February 14th, what other agencies?

A.   On February 14th, during the initial interaction at sea, when we arrived out on scene it was just our vessel with our marine interdiction agents, one Homeland Security Investigation's special agent and the U.S. Coast Guard.

Q.   And then on February 15th, were there any additional

OFFICIAL TRANSCRIPT

agencies?

A.    Yes, ma'am.

Q.    Which agencies?

A.    By that point we had activated the ReCoM or the Regional Coordinating Mechanism where if there's -- like I mentioned before, a need for additional personnel to handle multiple individuals or large in-nature type of activities, we'll bring additional personnel in for transportation, processing, paperwork collections.  At that time we had HSI, Homeland Security Investigations on scene.  We had the U.S. Border Patrol on scene.  Air and Marine Operations, we came on scene, and the U.S. Coast Guard.

Q.    And each of those agencies supplied multiple individuals; is that fair to say?

A.    A few individuals, yes, ma'am, to -- to help move things more smoothly along.

Q.    And about how many agents, would you say, you interacted with on February 15th?

A.    I would be remiss in trying to recount.

Q.    More than 10?

A.    Maybe 10, 15 people.

Q.    And what about on February 14th, same?

A.    Just us -- just us three on the boat plus the HSI special agent.

Q.    Okay.  And then the people on the Coast Guard boat as

well?

A.   We didn't interact with them.

Q.   Okay.  And you testified about the condition on the boat. You have no information about what the boat looked like when it set sail, correct?

A.   No, ma'am.

Q.   And, in fact, you testified that your first interaction, while not with the POP, you first observed the POP on February 14th, correct?

A.   Yes, ma'am.

Q.   And around what time did you make contact with the Down the Bayou boat, which was near the POP?

A.   It would have been several hours after we departed, which was around -- a little after midday, so early afternoon, before sunset.

Q.   Okay.  And eventually you go in and I think you said you got in around midnight, correct?

A.   Shortly after, yes, ma'am.

Q.   And it was a long day and you went back to Houma and then you went home for the night, correct?

A.   Yes, ma'am.

Q.   And because it was a long shift you didn't come in to work until later than maybe normal the following day, correct?

A.   Yes, ma'am.

Q.   And I believe you testified you thought it was midday,

OFFICIAL TRANSCRIPT

early afternoon that you actually arrived back where the Motor Vessel POP was, correct?

A.    It was early -- late morning.  I believe before -- a little before lunch.  It was minimum amount of rest to get back and -- and provide assistance.

Q.    And when -- I believe you testified on direct that when you arrived the people -- they were finishing unloading people from the POP?

A.    Yes, ma'am.

Q.    And so that entire time when you were -- it took a while to get back with -- from being out in the Gulf of Mexico back to Grand Isle, correct?

A.    Yes, ma'am.

Q.    Was that about two hours as well?

A.    For me to get back?

Q.    Yes.

A.    It's --

Q.    From -- from when you intercepted the Down the Bayou boat to get back to land?

A.    It took more than two hours.  Several hours.  We were moving, as I mentioned, slowly because of the additional weight that the vessel had on it, the sea conditions which were slowly subsiding, but not unsubstantial.  It took us a while to get back.

Q.    Okay.  And so the -- the whole time that you were towing

207

that boat in and you went home and you went to sleep for the night and you got up and you went back out, the POP was still either out in the Gulf of Mexico or just making its way back to the dock, correct?

A.    When we -- when we initially left the scene, the U.S. Coast Guard Cutter Tiger Shark was making maneuvers to attach itself, via a long tow line from the rear, to bring it back into port.

Q.    Okay.

A.    So it -- it spent the evening, while we escorted the Down the Bayou boat back to the U.S. station -- U.S. Coast Guard station Grand Isle, the Coast Guard Cutter was making way, albeit slowly, but making way as comfortably as possible for the occupants of that vessel back to the Coast Guard station. But because of the slow speed and 75 miles out, it took some time.

Q.    And at that point though you were aware that federal agencies were involved and investigating the POP, correct?

A.    At -- at the point in which we were asked to detain and escort that boat, the ReCoM or the Regional Coordinating Mechanism, had been activated and put on standby in case additional resources were needed.

Q.    And it's typical that when law enforcement is on scene people, generally for officer safety, aren't free to just sort of move about as they'd like, right?

A.    Correct.

Q.    And so -- and again, you didn't get on the POP when it was still out in the Gulf of Mexico, correct?

A.    No, ma'am.

Q.    And so you don't even have any information about what the conditions were on the POP at the time the Coast Guard intercepted it, correct?

A.    No, ma'am.

Q.    The only information you have is after that long evening of sitting with federal agents when the boat was towed into the dock, you got on the POP after everyone got off of it, correct?

A.    To my understanding the only people that were on the boat were the U.S. Coast Guard.

Q.    Okay.  And I know you said you didn't interview anyone on the Down the Bayou boat.  Did you interview anyone, at any point, in connection with this case?

A.    No, ma'am.

Q.    Okay.  I'd like to ask you -- would the government mind pulling up its Exhibit 18?

So you just went over this with Mr. Badawy, Mr. Joseph.

A.    Yes, ma'am.

Q.    And this is a chain of custody form that's prepared in connection with the items that are described that were seized, correct?

A.    Yes, ma'am.

OFFICIAL TRANSCRIPT

Q.   And that's -- I think you testified that's -- that's pretty standard, right?

A.   Yes.  It's required for any -- any evidence or property that is seized.

Q.   And that's because when law enforcement is doing something it often involve -- may end up in court at some point, correct?

A.   Yes, ma'am.

Q.   And most of us can't remember what we had for lunch a week ago, we write reports and we use these reports so that almost three years down the line we remember what happened that day, correct?

A.   Yes, ma'am.

Q.   And so in this report you're listed as the seizing officer, correct?

A.   Yes, ma'am.

Q.   That's your name in the middle under box 15?

A.   Yes, ma'am.

Q.   But that's not your signature to the right?

A.   It's not a signature.  That's -- that is the seized property specialist for U.S. Customs at the Custom's house.

Q.   So where it says -- there's a box and it says, "seizing officer," and you see there's a line that says, "print name," right, on the left?

A.   Yes, ma'am.

Q.   And then to the right of that -- right -- to the right of

print name it says, "signature," correct?

A.    Yes, ma'am.

Q.    And then it has a spot for date?

A.    Yes, ma'am.

Q.    But it's your testimony that that signature line is not supposed to apply to you, the seizing officer?

A.    I did not testify to that.  No, ma'am.  That -- that's my name as the seizing officer.

Q.    So you -- did you fill out this form personally, Mr. Joseph?

A.    In many cases if there is a damage to a form or if there is a spelling error or if I misspell cocaine or something like that, it's not uncommon that we will rewrite a form, but that is all of the exact -- correct information that I provided when I filled those forms out.

Q.    So this isn't the original form that you filled out?

A.    It is one of the original forms of the -- with all of the correct information, yes, ma'am.  These are all -- these are all copies provided to me.

Q.    So let me -- let me see if I understand what you're saying, Mr. Joseph.  So I understand that this, what we're looking at, is a digital recreation of the form.  Are you saying that this is the original document that was created on February 16th of 2022?

A.    No, ma'am.  It does not appear to be.

OFFICIAL TRANSCRIPT

Q.    And do you know why that is?

A.    I'm assuming that, from my -- from my recollection, either we had a number off on the seized property number or I misspelled something and the forms were rewritten in their exact contents.  I was presented to it and then agreed that yes, that it is in its entirety as I had prepared it and it was then continued to move forward -- to continue the consistent chain of custody.

Q.    And so did you or any of your colleagues write a report about how the first version of this document was destroyed at some point?

A.    I don't have a recollection of that.  It was -- this is -- this is forms that are typically prepared at the Customs House with the seized property specialist.

Q.    And I believe you testified on direct that you -- you've -- you believed this was cocaine, right --

A.    In my --

Q.    -- from your experience?

A.    In my personal experience it had the same consistency, the same white powdery substance and same packaging, yes, ma'am.

Q.    Because you've been involved in hundreds, thousands of --

A.    I wouldn't -- I wouldn't say that many, no, ma'am, but I've been involved in quite a few seizures.

Q.    And how many years have you been in law enforcement?

A.    Nearing a total of 20.

OFFICIAL TRANSCRIPT

212

Q.   And when you maybe dealt with drug seizures even more when you were a Baton Rouge police officer, correct?

A.   Yes, ma'am.

Q.   And so you filled out hundreds of these types of forms while you've been a law enforcement officer?

A.   Yes, ma'am.

Q.   And since you've been with the department of homeland -- I'm sorry -- with Customs and Border Patrol, you've filled out this exact form many times?

A.   Yes, ma'am.

Q.   And so we're clear, you seized, you -- your testimony was that you did this search on February the 15th?

A.   Fifteenth, yes, ma'am.

Q.   And is --

A.   At the dock.

Q.   And just so we're clear, the date that's on this form though is February 16th?

A.   Yes, ma'am.  As I mentioned, that a lot of these forms are prepared at the Customs House in the presence of the seized property specialist whose name is on this form.

Q.   So is it not important for these forms to be accurate?

A.   Yes, ma'am, but it's not uncommon that these forms will be transferred in their entirety and correctness to additional forms.  They're just -- they're numbered sequence forms just much like a ticket book for a police officer.

OFFICIAL TRANSCRIPT

213

Q.    And if you look at this form up close, it sort of looks like someone's traced over everything that was on it.  Can you see that?

MR. BADAWY: Objection, Your Honor.  Object to the characterization.

THE COURT: Well, ask a question first.

BY MS. O'NEILL:

Q.    Sir, if we zoom in on this document -- well, let me do it this way.

MS. O'NEILL: May I approach the witness, Judge?

THE COURT: Yes.

BY MS. O'NEILL:

Q.    I think it's easier not on the screen for you to see, sir.  Is it fair to say if you look at this, for example, if you look to the left of where it says 14BK, there's sort of like a double line.  Do you see what I'm talking about right here?

A.    Yes, ma'am.

Q.    And so it looks -- and if you look on the second page of this document, this -- you can see the same kind of -- it appears to be like a tracing over.  Do you see what I'm talking about?

A.    Yes, ma'am.

Q.    And do you have any information about --

MR. BADAWY: Your Honor, I object to the form of this question.  The lawyer is testifying, not really asking the

witness about what the form looks like.

**THE COURT:** Well, he's under cross so to some extent I'll give some leeway with that.

BY MS. O'NEILL:

Q.   Do you have any information to -- so you didn't fill out this form, correct?

A.   This specific form, no, ma'am.  The information contained therein is my information.

Q.   So if someone traced over the information on this form, that person also wasn't you?

A.   The -- the tracing you're referring to, appears to be done to create greater definition for these copies.  Again, these are the style paper where when you press on them they can go through.  They -- sometimes they're created digitally.  Again, this was prepared at -- with the -- the seized property specialist at the Customs House, Mr. Erwin.

Q.   So if -- if I under -- if someone traced over it, are you saying that the -- the government traced over it before they gave it to us so we could read it?

A.   No, ma'am.  I'm saying that for definition maybe -- maybe Mr. Erwin did.  I cannot testify on his behalf.

Q.   Okay.  And who's Mr. Erwin?

A.   He is the seized property specialist for U.S. Customs at the Customs House here in New Orleans.  I can --

Q.   He's not --

A.   I can attest that the information on here is correct.  I can also attest that my handwriting is not that pretty.

Q.   Okay.

A.   So this is -- as I said, this is my information on the required 6051 seizure forms that has either been recreated by Mr. Erwin with my permission, while my name and signature -- while my name is on there, but not my actual signature, which is not an uncommon practice being that this was done in his presence at the Customs House.

Q.   Okay.  But just to clarify, you're saying it's -- it's accurate?

A.   It's an accurate form, yes, ma'am.

Q.   Except that the date is wrong, right, because you seized it on the 15th, right?

A.   The paperwork was done in the presence at the Customs House when it was being done there because this was a multi-day ordeal and, as I said, once we transported it later to the Customs House to have it stored as evidence, these forms were prepared.  They were not prepared on scene.

Q.   So it's your understanding that when you do a chain of custody, you don't have to put on the chain of custody form what date you took the item from someone or collected it?

A.   That's why it says the 15th at the top of the page.

Q.   That says, "date seized," correct?

A.   Yes, ma'am.  That's when we seized it.

Q.    And again, you said that it's correct, but this form says, "Luke Joseph for J. Erwin," correct?

A.    It's, "J. Erwin for Luke Joseph," but, yes, ma'am.  As I said, the seized property specialist, Mr. Erwin, recreated this form for me there at the Customs House the next day when it was put into evidence -- stored into evidence.  Excuse me.

Q.    So anyone picking up this form and reading it should know that we should read it from right to left?

A.    No, ma'am.  The signatures were put into their respective positions.

            **MS. O'NEILL:** Just one moment, Your Honor.

            I tender the witness, Judge.

            **THE COURT:** All right.

                    **CROSS-EXAMINATION**

BY MR. WASHINGTON:

Q.    Good afternoon, Mr. Joseph.

A.    Good afternoon, sir.

Q.    You stated that there were a number of agents aboard the vessel.  Who actually found the cocaine?

A.    It was -- the search effort was a collective effort with our Air Marine Operation officers and Coast Guard personnel.

Q.    Who actually found the cocaine?

A.    I want to say it was discovered by a Coast Guard personnel, but it was removed and inventoried by me.

Q.    Why wasn't that individual the seizing officer?

A.   Because I was the official that was -- that was overseeing the search and the inventory and I was the one who ultimately took possession of it, transported it and submitted it into evidence the next day at the Customs House.

Q.   Where were you at when he found the cocaine?

A.   I believe I was either in the -- in the room or in one of the adjacent rooms at the same time while we were conducting our inventories and searches.

Q.   So your position over the search -- you were in charge of the entire search?

A.   I was the agent who was going to be collecting all of the evidence and testifying for its safe handling and submission into evidence, yes, sir.

Q.   Okay.  How many search warrants have you conducted during your career?

A.   Many.

Q.   And you've testified that the conditions aboard were terrible.  How did you describe the conditions when you stepped aboard?

A.   I simulated them most closely to a very much, in need of service, Port-o-John on a hot summer day at a music festival.

Q.   All right.  And Ms. O'Neill asked you how long after the Coast Guard boarded this vessel were those individuals kind of detained and not able to move around and your response was you don't know; is that correct?

OFFICIAL TRANSCRIPT

A.    That is correct.  I had no interactions with the POP vessel until it was alongside the dock at the Coast Guard station Grand Isle.

Q.    All right.  I'm going to show you what has already been introduced into evidence, Exhibit No. 42.

**MR. WASHINGTON:** May I approach?

A.    Yes, sir.

**MR. WASHINGTON:** Okay.  Your Honor this has already been introduced.

**THE COURT:** All right.

BY MR. WASHINGTON:

Q.    What's going on in this photo?

A.    This is a picture of the -- of the bathroom that was just off of the master suite in the forward part of the boat.

Q.    Who is that taking the picture?

A.    That is another marine interdiction agent.

Q.    So he works with you.  He works on your team?

A.    Yes, sir.  He was one of -- he was one of the three marine interdiction agents that had gone out to assist and he also returned with us the next day to assist in the search.

Q.    So, in my experience, when agents experience conditions like the ones you spoke about, they're concerned about their own health and safety --

A.    Yes, ma'am -- yes, sir.

Q.    -- they wear gloves, masks.  Do you know why this

OFFICIAL TRANSCRIPT

individual did not have any of that on?

A.    None of us had it on at the time.  The -- the Tyvek suits, gloves, masks and all were being brought to us because we -- at the time we did not know the conditions were like that but because it had been turned over to us, we were not going to leave it.

Q.    But at the time of this photo -- where is this photo taken at?

A.    That photo is taken forward near the doorway to the master bedroom and the suite that's on the side of it there.

Q.    This is downstairs?

A.    Yes, ma'am -- yes, sir.  Excuse me.

Q.    No problem.  So you guys thought it was fine for you, especially, to spend a night away from the vessel, come back to the vessel, as you spoke about, move the vessel slowly towards shore, then all of a sudden you walk into this room and it's the worst conditions you've ever seen before, but at that point it was an emergency to go down and search the vessel?

A.    We -- we did not bring the vessel in.  We didn't have any interaction with the vessel until this vessel was alongside. The Coast Guard had done its preliminary search and removed with Border Patrol all of the individuals from the vessel before it was turned over to us.

Q.    When did you guys receive the Tyvek equipment that you requested?

A.    Later on.  Much later on.

Q.    Did you use that when you searched the vessel?

A.    Yes, sir.  Booties, gloves, Tyvek suits, yes, sir, and masks.

Q.    Is there any reason why there's no pictures of anyone in those Tyvek suits?

A.    Because when we conducted the search, in a timely manner, being that we were alongside and it had already been turn -- turned over to us, we wanted to collect and preserve as much evidence as possible.  We're consistently having to put ourselves in harmful environments to do -- to preserve such kinds of evidence.

Q.    You spoke about the -- the bilge and the backup of water.  Did that have anything to do with the electricity or lack thereof aboard the vessel?

A.    Absolutely.

Q.    All right.  So that could be one of the reasons why water was backing up into the vessel; is that correct?

A.    Along with the human excrement, urine and other bodily excrements, fluids.

Q.    All right.  So there's human excrements everywhere, feces on the ground as you mentioned, but you don't see any feces in any of the pictures.  You guys still think it's fine to walk through without any PPE or Tyvek equipment to start searching and taking pictures of the evidence?

OFFICIAL TRANSCRIPT

A.    Yes, sir.  We still went in -- went to collect evidence.
As I mentioned before, we are used to having to take a certain
level of personal risk in order to preserve, properly preserve
evidence.  Much like we did with the Carnival Cruise line that
lost its power at sea, we went on board there as well to
process them quickly and get them into port.  It's not
uncommon.

Q.    Okay.  So I'm going to show you another portion of
Exhibit 42, which has already been introduced into evidence.
You testified that this was the master suite in the master
bedroom; is that correct?

A.    Yes, sir.  In the very most forward portion of the vessel.

Q.    Do you know who was sleeping in these quarters?

A.    As I mentioned, sir, I had no interactions with any of the
individuals from that vessel.

Q.    Who, typically, gets the master bedroom or the master
suite on a vessel?

        **MR. BADAWY:** Objection, Your Honor, speculation.

BY MR. WASHINGTON:

Q.    To the extent that you know, based off of your career in
this industry, who, typically, gets the master suite and the
master bedroom on a vessel of this size?

A.    In a -- in a vessel of this class that bedroom is
typically known or classified as what's called a master suite
or an owner's suite.

OFFICIAL TRANSCRIPT

Q.   If a captain is on that vessel, would a captain have that suite?

MR. BADAWY: Objection, Your Honor, speculation.

BY MR. WASHINGTON:

Q.   To the extent that you know, based off of your experience, would that suite be reserved for the captain?

A.   It would entirely depend.

Q.   Depend on what?

A.   On the owner or the -- the -- whoever's in command of that ship's personal preference and choice, but that, as I mentioned, is what's known as or classified as an owner or a master's suite.

Q.   Okay.  And this was the nicest suite on that vessel; is that correct?

A.   It was the largest one, yes, sir.

Q.   Okay.  I'm going to show you now some photos that were included in the Government's Exhibit No. 41.  You testified that these were some of the photos that were taken of the exterior of the POP; is that correct?

A.   Yes, sir.

Q.   All right.  Do you know if that flare gun was there in that container before you guys boarded the vessel?

A.   Yes, sir.  This -- we did not bring that onto the vessel, no, sir.

Q.   I'm sorry if I misunderstood.  So Ms. O'Neill showed you a

picture of a flare gun container --

A.   Yes, sir.

Q.   -- where the flare gun was actually in it?

A.   Yes, sir.

Q.   On this vessel -- I mean, in this picture, the flare gun is not in the container.  Do you know if it was in the container prior to you boarding the vessel?

A.   I would assume so.  They -- it was either in it or nearby it or it had fallen out.  The contents were all there.

Q.   Would any agent have had a reason to take the flare gun out of this container?

A.   Only to make sure it would be safe.  If -- if they -- I -- I did not remove that, so I can't attest to its condition at the time, but in any instance where a dischargeable item like that is located, it's usually rendered safe as soon as possible.

Q.   All right.  And there are blankets -- well, explain to us what compartment this is on the vessel?

A.   Again, that's the forward seating area in the upper helm station or, what they call, the flybridge.  It would be a seating area that someone who was accompanying or visiting with whoever was in control of the vessel could sit casually.

Q.   There were blankets up there?

A.   It was cold, yes, sir.

Q.   All right.  You don't know if anyone was sleeping up

there, do you?

A.   Again, I had no interactions with it while it was at sea, no, sir.

Q.   On your search team, did you guys find any luggage up here?

A.   I don't recall.  It was not -- it was not something that we specifically inventoried that had relevance to our search.

Q.   I'm going to show you one last photograph.

Dean, I'm going to need you to --

THE DEPUTY CLERK: You're hooked up?

MR. WASHINGTON: I believe so.  We just need to publish it only to the witness.

THE DEPUTY CLERK: Hold up.

BY MR. WASHINGTON:

Q.   Can you see that photo?

A.   Yes, sir.  I can.

Q.   All right.  Do you recognize that photo?

A.   I do now, yes, sir.

MR. WASHINGTON: Okay.  I'm going to ask to introduce this as Defense Exhibit No. 3 or Number 2 -- Number 2.

THE COURT: Any objection?

MR. BADAWY: No objection, Your Honor.

THE COURT: Okay.  Let it be admitted.

MR. WASHINGTON: Can we publish this exhibit?

BY MR. WASHINGTON:

Q.   All right.  You testified before that you didn't remember -- do you know where these 9mm bullets were located on the vessel?

A.   To the best of my recollection, I want to say they were located in or near the bathroom near the master suite or in the master suite.  It was -- I didn't personally collect them but they were -- as I'm remembering, they were -- they were part of our collective inventory, but once they were located on -- to the best of my recollection, they were near or in the bathroom off of the master suite.

            MR. WASHINGTON: No further questions, Your Honor.

            THE COURT: Okay.  Any redirect?

            MR. BADAWY: Brief redirect, Your Honor.

                    **REDIRECT EXAMINATION**

BY MR. BADAWY:

Q.   Agent Joseph, just to clarify, on February 14th on your way to the Motor Vessel POP, can you tell the members of the jury what the weather was like?

A.   Yes, sir.  As I mentioned before, we had -- we were coming out of a low pressure system.  The -- if I remember correctly, I want to say earlier -- several days prior, the waves were eight to 10 feet but subsiding.  When we went to go out the waves were four to six feet with occasional bigger waves.  It was a rough ride out but, again, subsiding.  So eventually by the time we were on scene, several hours later, the -- the seas

were manageable and then continued to subside to where we came -- trekked back to Grand Isle -- trekked back down to Grand Isle with the other boat, they were waning off substantially to where it was a more comfortable ride.

**MR. BADAWY:** Thank you.  No further questions.

**THE COURT:** All right.  You're excused.  Thank you, sir.

Okay.  What's the situation with the witness?  Let me see, counsel.

**MR. GUICE:** Judge, we have a witness ready to go --

**THE COURT:** Okay.

**MR. GUICE:** -- if the Court wants to proceed.

**THE COURT:** Is that...

**MS. O'NEILL:** This isn't the one that there was an issue, Judge.

**THE COURT:** This is not the one?

**MS. O'NEILL:** There's one more.

**THE COURT:** Okay, okay.

**MS. O'NEILL:** Yes.  Thank you.

**THE COURT:** Let's call them.

**MR. GUICE:** The government calls Mary Donadieu.

**THE COURT:** You're excused.  Thank you.

**MS. O'NEILL:** Judge, would the court like -- can I just leave this here and just make sure they don't -- or do you want me to move it out of the way?

OFFICIAL TRANSCRIPT

THE COURT: It doesn't matter to me.

MS. O'NEILL: I can -- I'll just make sure the witness doesn't step on it.

THE COURT: If somebody trips on it though it's going to be your fault.

MS. O'NEILL: Thank you very much, Dean.  Thank you.

MR. GUICE: Judge, one second, please.  She's in the restroom, Your Honor.

THE COURT: Okay.  And we'll stop after this witness.

Come forward, please.

MR. GUICE: You can come forward, ma'am.

THE DEPUTY CLERK: Step on up and before you sit down, raise your right hand.

MARY DONADIEU,

having been first duly sworn, was examined and testified as follows:

THE DEPUTY CLERK: Please have a seat and state and spell your name for the record.

A.   It's Mary Donadieu, M-A-R-Y, D-O-N-A-D-I-E-U.

**DIRECT EXAMINATION**

BY MR. GUICE:

Q.   Good afternoon.

A.   Good afternoon, sir.

Q.   I'm Carter Guice and I'm -- you and I have met before, correct?

A.    Yes, sir.

Q.    Okay.  And I'm going to ask you a couple of questions about what you've done in this case.  So where do you work, ma'am?

A.    Homeland Security Investigations at the field office in New Orleans.

Q.    And what do you do for them?

A.    I'm an analyst, criminal analyst.

Q.    And what -- can you tell the ladies and gentlemen of the jury what an analyst for Homeland Security does?

A.    We prepare analytical products to help with case support, taking a lot of information and putting it into a form that's easy -- easier to digest and that kind of thing, so that and research and analyst.

Q.    Okay.  And you actually have, at the government's request, prepared some summary charts for this case --

A.    Yes.

Q.    -- have you not?

A.    Yes.

Q.    Okay.  I'm going to show you --

        **MR. GUICE:** And, Judge, may I approach the witness?

        **THE COURT:** Yes.

BY MR. GUICE:

Q.    I'm going to show you Government's Exhibit 1, which is a compact disc.

OFFICIAL TRANSCRIPT

A.    Yes, sir.

Q.    Would you look at that?

A.    Yes.

Q.    And you and I talked about this when we met before, correct?

A.    Yes, sir.

Q.    Okay.  Did the government send a -- or do a search warrant on -- for Garmin satellite phone records?

A.    Yes, sir.

Q.    Okay.

A.    Yes.

Q.    And are you aware that the -- that Carl Allison and Mr. Martinez communicated through a Garmin satellite phone from the sea?

A.    Yes.

Q.    Okay.  What kind of data is in Government Exhibit No. 1?

A.    Locational data, so time and date, latitude, longitude, as well as chat back and forth --

Q.    Okay.

A.    -- and like who it's from and who it's going to.

Q.    Okay.  So could you tell the ladies and gentlemen exactly what the Garmin satellite phone does when somebody either talks on it or sends a text message?

A.    It'll track the latitude and longitude, so like the point on the map where the conversations were taking place.

OFFICIAL TRANSCRIPT

Q.   Okay.  And every time you do that, it's going to send a signal --

A.   Yes.

Q.   -- where they were, longitude and latitude, or GPS or whatever it is --

A.   Right.

Q.   -- it's going to be a precise location of where they are?

A.   Yes.

Q.   Okay.  Did you review those Garmin records that we got with a search warrant?

A.   Yes.

Q.   And in your review do they appear to be what they purported to be?

A.   Yes.

Q.   And that would be records of this particular cell phone or satellite phone, whenever it was used, it would beam up into the sky and locate it -- and tell you their location?

A.   Yes.  It's not just the -- like it's not based just on the communications back and forth, it's also -- like it -- it tracks the -- whoever is holding the device, it's going to track them periodically.

Q.   Wherever they are?

A.   And it -- yes.

Q.   Just like our cell phones --

A.   Yes.

OFFICIAL TRANSCRIPT

Q.   -- but on land?

A.   Uh-huh (affirmative response).

Q.   So they're really listening to us, aren't they?

Okay.  So did you do anything with this information received from Garmin by the search warrant?

A.   I put the time and date data and the latitude and longitude that it connected to and I put it on a template that's an Excel spreadsheet in order to upload it into a mapping tool --

Q.   Okay.

A.   -- and then it displays as spots on a map.

Q.   Okay.  And tell us about that.  What -- tell us how the mapping tool takes that Garmin data and puts it on a map.

A.   So once the data is inputted you can manipulate the map like a zoom in and zoom out to be able to hover your cursor over a spot so it'll tell you what the latitude and longitude is and what the date and time is.  And once I had -- well, I did a couple of things to check the -- the information.

Once I had it copied and pasted to the new document I was able to check the top and the bottom -- the first one and the last one for a specific date range.  And went back to the original that Garmin sent and I made sure that they matched up on both.

Q.   Okay.

A.   And then once it's in the system I can look at the map and

OFFICIAL TRANSCRIPT

232

hover over the spot on the map and be able to directly go back to the original document and make sure that the times and the dates and the lat and long match up.

Q.   Okay.  And the Government Exhibit 1, the CD you have in front of you, you reviewed all of this data on a laptop in our office --

A.   Yes.

Q.   -- in front of us, correct?

A.   Yes.

Q.   Okay.  And is the data that's contained on that disc, is that an accurate portrayal or the actual data that Garmin sent?

A.   Yes.

Q.   Okay.  And did you review that CD?

A.   I did.

Q.   And the CD in front of you, how -- how do you know that's the same CD?

A.   I signed and dated it.

Q.   Okay.  And your signature and date appear --

A.   That is my signature, yes.

Q.   -- on the disc?

        **MR. GUICE:** Your Honor, at this time we'd offer Government Exhibit 1 into evidence.

        **THE COURT:** Any objections?

        **MS. O'NEILL:** Judge, could -- just one...

                (Off the record discussion.)

OFFICIAL TRANSCRIPT

**MS. O'NEILL:** No objection.

**THE COURT:** Okay.  Let it be admitted.

**MR. GUICE:** Thank you, Your Honor.

BY MR. GUICE:

Q.   I'm going to show you what's been marked Government 1.1 through 1.12.

**MR. GUICE:** Approach the witness, Your Honor?

**THE COURT:** Yes.

BY MR. GUICE:

Q.   So tell the ladies and gentlemen of the jury what -- what -- you can take a second to look through it.

A.   Okay.

Q.   Okay.  And you -- you reviewed them on the stand today --

A.   Yes, sir.

Q.   -- correct?

And you have -- have you reviewed these before?

A.   I have.

Q.   Okay.  And what are they?

A.   It's the track data for -- for the voyages, northbound and southbound, over water, so the vessels.

Q.   Okay.  So, in essence, this is the work product of the data you received from Garmin?

A.   Yes.  This is the track data that comes out when I uploaded that -- the locational data into the mapping tool and this is a screenshot of the tool itself.

OFFICIAL TRANSCRIPT

234

Q.   Okay.  And those exhibits, do they portray, accurately, the -- the -- the data -- the GPS data that you received from Garmin?

A.   Yes.

        MR. GUICE: Okay.  Approach the witness, Judge?

        THE COURT: Yes.

        MR. GUICE: I'm sorry.  Your Honor, at this time we move exhibits -- Government Exhibits 1.1 through 1.11 into evidence.

        THE COURT: Okay.  Any objection?

        MR. WASHINGTON: No objections, Your Honor.

        MS. O'NEILL: What the government has is not what the government gave us.

        MR. GUICE: I'm sorry.  1.12.

        THE COURT: 1.1, okay.

        MS. O'NEILL: No objection.

        THE COURT: Let it be admitted.

        MR. GUICE: Okay.  May we publish them to the jury, Your Honor?

        THE COURT: Yes.

BY MR. GUICE:

Q.   Okay.  Could you put up 1.1, please.

     What is this, ma'am?

A.   This is the southbound voyage between April 17th and April 26th --

OFFICIAL TRANSCRIPT

Q.   Okay.

A.   -- 2021.

Q.   And just for the record, you don't know who's on the journey and you don't know what boat it is?

A.   No.  It's just -- I can see which way they're traveling based on the information that I put into the system.

Q.   Okay.  And so this is in April of 2021 and so we're going to -- we're going to note that later.  All right.  April 2021, someone moved -- whoever had this Garmin cell phone -- satellite phone from, looks like, Miami, would that be accurate?

A.   Yes.  Miami to Honduras.

Q.   To Honduras?

A.   Uh-huh (affirmative response).

Q.   Okay.  Let's look at Government Exhibit 1.2.

A.   Okay.

Q.   All right.  Same thing.  So this is generally the Gulf of Mexico, right?

A.   Uh-huh (affirmative response).

Q.   And what is this showing?  What -- what direction -- and how do you know it's northbound or southbound?

A.   Because of the date and time that it -- your first latitude and longitude.

Q.   Okay.  So it goes from earlier --

A.   Coordinates are --

236

Q.   -- to later --

A.   Uh-huh (affirmative response).  Right.

Q.   -- right?

     Okay.  So this is May 1st, 2021?

A.   Yes.

Q.   It's a northbound journey and where is it leaving from?

A.   It's leaving from Honduras and going up to Louisiana.

Q.   Okay.  And that's in May.  All right.  Let's look at Exhibit 1.3.  Now, this is, again, May 11th through May 16th; is that correct?

A.   Yes.

Q.   And it looks like it's the return trip; is that right?

A.   Southbound.

Q.   Leaving Louisiana and going down to --

A.   Back to Honduras, yes.

Q.   -- Honduras?

     Okay.  Let's look at 1.4.  This is -- will you tell me the date on the top?

A.   It's July 11th to July 15th and it's northbound.

Q.   Okay.  And where is this leaving?

A.   Honduras and going to Louisiana.

Q.   Okay.  Let's go to Government 1.5.

     Which direction is it going?

A.   Southbound.  Going -- July 19th to July 24 --

Q.   Okay.

A.    -- from Louisiana to Honduras.

Q.    Okay.  Let's look at Government 1.6.

This is more complicated.

A.    Right.

Q.    All right.

A.    This one was -- started in New York and went down to Honduras and stopped in Charleston and Miami.

Q.    Okay.  So starts in New York, ends up in Honduras?

A.    Yes, sir.

Q.    Okay.  Let's look at Government 1.7 and this is -- will you tell the ladies and gentlemen what it is?

A.    It's a northbound voyage, October 12th through -- yeah, October 12th through October 15th and that one is -- yeah, northbound.

Q.    And so that's leaving Honduras and --

A.    Leaving Honduras and arriving in Louisiana.

Q.    Okay.  Let's look at Government 1.8 and tell the ladies and gentlemen of the jury what that is?

A.    Southbound from Louisiana to Honduras starting October 18th and ending October 22nd.

Q.    Let's look at Government 1.9.

A.    Went northbound December 10th and December 11th and then turned around, around Cancun.

Q.    Okay.  And so let's -- let's read that in conjunction with Government 1.10.  So it stops at a certain point in December of

OFFICIAL TRANSCRIPT

2021 and then on Government 1.10, what happens?

A.   It comes back December 12th and December 13th it returns to Honduras.

Q.   And you don't know why they turned around?  Your -- your data just shows that they turned around?

A.   This data only shows location, so yeah.

Q.   Very good.  Okay.  Let's look at Government 1.11.  Tell the ladies and gentlemen of the jury what that is, please.

A.   A northbound voyage from Honduras to Louisiana, including -- let's see, February 12th and 14th is where they ended up drifting.

Q.   Okay.  All right.  So they're -- this is the February journey and you don't know -- is -- it's the M/V POP, you just know that your data -- your satellite phone data shows us what happened?

A.   This is -- yes.  This is all locational, yeah.

Q.   Okay.  And they leave on February 9th and they end up south of the Louisiana coastline; is that correct?

A.   Yes.

Q.   Okay.  And let's go to -- now, this is a close up and this is a little different.  So let's spend a minute or two on this. So Government 1.12, dated February 12th through February 14th, what does this show you, and tell the ladies and gentlemen what it is?

A.   This is where the vessel stopped moving on its own towards

Louisiana and it ended up turning around when it drifted and just slowly drifted until -- until it was picked up and you can see the -- the locational data going up towards Louisiana. I believe that's...

Q. On February 12th, 2022 at 7:20 p.m., you have it plotted at a certain point, correct?

A. Correct.

Q. Then, even though they're going towards Louisiana, theoretically, the next tracking spot you have is February 13th, 2022 at 10:30, does that appear to be south of where it was?

A. Yes.

Q. Okay. And the -- the closeness of the dots, what does that mean to you?

A. Just how many times the -- it was communicating with the satellite.

Q. So somebody is busy on that sat phone?

A. They could be.

Q. Okay. Then it shows you February 15th at 12:26 a.m., it's even further south, correct?

A. Correct.

Q. All right. And then -- now, that's 12:26 in the morning, right, so that's after midnight, so it's the middle of the night?

A. Yes.

Q.   And then you show on February 15th, 2022 the -- the same day, but much later in the day, 10:30 at night; is that correct?

A.   Yes.

Q.   That it ends up, looks like, in Grand Isle; is that right?

A.   Yes.

Q.   Okay.  Thank you.  Okay.

        **MR. GUICE:** I'm going to show you -- approach the witness, Your Honor?

        **THE COURT:** Yes.

BY MR. GUICE:

Q.   I'm going to show you what's been marked as Government Exhibit 3 and I'd like you to take a look at this.

A.   Yes.

Q.   Okay.  Have you looked at it?

A.   Yes, I have.

Q.   Okay.  Now, to your knowledge has the government sent a subpoena to various airlines to Delta, American, and United for certain travel records?

A.   Yes.

Q.   Okay.

        **MS. O'NEILL:** Objection.

        **THE COURT:** Wait one moment.

        **MS. O'NEILL:** Judge, I'm going to object.  He's asking if she knows whether the government -- did she send it --

241

subpoena?

MR. GUICE: But she received it.

MS. O'NEILL: I'm going to object to the extent that they're going to ask this witness to testify about airline records.

THE COURT: Well, let's see where we go.  You asked a question -- you asked --

BY MR. GUICE:

Q.   All right.  So -- so let's walk through this.  You work for the federal government, correct?

A.   Yes, sir.

Q.   And you're working with us on -- on this trial preparation, correct?

A.   Yes, sir.

Q.   Did we -- did -- did the U.S. Attorney's office or Homeland Security provide you with the results of the grand jury subpoena sent to three airlines?

A.   Yes.

Q.   Did you examine what was received?

A.   I did.

Q.   What was received?

A.   Schedules, basically, reservations for flights for particular people.

Q.   Okay.  And so, to your knowledge, just being a human in America, is that what airlines do, is that they -- they

provide -- what do they provide, transportation?

A.    Yes.

Q.    Okay.  And do they keep records of that transportation?

A.    They do.

     **MS. O'NEILL:** Judge, I'm just going to -- she doesn't work for an airline and I would also object to the leading.

     **THE COURT:** Yeah.  Well, don't lead, but just ask the questions.

     **MR. GUICE:** Just trying to lay the predicate, Your Honor, that she received the records, so --

     **THE COURT:** What does it show?

BY MR. GUICE:

Q.    What -- what do the records show?

A.    These, in particular, they're flights Carl Allison took and some of the flights with other passengers on the same flight and crew members for the vessels.

Q.    Okay.  And from your receipt of the records, so you received them in what form?

A.    PDFs.

Q.    Okay.  PDF.  And you reviewed the records?

A.    Yes, sir.

Q.    And did they appear to be what the government had subpoenaed?

A.    Yes.

Q.    And what were they again?

OFFICIAL TRANSCRIPT

243

A.   Flight information.

MR. GUICE: Okay.  So, Your Honor, we offer, file and introduce Government Exhibit 3 into the record as being fully authenticated as airline records.

THE COURT: Okay.

MS. O'NEILL: And, Judge, I just -- I don't have a copy of what the government is saying is Exhibit 3.  What the government's provided us is Exhibits 3.1 and 3.2.

MS. WAGNER: Your Honor, these are records that were stipulated to by Bates number in the stipulations that were filed at the end of last week and the government has provided those records and it was in the stipulation as to the Bates records.  We're happy to provide them --

MS. O'NEILL: I just want to clarify that it is what they're saying it is, Judge.  That's all I'm asking --

THE COURT: Yes.  Right.

MS. O'NEILL: We have this whole big book, but it's not in here.  That's all I'm saying.

THE COURT: Yeah.

MR. WASHINGTON: Your Honor, I think the issue is the government provided us with bench books.  They did not put a copy of Exhibit 3 in Ms. O'Neill's binder.

THE COURT: I thought you all had all of the records in your...

MR. GUICE: We did.  We have, Your Honor, and we

244

provided them in discovery.

**MS. WAGNER:** We can pull them up, Your Honor, and show them what is on the disc, if that would be helpful.  If the Court would indulge us for just a few seconds.

**THE COURT:** All right.  In any event, I'm going to admit them.

**MR. GUICE:** Thank you, Your Honor.

**THE COURT:** Anything else of this witness?

**MR. GUICE:** No, Your Honor --

**MS. O'NEILL:** Judge, provided it matches exactly what's on the stipulation, that's fine.

**THE COURT:** Okay.

**MS. O'NEILL:** I just was unclear.  Thank you.

**THE COURT:** Tender the witness?

**MR. GUICE:** No, Your Honor.  I got to --

**THE COURT:** Okay.

**MR. GUICE:** -- show her another exhibit --

**THE COURT:** I'm sorry.

**MR. GUICE:** -- and kind of go through that.

**THE COURT:** Go ahead.

BY MR. GUICE:

Q.   Okay.  Based on this data that you received from the airlines, what did you do with it?

A.   I created, like, a chart with the flights to and from the U.S. to Honduras and back.  On one of them it's just the -- the

OFFICIAL TRANSCRIPT

245

dates and the airlines. The -- the flights that he took.

Q. Okay.

A. And the other one has the co-travelers.

Q. Okay. So the data that you received from the airlines, what did you do with it?

A. I took the information from the data we got and created the chart to match that information.

Q. Okay. I will show you what's been marked Government Exhibit 3.1 and 3.2, which has been provided to counsel in their bench book.

    **MR. GUICE:** May I approach the witness, Your Honor?

    **THE COURT:** Yes.

BY MR. GUICE:

Q. Would you please take a look at these two exhibits and tell me what you see?

A. Flights to and from Honduras.

Q. Okay. So -- and -- and -- just -- again, just to cover all of our bases, from what data are these charts made from?

A. From the returns that we got from the airlines.

Q. From the airlines.

A. Yes, sir.

Q. Okay. And from -- and you, personally, created this summary chart?

A. I did.

Q. And do the -- does the data contained in that summary

OFFICIAL TRANSCRIPT

chart --

A.    Yes.

Q.    -- accurately reflect the data received -- the information received from the airlines?

A.    Yes.

        **MR. GUICE:** Okay.  And, Your Honor, at this time we move these two exhibits -- what are there numbers?  I'm sorry.

A.    3.1 and 3.2.

BY MR. GUICE:

Q.    3.1 and 3.2 into evidence, Your Honor.

        **THE COURT:** It's a summary chart, huh?

        **MR. GUICE:** It's a summary.

        **THE COURT:** Summary chart, 1006.  I'll allow it.

        **MR. GUICE:** Okay.  May we publish them to the jury, Your Honor?

        **THE COURT:** Yes.

BY MR. GUICE:

Q.    Okay.  Can we put up?  Carl Allison.

        Okay.  Is this what you prepared, ma'am?

A.    Yes, sir.

Q.    Okay.  So -- and what's the title of it?

A.    Carl Allison's air travel to and from Honduras from March 2021 to September 2021.

Q.    Okay.  So this is, clearly, on every one of these lines. On 3.1 Carl Allison is a passenger?

A.   Correct.

Q.   Okay.  Now, we see the dates on the left; is that correct?

A.   Yes.

Q.   Okay.  And then we see the actual flight information in the middle, correct?

A.   Yes, sir.

Q.   And then what do we see on the right side?

A.   Individuals who were on the same flight.

Q.   Okay.  And you've -- you've titled that co-travelers?

A.   Correct.

Q.   Okay.  So we won't burden the jury going through each one, but is it fair to say that it starts in March of 2021 and end -- and this particular page ends in 20 -- September 16, 2021?

A.   Yes.

Q.   And where do -- the majority of these flights, where do they originate, in what country, and in what country do they end?

A.   Most of them are, at least, from Miami to Roatan and Roatan back.  Some start in Pittsburgh.  It depends on who's on the flight, but his are usually from Pittsburgh or Miami.

Q.   Okay.  And -- and on -- is that the end of that exhibit or is there another page?

A.   There's another one, yeah.

Q.   Okay.  Let's look to Page 2.  Oh, this is Page 2?

OFFICIAL TRANSCRIPT

A.    That's Page 2.

Q.    Okay.  Again, same scenario, correct?

A.    Yes, sir.

Q.    Where's the date?

A.    On the left-hand side.

Q.    Okay.  And what's the middle?

A.    The flights and where there -- where they originate and where they land.

Q.    Okay.  And then on the right side, what's that?

A.    Co-travelers.

Q.    Co-travelers, okay.

A.    And it specifies, like, which flight.

Q.    All right.  So --

A.    They may not have been on the entire trip, but that's the flight that they were on together.

Q.    And again, what countries are they traveling from and what countries are they going to?

A.    U.S. to Honduras.

Q.    Okay.  All right.  Let's pull up Government Exhibit 3.3, please.

      Okay.  What's the title of this one?

A.    Martinez, Cooper Zelaya, and Jackson Hernandez, one way air travel from Honduras in 2021.

Q.    Okay.  And -- and so -- and in the second line, who were the travelers?

OFFICIAL TRANSCRIPT

A.    On the April 7th flight it's Darrel Martinez and on the July 28th flight it's Darrel Martinez, Hennessy Cooper Zelaya and Rudy Jackson Hernandez.

Q.    And where are they flying from and to?

A.    For the first flight, San Pedro Sula to Miami and the other one, Roatan to Miami and then Miami to JFK.

Q.    And you didn't find a return flight from JFK back to Honduras?

A.    No.

MR. GUICE: And, Your Honor, just for the record, we've entered these exhibits and have moved them into evidence.

THE COURT: You -- you entered the underlying data and the chart at this point.

MR. GUICE: Yes.  Okay.  No further questions, Your Honor.  Thank you.  Thank you, ma'am.

A.    Thank you.

THE COURT: Just -- just one word about charts, members of the jury.  The Rules of Evidence 1006, specifically, allows the introduction of charts, but the charts are not proof of a fact.  The proof is contained in the underlying data that -- that the chart reflects.  So it's given to you -- the chart is given to you so that you can follow it more easily.  I just wanted to mention that.

Any cross?

MR. WASHINGTON: Yes, Your Honor.  Just briefly.

250

**CROSS-EXAMINATION**

BY MR. WASHINGTON:

Q.    You were shown a picture of Exhibit 1.12.  You stated that on February 12th, 2022 the boat started to drift and this indicates that the boat starts to drift --

A.    Yes.

Q.    -- how do you know that?

A.    By the way the track is going.

Q.    So by the way the track is going you can tell the difference between the boat traveling and --

A.    Yes.

Q.    -- the boat drifting?

A.    Uh-huh (affirmative response).  By speed and the track that it's taking.

Q.    Okay.  You testified that the -- the spots are based off of the frequency to which there's communication with the satellite; is that correct?

A.    I'm not sure I understand the question.

Q.    So Mr. Guice asked you that during this time there must have been frequent text messaging to create all of these dots and you stated, yes?

A.    The dots may not be associated just with communication.  It's the -- like a -- like texting back and forth.  It's also what it's receiving from the satellite.

Q.    I'm not sure I'm following you, so let's take a step back.

OFFICIAL TRANSCRIPT

251

The dots going northbound --

A.   Uh-huh (affirmative response).

Q.   -- are you saying they're separated because there's a separation in the timing of the text messages?

A.   I don't know if there is a set time space between how many times it's going to communicate with the satellite, but I can see by the track and how -- how -- the distance between each point and when it happens, that it had slowed down and was not going to its destination.

Q.   Okay.  And so you concluded from that that it was drifting backwards?

A.   Yes.

Q.   Okay.  But you don't know for sure?

A.   Based upon experience, that's what I would --

         **MR. WASHINGTON:** Okay.  That's fair.  All right.  And I have no further questions.

         **THE COURT:** Okay.

                    **CROSS-EXAMINATION**

BY MS. O'NEILL:

Q.   Good afternoon, ma'am.

A.   Good afternoon.

Q.   I just have a couple questions for you.

A.   Uh-huh (affirmative response).

Q.   I believe you said your title is an analyst?

A.   Yes.

OFFICIAL TRANSCRIPT

Q.   And you work for the federal government?

A.   I do.

Q.   Which agency?

A.   HSI.

Q.   And so these documents that Mr. Guice went over with you, you -- these prosecutors requested those -- that you prepare those documents, correct?

A.   Yes.

Q.   And they asked you -- well, you received data -- let's start with the GPS.  You received data from Garmin?

A.   Yes.

Q.   The maker of the device?

A.   Correct.

Q.   And you -- based on what they asked you, you selected some information from that device to put on those charts?

A.   I selected all of the latitude and longitude, so all of the locational points between the dates that I have on the slides.  All of the -- like every time the Garmin was communicating with that satellite, I have every point accounted for between those dates.  So I didn't, like, add or subtract. I went from the beginning date to the end date and all of that -- sorry -- all of that is on the slide, like, that's what's depicted on the map.

Q.   So each dot represents a communication; is that --

A.   Correct.

OFFICIAL TRANSCRIPT

Q.    -- a fair statement?

A.    Yes.

Q.    And so just the -- just so I understand, the way these work is someone sends something, it goes up to a satellite and to someone else either -- on another device somewhere else; is that correct?

A.    I don't know.  I just know that it's -- wherever that device was, that locational data is what I received.

Q.    So what you received has to do with -- if I'm holding the device --

A.    Uh-huh (affirmative response).

Q.    -- maybe we'll do it this way --

A.    Yes.

Q.    -- and I send someone a text message, it registers where I am?

A.    Correct.

Q.    And -- but if -- if my husband, sitting at home, sends me a text, it still registers where I am, correct?

A.    Yes.

Q.    Not where he is?

A.    No.

Q.    So the information is specific to the device?

A.    Correct.

Q.    Okay.  And you don't know anything about the people that were communicating on that device, right?

A.    The -- their contact information is also on the original -- like the original data that we got, it will -- it says who it came from and who it went to.

Q.    Okay.  And the Garmin device is actually registered to someone named Carl, correct?

A.    As far as I know.  That was part of that e-mail.

Q.    And I just want to ask you a couple of questions.  We could put -- the -- just by way of example -- perfect.

That's 1.2, just by way of example.  These little blue things pulled out, so -- so just to clarify what we were talking about earlier.  This -- you plotted all of the communications.  That's what all of the little dots are, correct?

A.    All of the little dots are what comes up on the mapping tool after I upload all of the locational data.  So when I do the template and upload it, I get the line and then I went into the -- the map, itself, and I wrote in what that position's date and time was.

Q.    Okay.  And so for this one, Exhibit 1.2, the first time was at 9:47 p.m., correct?

A.    As far as I know, yes.

Q.    And it actually starts -- I can't read so well, but it starts all the way out at sea already.  It's not starting close to shore, correct?

A.    Correct.

Q.   And with respect to 1.3, that one, the voyage starts or the GP -- the satellite turns on at 9:17 p.m.?

A.   Uh-huh (affirmative response).

Q.   And this one starts at 9:30 in the morning?

A.   Yes.

Q.   And this one, again, it's another northbound journey, that one starts at 5:46 a.m.?

A.   Uh-huh (affirmative response).

Q.   And this one in December starts at 8:22 a.m --

A.   Yes.

Q.   -- is that right?

A.   Uh-huh (affirmative response).

Q.   And then this one in February, that one starts at 8:25 --

A.   Correct.

Q.   -- correct?

     And the -- will the government pull up -- I'm sorry.  I can't find the one that's the August.  Would you mind pulling that up for me?  Oh, I found it.  I'm sorry.  1.6.  Thank you.

     And this one -- again, this is starting in August, right?

A.   Uh-huh (affirmative response).

Q.   It starts in New York?

A.   Correct.

Q.   This is a different one.  There's only a south -- there was no associated northbound journey that you could tell, right?

A.    No.

Q.    But you looked at those flight records, correct?

A.    Yes.

Q.    And you can tell that in August, according to those flight records, Mr. Hernandez and Mr. Cooper flew to New York City, correct?

A.    Correct.

Q.    And into -- actually, into an airport in New York, correct?

A.    Yes.

Q.    Designated port of entry and they then set sail along the eastern United States, correct?

A.    Correct.

Q.    And when they left New York that's 10:08 p.m., correct?

A.    Correct.

        **MS. O'NEILL:** Just one moment, Your Honor.

BY MS. O'NEILL:

Q.    And just to be clear, Ms. Donadieu, Government's Exhibits 3.1 through 3.3, you put those together?

A.    I did.

Q.    Again, at the request of the government?

A.    Yes.

Q.    And you reviewed airline records from a few different airlines?

A.    Yes.

OFFICIAL TRANSCRIPT

Q.    And those records didn't just have information related to Carl Allison in them, correct?

A.    Correct.

Q.    Some of them had other passengers, correct?

A.    Correct.

Q.    And you just summarized the information that the government wanted you to from those records, correct?

A.    Correct.

Q.    So those summaries -- there's additional information that isn't reflected in those summaries?

A.    What do you mean?

Q.    The -- the actual airline records, themselves, contain information that would not be reflected in your summaries because your summaries selected certain information, correct?

A.    Oh, correct.

Q.    Okay.

A.    Yes.

            **MS. O'NEILL:** No further questions, Judge.

            **THE COURT:** Any redirect?

            **MR. GUICE:** No, Your Honor.

            **THE COURT:** Okay.  All right.  Okay.  We'll stop here then.

            Okay.  Ladies and gentlemen, we're going to stop here -- and you're excused.  Thank you.

            **THE WITNESS:** Thank you, sir.

OFFICIAL TRANSCRIPT

**THE COURT:** We'll stop here and resume tomorrow at 8:30. Please leave all of your material, we'll secure it for the -- and please leave your material and we'll secure it for tonight and please don't talk to anybody about the case and handle all of the things that I mentioned about -- about social media and all of the other things.

All right. Court will stand in recess until 8:30.

**THE DEPUTY CLERK:** All rise.

(Jury out and recess began at 4:50 p.m.)

(Whereupon this concludes the proceedings.)

<u>**CERTIFICATE**</u>

I, Sammantha A. Morgan, RPR, CCR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.


*/s/Sammantha A. Morgan, RPR, CCR*
Sammantha A. Morgan, RPR, CCR
Official Court Reporter


OFFICIAL TRANSCRIPT